LEXSEE 2006 U.S. DIST. LEXIS 13825

**David E. ROBERTS, Administrator for the Estate of Gregory J. Roberts, Plaintiff,
v. NATIONAL RAILROAD PASSENGER CORPORATION,
Defendant/Third-Party Plaintiff v. O&G INDUSTRIES, INC., Third-Party
Defendant.**

**Case No. 3:04cv1318 (PCD), Case No. 3:04cv1622 (PCD), Case No. 3:04cv2195
(PCD)**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF CONNECTICUT**

*2006 U.S. Dist. LEXIS 13825*

**March 9, 2006, Decided**

**SUBSEQUENT HISTORY:** Motion for new trial denied by *Roberts v. AMTRAK, 2006 U.S. Dist. LEXIS 38565 (D. Conn., May 31, 2006)*

**COUNSEL:** **[*1]** For David E. Roberts as Admin for Est of Gregory J. Roberts, Plaintiff (3:04-cv-01318-PCD): Charles C. Goetsch, Cahill, Goetsch & Maurer, P.C., New Haven, CT; Scott E. Perry, George J. Cahill, Jr., Cahill & Goetsch, New Haven, CT.

For Hartford Fire Ins Co, as subrogee of O&G Industries, Inc & O&G Industries, Inc, Plaintiff (3:04-cv-01318-PCD): William J. Kelleher, III., Robinson & Cole, Stamford, CT.

For Peter Quintiliani, Consol Plaintiff (3:04-cv-01318-PCD): Charles C. Goetsch, Cahill, Goetsch & Maurer, P.C., New Haven, CT; George J. Cahill, Jr., Cahill & Goetsch, New Haven, CT.

For Laurel Quintiliani, Consol Plaintiff (3:04-cv-01318-PCD): Charles C. Goetsch, Cahill, Goetsch & Maurer, P.C., New Haven, CT.

For Hartford Fire Ins Co as subrogee of O&G Indus Inc, Consol Plaintiff (3:04-cv-01318-PCD): John Higgins Kane, William J. Kelleher, III., Robinson & Cole, Stamford, CT.

For O&G Indus Inc, Consol Plaintiff (3:04-cv-01318-PCD): Jeffrey A. Blueweiss, Bai, Pollock, Blueweiss & Mulcahey, Shelton, CT.

For National RR Passenger Corp, Defendant (3:04-cv-01318-PCD): Cathleen Ann Giannetta, James M. Woolsey, III., Landman Corsi Ballaine & Ford, New York, NY. **[*2]**

For National RR Passenger Corp, ThirdParty Plaintiff (3:04-cv-01318-PCD): James M. Woolsey, III., Landman Corsi Ballaine & Ford, New York, NY.

For O&G Indus Inc, ThirdParty Defendant (3:04-cv-01318-PCD): Courtney C. Stabnick, Ellen Mary Dougherty Aspell, Heather K. Porto, Pomeranz, Drayton & Stabnick, Glastonbury, CT; Jeffrey A. Blueweiss, Raymond J. Plouffe, Jr., Lewis S. Lerman, Bai, Pollock, Blueweiss & Mulcahey, Shelton, CT.

For National RR Passenger Corp, Counter Claimant (3:04-cv-01318-PCD): James M. Woolsey, III., Landman Corsi Ballaine & Ford, New York, NY.

For Hartford Fire Insurance Co. as subrogee of O & G Industries, Inc., Plaintiff (3:04-cv-01622-PCD): John Higgins Kane, William J. Kelleher, III., Robinson & Cole, Stamford, CT.

For O&G Industries, Inc., Plaintiff (3:04-cv-01622-PCD): Jeffrey A. Blueweiss, Bai, Pollock, Blueweiss & Mulcahey, Shelton, CT; John Higgins Kane, Robinson & Cole, Stamford, CT.

Hartford Fire Insurance Company and O&G Industries,

Inc., Plaintiff (3:04-cv-01622-PCD), Pro se,

For National Railroad Passenger Corp, Defendant (3:04-cv-01622-PCD): Cathleen Ann Giannetta, James M. Woolsey, III., Landman Corsi Ballaine [*3] & Ford, New York, NY.

For Peter Quintiliani, Laurel Quintiliani, Plaintiffs (3:04-cv-02195-PCD): Charles C. Goetsch, Cahill, Goetsch & Maurer, P.C., New Haven, CT.

For National Railroad Passenger Corp, Defendant (3:04-cv-02195-PCD): James M. Woolsey, III., Landman Corsi Ballaine & Ford, New York, NY.

For O&G Indus Inc, ThirdParty Defendant (3:04-cv-02195-PCD): Jeffrey A. Blueweiss, Bai, Pollock, Blueweiss & Mulcahey, Shelton, CT.

**JUDGES:** Peter C. Dorsey, United States District Judge.

**OPINION BY:** Peter C. Dorsey

**OPINION:**

### RULING ON MOTIONS FOR SUMMARY JUDGMENT

Defendant/Third Party Plaintiff National Railroad Passenger Corporation ("Amtrak") moves [Doc. Nos. 89, 99] pursuant to *Rule 56(c) of the Federal Rules of Civil Procedure* for an order (1) granting it summary judgment on its claim for contractual indemnification in the first cause of action of its third-party complaint against Third-Party Defendant O&G Industries ("O&G") in Case Nos. 04cv1318 and 04cv2195; (2) directing O&G to defend Amtrak in the actions; and (3) directing O&G to pay the amount of past costs, expenses, and reasonable attorneys' fees due to Amtrak in connecting [*4] with these actions. O&G, in addition to opposing Amtrak's motion, moves [Doc. No. 149] separately for the entry of summary judgment in its favor in each of the three consolidated actions, Case Nos. 04cv1318, 04cv1622, and 04cv2195.

Amtrak also moves for summary judgment and seeks an order dismissing Plaintiffs' claims for punitive damages in Case Nos. 04cv1318, 04cv1622, and 04cv2195. Plaintiffs, Peter Quintiliani and David E. Roberts, administrator for the estate of Gregory J. Roberts, have filed a memorandum opposing Amtrak's

motion.

For the reasons that follow, Amtrak's motion is **granted in part and denied in part,** and O&G's motion is **denied.**

### I. Background

On June 16, 2004, Gregory Roberts and Peter Quintiliani were employed by O&G and were working as carpenters installing false decking on Amtrak's right of way in East Haven, Connecticut. Plaintiffs were contained in a piece of industrial equipment that extended over two Amtrak railroad tracks and were struck by an Amtrak diesel test train ("the test train"). Gregory Roberts died as a result of his injuries, and Peter Quintiliani suffered severe injuries but survived. For the sake of clarity when addressing [*5] the claims raised in the motions for summary judgment, the Court will outline more specific pre- and post-event facts.

On June 15-16, 2004, the test train was utilized to test Amtrak's Advanced Civil Speed Enforcement System ("ACSES") between New Haven and Old Saybrook. At 3:15 a.m., the Test Train departed from Old Saybrook and traveled westbound towards New Haven.

On June 15, 2004, the day preceding the accident, an Amtrak crew dispatcher called Amtrak Conductor Annette Morman to work as a flagperson for work to be performed by O&G personnel in the vicinity of the Bridge on the evening of June 15 to June 16, 2004. Morman had worked at Amtrak since May 22, 1997, first as an Assistant Conductor, and then as a Conductor since January 1, 1998, and was qualified to provide track protection for contractors.

On June 15, 2004, Morman reported for duty at approximately 10:00 p.m. and spoke with Fred Scarfi, a fully qualified Amtrak ET lineman. Morman testified that Scarfi told her that he was "taking both tracks out," which she believed "meant taking the tracks out of service, which means there would have been no train through [the] work zone." Morman also testified that she believed [*6] that tracks 1 and 2 were out of service because of her understanding of NORAC Rule 132 and her observation of ET Lineman Scarfi and Gholson placing grounds on the catenary system. Scarfi told Morman that he and another ET Lineman, Lee Gholson, would de-energize the overhead catenary system for track number 1 and that, following the scheduled passage of

Amtrak's passenger train 67, he and Gholson would also de-energize the catenary for track number 2.

Track number 1 was de-energized at 10:09 p.m. and Scarfi and Gholson were issued a clearance. Scarfi and Gholson then placed non-fouling n1 grounding apparatus on the catenary for track number 1. At approximately 11:30 p.m. on June 15, 2004, O&G's work crew, which included Plaintiff Roberts, reported to work in the vicinity of the bridge. Some of the work the O&G crew intended to try to perform involved moving false decking within bays on the underside of the bridge. At that time, Scarfi held a job briefing for all of O&G's personnel concerning the de-energization of the overhead catenary system ("OCS") for track number 1. Morman did not participate in this briefing, n2 but held a separate track safety briefing for O&G employees. Scarfi [*7] and Gholson did not participate in Morman's briefing.

n1 The Amtrak Roadway Worker Protection Manual ("RWP") generally defines "fouling a track" as "the placement of an individual or an item if equipment in such proximity to a track that the individual or equipment could be struck by a moving train or on track equipment, in any event, the placement of an individual or equipment within four feet of the field side of the near running rail."

n2 Rule 316 of Amtrak's RWP provides that "prior to performing any task, which requires fouling a track or has the potential to foul a track, all roadway workers must participate in an RWP job briefing."

All of the O&G employees present at the bridge on June 15 and June 16 had attended Amtrak's contractor safety training course prior to the Accident. The Contractor Safety Course Handout identified the flagman as the authorized Amtrak employee who was qualified to protect contractor employees against the movement of trains and to obtain the use of the tracks. Following Morman's [*8] on-track safety briefing, O&G personnel went to work overhead on the bridge, and the work that they initially completed did not involve any fouling of the Amtrak tracks below them. At approximately 12:12 a.m., on June 16, 2004, Amtrak passenger train 67 passed

under the Bridge on track number 2. Shortly thereafter, at 12:26 a.m., on June 16, the Amtrak Boston Power Director de-energized the overhead catenary system above track number 2 and issued a clearance to ET Lineman Scarfi.

Scarfi and Gholson then placed non-fouling grounding apparatus on the catenary for that track and held a second ET job briefing with O&G employees at approximately 12:45 a.m., and advised them that the catenary for track numbers 1 and 2 were de-energized and grounded. As with the earlier ET briefing, Morman did not participate in this second ET briefing held by Scarfi and O&G personnel. At approximately 12:39 a.m., Morman placed a phone call to Assistant Chief Dispatcher Robert McCall in Boston, asking if he knew of any extra trains that night. McCall advised Morman that there was a rail train near Old Saybrook and a work train that may have been cancelled and further advised that, as far as he knew, there [*9] were no extra ACELA passenger trains or extra moves that night. Morman did not request foul time during her conversation with McCall. Dispatcher Steven Pratt was also working at the CETC Center, functioning as Amtrak's Shoreline dispatcher between the hours of midnight and 4:00 a.m. on June 16, 2004. Pratt was authorized to issue foul time for track numbers 1 and 2 near the Bridge. Morman, however, did not contact Pratt prior to the accident.

McCall first learned of the presence of the Amtrak Test Train on track in the Old Saybrook vicinity after his conversation with Morman. At that time, the train was approximately thirty miles from the bridge. McCall allegedly did not contact Morman to inform her of the test train allegedly because she had not requested foul time.

At approximately 3:15 a.m., Plaintiffs Roberts and Quintiliani boarded an O&G manlift and positioned it so that the boom of the lift extended through the columns of the Bridge, extended the boom towards track number 2 and began to reposition false decking in the bays of the bridge. Morman testified that she first became aware that the test train was traveling in the direction of the Bridge when she heard a hot box detection [*10] transmission over the portable radio. Morman was standing about 100-150 feet East of the Bridge when she heard this transmission. Morman attempted to warn the O&G workers to clear the track by running towards the track and yelling "train." Scarfi was just exiting his vehicle

when he saw Morman running towards the track, and he testified that he yelled "emergency" into the radio in his truck. Scarfi then ran after Morman towards the tracks, and the test train reached the Bridge as he arrived at the tracks. Scarfi estimated that forty-five seconds elapsed from the time Morman exited her truck and began to run toward the Bridge and the time the Test Train was involved in the collision with O&G's equipment. As a result of the collision, Gregory Roberts died and Plaintiff Quintiliani suffered non-lethal injuries.

After the accident, Amtrak conducted an investigation into the events resulting in the collision. The train driver's post-accident toxicological results were negative. Amtrak's investigation revealed, however, that Morman had failed to fully comply with foul time procedures concerning O&G's false decking work within the manlifts on June 16, 2004.

## II. Standard of Review [*11]

A party moving for summary judgment must establish that there are no genuine issues of material fact in dispute and that it is entitled to judgment as a matter of law. *Fed. R. Civ. P. 56(c)*; *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).* "A party opposing a properly brought motion for summary judgment bears the burden of going beyond the pleadings, and 'designating specific facts showing that there is a genuine issue for trial.'" *Amnesty Am. v. Town of W. Hartford, 288 F.3d 467, 470 (2d Cir. 2002)* (quoting *Celotex Corp. v. Catrett, 477 U.S. 317, 324, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)).* In determining whether a genuine issue has been raised, all ambiguities are resolved and all reasonable inferences are drawn against the moving party. *United States v. Diebold, Inc., 369 U.S. 654, 655, 82 S. Ct. 993, 8 L. Ed. 2d 176 (1962)*; *Quinn v. Syracuse Model Neighborhood Corp., 613 F.2d 438, 445 (2d Cir. 1980).* Summary judgment is proper when reasonable minds could not differ as to the import of evidence. *Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir. 1991).* **[*12]** "Conclusory allegations will not suffice to create a genuine issue." *Delaware & H.R. Co. v. Conrail, 902 F.2d 174, 178 (2d Cir. 1990).* Determinations as to the weight to accord evidence or credibility assessments of witnesses are improper on a motion for summary judgment as such are within the sole province of the jury. *Hayes v. N.Y. City Dep't of Corr., 84 F.3d 614, 619 (2d Cir. 1996).*

## III. Discussion

Amtrak moves for the entry of summary judgment with respect to Plaintiffs' claim for punitive damages. Amtrak also seeks a grant of partial summary judgment on the first cause of action in each of its third-party complaints against O&G in Case Nos. 04cv1318 and 04cv2195. More specifically, Amtrak requests that the Court enter judgment ordering O&G, pursuant to the parties' indemnification agreement, to defend and indemnify it as to Plaintiffs' claims. O&G argues that summary judgment should enter in its favor because the contract claims that Amtrak alleges are barred by *section 52-572k of the Connecticut General Statutes* and the articulated public policy of the State. O&G also argues that the common law indemnification **[*13]** claims cannot be sustained because under the undisputed facts Amtrak cannot prove that O&G has exclusive control over the accident site and surrounding circumstances.

## A. Punitive Damages

Amtrak concedes that Morman negligently performed her duties, but does not concede that any other employee conduct was inappropriate. Plaintiffs, however, argues that Amtrak's failure to reprimand other employees or admit inappropriate conduct beyond that of Morman results in Amtrak's adoption or ratification of their action for purposes of liability for their alleged misconduct. More specifically, Plaintiffs have highlighted the disputed issues of material fact regarding Amtrak's alleged reckless (1) performance of joint job briefings, (2) dispatch work, (3) training of flagman Morman, (4) use or lack of use of safety equipment, (5) failure to communicate with Morman regarding the need for foul time, and (6) recklessness in not issuing bulletin orders. These allegations are explained more fully below.

## I. Joint Job Briefings

Plaintiffs argue that Amtrak revised its job briefing form in 1999 to include specific details regarding the fouling of tracks because it knew or should **[*14]** have known that a revised form was a critical safety issue. They contend, however, that Amtrak did not train and instruct its flagmen and linemen so as to enforce the use of the revised form, and recklessly failed to replace the old job briefing form with the revised form. Furthermore, Plaintiffs point to the testimony of both Scarfi and Morman who testified that Amtrak had never instructed

them to conduct joint job briefings. Plaintiffs argue that the death of Roberts and injuries of Plaintiff Quintiliani would have been avoided if they had conducted a joint job briefing because neither one of them had obtained foul time.

### ii. Dispatch Work

Plaintiffs argue that the dispatcher transfer sheet for the evening of the accident provided that an extra train was running on the evening of June 15 and the morning of June 16, and that Amtrak's Assistant Chief Dispatcher ("ACD") failed to review the sheets before starting his shift as an ACD. Plaintiffs assert that Amtrak's ACD consciously chose not to call back Morman after learning that an additional train was operating in her vicinity and that if Amtrak's ACD had provided Morman with the correct information, either at the time **[*15]** of her initial phone call or through a follow-up conversation, the accident would not have occurred. Because Amtrak has not taken exception to the ACD's action or inaction, Plaintiffs allege that Amtrak has ratified and adopted their conduct.

### iii. Morman's Training

Plaintiffs also argue that Amtrak failed to train Morman that electrical grounds could be applied to the track's overhead power system that did not foul the track. Plaintiffs argue that if she was aware of that possibility, she would have requested foul time.

### iv. Reckless Use of Safety Equipment

Plaintiffs argue that Amtrak did not provide Supplemental Shunting Devices to its flagmen conductors, including Morman, or to its linemen, notwithstanding the fact that Amtrak's Roadway Protection Manual ("RWP Manual") requires that a SSD be used whenever equipment will be used to foul a track and Amtrak's Job Briefing form provides that SSDs "can and should be used any time equipment fouls the tracks." In support of this proposition, Plaintiffs point to the deposition testimony of Morman and Scarfi. Morman stated that "mostly no one" had been issued the shunting devices, and Scarfi testified that "in our **[*16]** department we don't use them." Plaintiffs allege that the accident would not have occurred if SSDs were utilized because the train would have automatically stopped before it reached the bridge on which the accident

occurred.

### v. Amtrak Manager's Failure to Communicate with Morman Regarding the Need for Foul Time

Plaintiffs also argue that Amtrak's project manager knew that O&G's workers and equipment were going to foul the tracks at the Bridge site on the date of the accident. In support of this proposition, Plaintiffs proffered a document entitled "demo schedule" on which O&G had indicated that the tracks would need to be taken out of service to perform their work. Plaintiffs allege that Amtrak's Project Engineer was aware that O&G's employees were performing work requiring foul time, but consciously chose not to discuss the issue of foul time with Morman when she called to ask whether any extra trains were operating in her vicinity. Plaintiffs highlight the testimony of Project Engineer Bencivengo, who testified that there was no "doubt in [his] mind [that the] . . . false decking work with the manlifts was going to foul the tracks that night." Plaintiffs also point **[*17]** to the testimony of ACD Fournier, who explained that he had raised the issue of foul time with a person without a specific request for it. Plaintiffs argue that Amtrak's failure to take exception to the Engineer's conduct results in its ratification or adoption of his action.

### vi. Amtrak's Failure to Issue Bulletin Orders

Plaintiffs also allege that Amtrak recklessly failed to issue a thorough bulletin order, which is issued weekly to all Amtrak train crews, flagmen, linemen, and dispatchers, and includes, among other things, notification of potential safety hazards in various sections of the track. Plaintiffs allege that although Amtrak issued a bulletin order the week of the accident, it failed to inform all employees that construction work was being done at the location. Plaintiffs argue that if that information was contained in a bulletin order, the train would have to had stopped before passing the site of the Accident. In support of this proposition, they point to the testimony of Morman, who indicated that a bulletin order indicating that a test train was in the vicinity of the accident "would have made [her] aware that there was an unscheduled train out there that **[*18]** [she] would have to be aware of." (Morman dep. at 43.)

In its motion for summary judgment, Amtrak focuses solely on Morman's admittedly improper actions, and argues not only that her actions did not constitute wilful

or wanton misconduct, but that there is no probative evidence to support a reasonable finding that high-ranking managements employees at Amtrak engaged in wilful or wanton misconduct or approved of such conduct by Morman or any other lower-level Amtrak employees. See, e.g., *Maisenbacker v. Society Concordeia, 71 Conn. 369, 42 A. 67 (1899)* (explaining that "no recovery of exemplary damages can be had against a principal for the tort of an agent or servant, unless the defendant expressly authorized the act as it was performed, or approved it, or was grossly negligent in hiring the agent or servant.") (internal quotation marks omitted). Plaintiffs, however, as highlighted above, have proffered testimony in support of the proposition that Amtrak failed to properly train employees regarding the appropriate procedure for conducting joint job briefings, failed to issue a thorough bulletin order, failed to require the use of SSDs, and failed to train Morman **[*19]** that not all electrical grounds fouled a track. Even assuming that Amtrak never expressly authorized Morman's conduct as she performed it or approved of it, Plaintiffs have proffered evidence regarding Amtrak's, and not solely Morman's, allegedly reckless conduct. Plaintiffs have therefore established the presence of genuine issues of material fact as to whether Amtrak acted recklessly and whether its conduct "involved a risk to others which is substantially greater than that which is necessary to make . . . [its] conduct negligent." See *Matthiessen v. Vanech, 266 Conn. 822, 831, 836 A.2d 394 (2003)*. Because a jury could properly award punitive damages if it determined that Amtrak acted recklessly, see id., it would not be appropriate to summarily exclude the issue from the jury's consideration.

Amtrak also argues that Plaintiffs may not rely on opinion testimony from experts offered as an ultimate opinion of fact. Although the Court agrees with the legal foundation of Amtrak's argument, Plaintiffs in this case rely primarily on the testimony of Amtrak workers and not, as Amtrak argues, expert testimony.

Finally, Amtrak argues that Plaintiffs are barred from **[*20]** introducing evidence in support of any claim involving allegations that Amtrak failed to have in place safety standards that are, in fact, the subject of FRSA regulations. More specifically Amtrak argues that Federal preemption doctrine would apply to any claim that the test train was operating at an excessive speed, as the train was indisputably traveling within the maximum speed limit at the time the Bridge first came into view. Amtrak

further argues that the Federal preemption doctrine would similarly apply to any claim that Amtrak failed to have had in place safety standards that are, in fact, the subject of FRSA regulations. Amtrak, however, has not pointed to any particular FSRA regulation that could reasonably be considered to preempt Plaintiffs' claims addressed in this section. Amtrak's brief is limited to the two specific examples discussed above, and Plaintiffs do not raise either of those issues in their memorandum in opposition.

Amtrak's motion for summary judgment with respect to Plaintiff's punitive damages [Doc. No. 99] claims is denied.

**B. Indemnification**

O&G has moved, and Amtrak has opposed its motion, for summary judgment on Amtrak's claim for contractual **[*21]** indemnification are barred by the provisions of *section 52-572k of the Connecticut General Statutes* and the articulated public policy of the State of Connecticut. Amtrak has also filed a motion for summary judgment, which O&G opposed, requesting that the Court grant it summary judgment in its favor with respect to its claims for contractual indemnification against O&G in Case Nos. 04cv1318 and 04cv2195.

The Court has already set forth the facts leading up to the accident. For purposes of resolving the present issue, however, additional background information is necessary. O&G was performing construction work on Amtrak's property pursuant to a Temporary Permit to Enter Property (hereinafter "the contract"). The permit authorized O&G to enter property owned and/or controlled by Amtrak "for purposes of reconstructing O.H. Bridge 78.02, I-95 (CDOT Project 42-122) in East Haven, State of Connecticut." The contract contained an indemnification provision providing in relevant part:

INDEMNIFICATION

The permittee shall defend, indemnify, and hold harmless Railroad, its officers, directors, employees, agents, servants, successors, assignees and subsidiaries, **[*22]** irrespective of their negligence or fault, from and against any and all losses and liabilities, penalties, fines, forfeitures, demands, claims causes of action, suits, costs, and expenses incidental thereto

(including costs of defense and attorney's fees), which any or all of them may hereinafter incur, be responsible for, or pay as a result of injury, death, disease or occupational disease to any person and for damage . . . to or loss of any property, including property of Railroad, arising out of or in any degree directly or indirectly caused by or resulting from activities of or work performed by Permittee, its officers, employees, agents, servants, contractors, subcontractors, or any other person acting for or by permission of Permittee. The foregoing obligation shall not extend to situations where the negligence or fault of Amtrak, its officers, directors, employees, agents, servants, successors, assigns, or subsidiaries is the sole causal negligence or fault, except that it shall so extend to injury, death, disease, or occupational disease to employees of Permittee, its agents, servants, contractors, subcontractors, or any other person acting for or by permission of the Permittee

[*23]

O&G argues that the indemnification agreement is in direct violation of *section 52-572k of the Connecticut General Statutes*, which provides in relevant part:

(a) Any covenant, promise, agreement or understanding entered into in connection with or collateral to a contract or agreement relative to the construction, alteration, repair or maintenance of any building, structure or appurtenances thereto including moving, demolition and excavating connected therewith, that purports to indemnify or hold harmless the promisee against liability for damage arising out of bodily injury to persons or damage to property caused by or resulting from the negligence of such promisee, such promisee's agents or employees, is against public policy and void, provided this section shall not affect the validity of any insurance contract, workers' compensation agreement or other agreement issued by a licensed insurer.

O&G argues further that this statute is not preempted by *49 U.S.C. § 28103*, which expressly permits Amtrak to enter into indemnification agreements. More specifically, *49 U.S.C. § 28103 (2005)* provides: [*24]

Limitations on rail passenger transportation liability

(a) Limitations.

(1) Notwithstanding any other statutory or common law or public policy, or the nature of the conduct giving rise to damages or liability, in a claim for personal injury to a passenger, death of a passenger, or damage to property of a passenger arising from or in connection with the provision of rail passenger transportation, or from or in connection with any rail passenger transportation operations over or rail passenger transportation use of right-of-way or facilities owned, leased, or maintained by any high-speed railroad authority or operator, any commuter authority or operator, any rail carrier, or any State, punitive damages, to the extent permitted by applicable State law, may be awarded in connection with any such claim only if the plaintiff establishes by clear and convincing evidence that the harm that is the subject of the action was the result of conduct carried out by the defendant with a conscious, flagrant indifference to the rights or safety of others. If, in any case wherein death was caused, the law of the place where the act or omission complained of occurred provides, or has [*25] been construed to provide, for damages only punitive in nature, this paragraph shall not apply.

(2) The aggregate allowable awards to all rail passengers, against all defendants, for all claims, including claims for punitive damages, arising from a single accident or incident, shall not exceed $ 200,000,000.

(b) Contractual obligations. A provider of rail passenger transportation may enter

into contracts that allocate financial responsibility for claims.

(c) Mandatory coverage. Amtrak shall maintain a total minimum liability coverage for claims through insurance and self-insurance of at least $ 200,000,000 per accident or incident.

(d) Effect on other laws. This section shall not affect the damages that may be recovered under the Act of April 27, 1908 (*45 U.S.C. 51 et seq.*; popularly known as the "Federal Employers' Liability Act") or under any workers compensation Act.

(e) Definition. For purposes of this section--

(1) the term "claim" means a claim made--

(A) against Amtrak, any high-speed railroad authority or operator, any commuter authority or operator, any rail carrier, or any State; or

(B) against an officer, employee, affiliate **[*26]** engaged in railroad operations, or agent, of Amtrak, any high-speed railroad authority or operator, any commuter authority or operator, any rail carrier, or any State;

(2) the term "punitive damages" means damages awarded against any person or entity to punish or deter such person or entity, or others, from engaging in similar behavior in the future; and

(3) the term "rail carrier" includes a person providing excursion, scenic, or museum train service, and an owner or operator of a privately owned rail passenger car.

O&G argues that the parties' indemnification agreement is void as violative of both *section 52-572k of the Connecticut General Statutes* and public policy. O&G contends further that 52-572k is not preempted by *section 28103* because *section 28103* is limited to claims by

passengers, which Plaintiffs in this case were not. In support of this proposition, O&G points to the title of the statute, "Limitations on rail passenger transportation liability," and the language in subsection (a), which is specifically limited to punitive damages for claims by passengers. Although O&G concedes that the statutory definition of claims is not limited to passenger **[*27]** claims, it argues that the statute can only reasonably be interpreted as applying to claims made by passengers. O&G also argues that the legislative history of the statute supports this limitation.

Amtrak counters that subsection (b), providing that "[a] provider of rail passenger transportation may enter into contracts that allocate financial responsibility for claims," is not limited to claims by passengers. Amtrak also points to the definition of "claims" set forth in subsection (e)(1)(A), which defines a "claim" as a claim made:

(A) against Amtrak, any high-speed railroad authority or operator, any commuter authority or operator, any rail carrier, or any State; or

(B) against an officer, employee, affiliate engaged in railroad operations, or agent, of Amtrak, any high-speed railroad authority or operator, any commuter authority or operator, any rail carrier, or any State

To determine whether federal law preempts a state statute, the Court looks to congressional intent. *FMC Corp. V. Holliday, 498 U.S. 52, 56, 111 S. Ct. 403, 112 L. Ed. 2d 356 (1990).* "Preemption may be either express or implied, and 'is compelled whether Congress' command is explicitly **[*28]** stated in the statute's language or implicitly contained in its structure and purpose.'" Id. (quoting *Shaw v. Delta Air Lines, Inc., 463 U.S. 85, 95, 77 L. Ed. 2d 490, 103 S. Ct. 2890 (1983)).* "Absent explicit pre-emptive language, Congress' intent to supersede state law in a given area may nonetheless be implicit if a scheme of federal regulation is "so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it," if "the Act of Congress . . . touch[es] a field in which the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject," or if the goals "sought to be obtained" and

the "obligations imposed" reveal a purpose to preclude state authority. *Wisconsin Pub. Intervenor v. Mortier, 501 U.S. 597, 605, 111 S. Ct. 2476, 115 L. Ed. 2d 532 (1991)*; (quoting *Rice v. Santa Fe Elevator Corp., 331 U.S. 218, 230, 91 L. Ed. 1447, 67 S. Ct. 1146 (1947).* If a federal statute does not occupy an entire field, state law may be preempted to the extent that it renders compliance with the federal statute a physical impossibility **[*29]** or "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." Id. (Internal quotation marks omitted).

The statute at issue does not contain an express preemption clause and is not so pervasive as to make reasonable the inference that Congress left no room for the states to supplement it. In fact, subsection (a) specifically applies to punitive damages "to the extent permitted by applicable state law." The question in this case is therefore whether *section 52-572* is preempted to the extent that it renders compliance with *section 28103* a physical impossibility or stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.

**a. The Title of the Statute**

The Court finds unpersuasive O&G's reliance on the title of the statute--"Limitations on rail passenger transportation liability"--for the proposition that the statute is limited to passenger claims and thus does not preempt *section 52-572k of the Connecticut General Statutes* in this case, as neither Roberts nor Quintiliani were Amtrak passengers in this case. It is undisputed that Amtrak is a provider **[*30]** of rail passenger transportation. The fact that the title of the statute refers to limitations on Amtrak's liability is not inconsistent subsection (a), which is subtitled "Limitations," and sets forth the standard by which punitive damages may be awarded "in a claim for personal injury to a passenger, death of a passenger, or damage to property of a passenger arising from or in connection with the provision of rail passenger transportation." Subsection (a) therefore specifically limits its applicability to claims by a passenger. Subsection (b), however, entitled "Contractual obligations," provides that "[a] provider of rail passenger transportation may enter into contracts that allocate financial responsibility for claims." The term "claims," which is defined in subsection (e)(1)(A) and (B), is not limited to claims by passengers but, rather, defines the class of persons against whom a claim may be

made for purposes of 28103.

The title of a statute and the heading of a section cannot limit the plain meaning of the text. [Citations omitted]. For interpretative purposes, they are of use only when they shed light on some ambiguous word or phrase. They are but tools available **[*31]** for the resolution of a doubt. But they cannot undo or limit that which the text makes plain.

*United States v. Roemer, 514 F.2d 1377, 1380 (2d Cir. 1975) (quoting Brotherhood of Railroad Trainmen v. Baltimore R.R., 331 U.S. 519, 528-29, 91 L. Ed. 1646, 67 S. Ct. 1387 (1947)).* The Court agrees with Amtrak that the statutory language is not ambiguous, and will not include language that the legislature chose to exclude. Because the legislature did not limit its definition of "claims" to those made by passengers, and because the use of the term passenger is used throughout the text of the statute, the Court concludes that subsection (b) is not limited to claims by passenger but, rather, applies to all "claims" as defined in subsection (e).

**b. Preemption due to State law presenting an obstacle for enforcement of federal law**

Having concluded that the text of the statute permits Amtrak to enter into indemnification agreements for all claims, not solely passenger claims, the Court must consider whether *section 52-572k of the Connecticut General Statutes* is preempted "to the extent that it renders compliance with the **[*32]** federal statute a physical impossibility or stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." Id. (Internal quotation marks omitted).

O&G argues that the text of the original bill vis-a-vis the text of the statute as enacted establishes the legislature's intent not to pre-empt *section 52-572k of the Connecticut General Statutes.* The bill, as originally proposed, provided:

Indemnification Obligations. Obligations of any party, however arising, including obligations arising under leases or contracts or pursuant to orders of an administrative agency, to indemnify

against damages or liability for personal injury, death, or damage to property described in subsection (a) incurred after the date of the enactment of the Amtrak Reform and Privatization Act of 1997, shall be enforceable, notwithstanding any other statutory or common law or public policy, or the nature of the conduct giving rise to the damages or liability.

S. 738, 105th Cong. § 161 (1997).

The statute as enacted provides:

Contractual obligation. A provider of rail passenger transportation may enter into contracts **[*33]** that allocate financial responsibility for claims.

*49 U.S.C. § 28103(b) (2005).*

O&G contends that the legislature's removal of the clause stating that the statute "shall be enforceable notwithstanding any other statutory of common law or public policy" compels the conclusion that it did not intend for the statute to preempt state law. O&G also points out, and Amtrak concedes, that the legislative history evidences the legislature's primary concern over Amtrak's ability to enter into indemnification agreements with the freight railroad companies over whose tracks Amtrak frequently operates, not with parties outside of that arrangement. That concern is not present in this case as the dispute is between Amtrak and a third-party with whom it entered into an indemnification agreement. Amtrak counters that, notwithstanding the legislature's primary concerns, the legislature chose broad language permitting Amtrak the authority to "enter into contracts that allocate financial responsibility for claims."

The Court's review of the legislative history confirms O&G's contention that the legislature was primarily concerned with Amtrak's ability to enter into indemnification **[*34]** agreements with the owners of rights-of-way. In fact, the bill initially proposes was intended to insulate Amtrak from the impact of *National Railroad Passenger Corp. V. Consolidated Rail Corp., 698 F. Supp. 951 (D.C. 1988)*, in which a federal district court voided an indemnification agreement between Amtrak and Conrail on the grounds that enforcing it would violate public policy because gross negligence on

the part of the Conrail locomotive engineer was alleged as the cause of the accident. The decision in Conrail resulted in freight railroads questioning the validity of their indemnification agreements, and the legislature was concerned that the freight railroads and Amtrak may, if an accident occurred, litigate with each other, resulting in higher settlement figures and judgments to plaintiffs, decreased goodwill between the contracting parties, and a less efficient and financially sound Amtrak. Furthermore, a House Report specifically references the facts of the Conrail case and highlights Amtrak's concern that the enforceability of future indemnification agreements was uncertain. Similarly, the Senate Report, although not specifically referencing the facts of **[*35]** the Conrail case, acknowledges "the possibility that state laws can nullify the indemnification contracts." More specifically, the Senate Report provided in relevant part:

Subsection (b) of section 161 clarifies that rail passenger service indemnification agreements entered into by Amtrak and other parties are enforceable. Amtrak and the freight railroads believe legislation is necessary to confirm the enforceability of indemnification agreements. The indemnification agreements allocate the cost of liability among the agreement parties. As long as there is the possibility that state laws can nullify the indemnification contracts, Amtrak and a freight railroad could find themselves litigating against each other or concerning their obligations to injured third parties. Amtrak believes that such litigation inevitably would not only adversely impact its business relationship with its host freight railroads, but it would also lead to significantly higher outlays in settlements and judgments to litigants.

The Senate Report initially provides that the statute "clarifies that indemnification agreements entered into by Amtrak and *other parties* are enforceable." (Emphasis added. **[*36]** ) The remainder of the Report relies upon Amtrak's testimony at hearings in which it expressed a fear of state laws nullifying indemnification agreements entered into between it and freight railroads. Although the Report explains that Amtrak and the freight railroads desired the legislation to confirm the enforceability of the agreements, and is focused on Amtrak's reason for

seeking the provision, that fact does not compel the conclusion that Congress intended to limit the statute's applicability solely to those between Amtrak and freight railroads. The Court has already concluded that the language of the statute does not restrict the parties with whom Amtrak may enter into an indemnification agreement for claims. Furthermore, the legislative history of the statute reveals that Amtrak's financial condition had "reached a crisis stage" and that "Amtrak could reach bankruptcy by the spring of 1998" if it did not receive the statutory reforms and funding requested. The Court concludes that construing the statute in this case as not preempting *section 52-572k* would violate both the plain language and spirit of the statute. Accordingly, O&G's motion for summary judgment on Amtrak's contractual **[*37]** indemnification claim is denied.

**IV. Conclusion**

For the reasons stated above, Amtrak's motions for summary judgment with respect to Plaintiff's claim for punitive damages [Doc. No. 99] is **denied.** Amtrak's motion for summary judgment with respect to the enforceability of its contractual indemnification agreement with O&G [Doc. No. 89] is **granted.** O&G's motion for summary judgment [Doc. No. 149] on the contractual indemnification agreement is **denied.** Amtrak's claim for common law indemnification is denied as moot because the Court has already concluded that the contractual indemnification provision is valid

SO ORDERED.

Dated at New Haven, Connecticut, March 9, 2006.

/s/

Peter C. Dorsey

United States District Judge

LEXSEE 2005 U.S. DIST. LEXIS 26956

**JEFFREY SILVER, Plaintiff, - against - CHRISTINE KUEHBECK, THOMAS RYAN, CARL BERNSTEIN, JOHN DOES 1 THROUGH 20, and JONATHAN ABADY, Defendants.**

**05 Civ. 35 (RPP)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*2005 U.S. Dist. LEXIS 26956*

**November 7, 2005, Decided**
**November 7, 2005, Filed**

**DISPOSITION:** **[*1]** Kuehbeck and Bernstein's motion to dismiss Silver's claims for relief granted as to the First, Second, Third, Fourth, Fifth, Sixth, Seventh, Eighth, Ninth, Tenth and Thirteenth Claims for Relief; Abady's motion to dismiss granted as to the Fourteenth Claim for Relief; and Detective Ryan's motion to dismiss granted as to the Eleventh and Twelfth Claims for Relief.

**COUNSEL:** For Plaintiff Silver: Heller Horowitz & Feit, P.C., New York, New York, Attn: Maurice W. Heller, May Orenstein.

For Defendants Kuehbeck, Bernstein, and Abady: Emery Celli Brinckerhoff & Abady LLP, New York, New York, Attn: Andrew G. Celli, Jr., O. Andrew F. Wilson.

For Defendant Ryan: Michael A. Cardozo, Corporation Counsel of the City of New York, New York, New York, Attn: Seth D. Eichenholtz, Assistant Corporation Counsel.

**JUDGES:** Robert P. Patterson, Jr., U.S.D.J.

**OPINION BY:** Robert P. Patterson, Jr.

**OPINION:**

　　**OPINION AND ORDER**

**ROBERT P. PATTERSON, JR., U.S.D.J.**

　　Jeffrey Silver ("Silver") brings this civil action against Christine Kuehbeck ("Kuehbeck"), Carl Bernstein ("Bernstein"), Detective Thomas Ryan ("Detective Ryan"), John Does 1 through 20, and Jonathan Abady ("Abady"). The Verified First Amended and **[*2]** Supplemental Complaint (the "Complaint") asserts fourteen claims against the Defendants arising out of an alleged campaign orchestrated by Bernstein to stalk, harass, defame, and interfere with Silver's business relationships and private communications. n1 Kuehbeck, Bernstein, Abady, and Detective Ryan have moved pursuant to *Rule 12(b)(6) of the Federal Rules of Civil Procedure* to dismiss the claims against them for failure to state a cause of action. For the reasons set forth below, the motions to dismiss are granted as to each and every claim asserted in the Complaint.

　　　　n1 Except for the Twelfth claim for relief for violation of *42 U.S.C. § 1983*, the Complaint is founded on diversity, alleging that Silver is a citizen of Nevada and that the Defendants are citizens of New York. *28 U.S.C. § 1332(a)(1)*. The Court will apply New York law. See *Erie R.R. v. Tompkins, 304 U.S. 65, 78, 58 S. Ct. 817, 82 L. Ed. 1188 (1938)*.

**BACKGROUND [*3]**

　　The Complaint alleges the following facts, which the

Court must accept as true for the purpose of deciding these motions. *Conley v. Gibson, 355 U.S. 41, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957).*

Silver and Kuehbeck began to date in 1993, and thereafter they were close friends and some-time lovers. (Complaint "Compl." PP21-22.) Silver and Kuehbeck were also engaged in a business relationship in which Silver provided investment advice to Kuehbeck and served as a paid consultant to the law firm that acted as plaintiffs' counsel in a securities fraud class action lawsuit conceived of and organized by Silver in which Kuehbeck was the lead plaintiff. (Id. P22.)

Silver's relationship with Kuehbeck is alleged to have continued even after she became romantically involved with Bernstein in the spring of 2002. (Id. P13, 25.) Bernstein was aware of Silver's relationship with Kuehbeck and, on or about June 19, 2002, Silver received a letter from Ira Garr, a lawyer claiming to represent Bernstein and Kuehbeck, stating that Silver was stalking and harassing them. (Id. P26.) When Silver allegedly confronted Kuehbeck about the letter, she denied knowing anything about it and told him that Mr. Garr did [*4] not represent her. (Id.) Silver replied twice to the letter but never received a response from Mr. Garr. (Id.)

Silver and Kuehbeck are alleged to have continued their romantic relationship during the fall of 2002 and into 2003. (Id. P27.) On June 12, 2003, Silver wrote a letter to Bernstein at Kuehbeck's request, which referred to the securities class action lawsuit and requested that Bernstein stay out of Silver's and Kuehbeck's legal affairs. (Id. P28.)

Kuehbeck told Plaintiff about a July 4, 2003 holiday weekend in Iceland but neglected to tell Plaintiff that she and Bernstein were purportedly married during that trip. (Id. P30.) Upon learning of the marriage, Silver alleges that he suggested to Kuehbeck that his relationship with her should end, but they continued to meet throughout late 2003 and early 2004. (Id.) In the months following the wedding, Bernstein heightened his surveillance of Silver and Kuehbeck. (Id. P31.) On January 15, 2004, at Kuehbeck's urging, Silver wrote another letter to Bernstein demanding that he stop interfering with Silver's and Kuehbeck's business affairs. (Id.) Silver and Kuehbeck continued to see each other regularly [*5] during this time. (Id. P32.)

In late June 2004, a letter was hand-delivered to

Silver at the apartment where he stayed while he was in New York City. (Id. P33.) Silver determined that the letter was from Bernstein and returned it unopened. (Id.) Silver later discovered that the letter contained a "Notice of Revocation of Power of Attorney," purportedly signed by Kuehbeck. (Id. P35.) Bernstein is alleged to have drafted the document and "compelled Kuehbeck to sign through a combination of threats and the refusal to comply with obligations of their pre-nuptial agreement." (Id. P35.) In addition, Silver learned from Wolf Popper LLP, the law firm handling the class action securities lawsuit brought in Kuehbeck's name, that Bernstein had begun urging the firm to ignore and cease dealing with Silver. (Id. P34.) As a result of the revocation of Silver's power of attorney, Silver was unable to continue serving as a consultant to Wolf Popper LLP. (Id. P35.)

On June 20, 2004, Silver wrote to Bernstein demanding that he "stay away from me," and warning Bernstein of possible civil and criminal consequences if he persisted in his activities. (Id. P37.)

On the [*6] afternoon of July 17, 2004, Silver went for a swim at a lake after Kuehbeck had advised him that she and Bernstein would be visiting the lake later that day. (Id. P38.) The Complaint summarizes the encounter that took place after Silver finished his swim as follows:

> As [Silver] was walking back from the Lake, at approximately 1:15 p.m., he saw Kuehbeck and Bernstein walking toward him. Kuehbeck immediately ducked into the ladies room. Bernstein then approached [Silver], and said, in a threatening voice, "you and I are taking a walk." [Silver] told Bernstein that he had nothing to say to him, and kept walking. As [Silver] walked away, Bernstein turned to [Silver] and said "I'm going to have you taken care of." [Silver] felt threatened.

(Id.) Silver allegedly feared for his safety and filed a complaint at the New York Police Department's 19th Precinct with a Detective Morales. (Id. P39.)

On July 29, 2004, less than two weeks after the incident at the lake, it is alleged that Kuehbeck and Silver met at the same lake "to go swimming, which led, inevitably, to sex." (Id. P40.) Three days later, on August 2, 2004, Kuehbeck informed Silver that [*7] Bernstein

had found out about their meeting at the lake, and Silver and Kuehbeck agreed to meet the next day to discuss the matter. (Id. P41.) However, on August 3, 2004, Kuehbeck failed to meet Silver at the agreed-upon time and place. (Id. P42.) They arranged to meet two other times that day, but Kuehbeck failed to appear both times. (Id. P42.)

On the following day, August 4, 2004, a police report was filed by Bernstein and Kuehbeck with the 19th Precinct in Manhattan accusing Silver of "aggravated harassment" and "stalking" against Kuehbeck. (Id. P43.) On the following Monday, August 9, 2004, Detective Ryan and another detective visited Silver at an office used part-time by Silver and told the receptionist that they wanted to speak to Silver to "'follow up on his earlier complaint.'" (Id. P44.) Plaintiff eventually walked downstairs and asked the two detectives "what was up," and they asked Silver to accompany them to the police station. (Id.) At the police station, Detective Ryan told Silver that he was going to arrest him for "stalking and harassment." (Id.) However, after Silver explained that five days earlier he had met and had consensual sex with **[*8]** Kuehbeck and after he played a message Kuehbeck left on Silver's answering machine arranging their recent swim at the lake, Detective Ryan permitted him to leave without arrest. (Id.)

On August 10, 2004, one day after Silver spoke with Detective Ryan, Silver decided to return to the 19th Precinct to offer additional evidence that Kuehbeck's complaint against him was baseless. (Id. P45.) The following scene is alleged to have occurred:

> Detective Ryan told [Silver] that he had called Kuehbeck and Bernstein, and Bernstein had claimed [Silver] was the subject of an arrest warrant in California, a slanderous fabrication. He then told [Silver] that Bernstein and Kuehbeck wished to press charges, and that he therefore had no choice but to arrest [Silver]. [Silver] asked the precise basis upon which he was being arrested, and Ryan answered that it was on the basis of "many threatening phone messages." [Silver], puzzled, asked Detective Ryan if he found such supposed messages threatening, and Ryan replied "not to my ears, but when a woman is involved we tend to bend over backwards." Upon

information and belief, there were no such "messages." Ryan then said that **[*9]** "Bernstein is all over the case, and I'm going to recommend that the ADA interview her separately." He declined to delay his decision pending an investigation of the actual facts. [Silver] was placed in a detention area in the police station behind a locked door, until his release later that day.

(Id.; But cf. Compl. P121 n2.)

> n2 The Complaint also states inconsistently that Plaintiff was held overnight at the 19th Precinct. P129.

On August 19, 2004, Kuehbeck executed an affidavit at the Manhattan District Attorney's Office in which she swore, inter alia, that Silver had stalked her during the ten years after they had an only brief relationship in 1994, and that Silver had threatened her and Bernstein. (Id. P46.) Silver alleges that "each and every element of her sworn statement is a fabrication." (Id.) On August 20, 2004, Judge Anthony Ferrara issued an order of protection ordering Silver to stay away from Kuehbeck and Bernstein, which was served on Plaintiff on August 23, 2004. ( **[*10]** Id. P47.)

During the next three months, Silver organized a defense, hired counsel, and investigated his situation, which resulted in a presentation of the actual facts to the District Attorney's Office that suggested that Kuehbeck had not been truthful. (Id. P48.) In view of the evidence presented by Silver, the District Attorney's Office confronted Kuehbeck. (Id. P49.) Silver alleges that he "was eventually directly told that this meeting was 'not pleasant' for Kuehbeck, and . . . that they had finally realized they had 'lying woman on their hands.'" (Id.) The charges against Silver were then dismissed and the order of protection was vacated. (Id.)

On January 6, 2005, two days after Silver initiated this action by filing the original complaint in this Court, the New York Post published an article about Silver's filing of the complaint that included the following quotation from Defendant Jonathan Abady, an attorney retained to represent Kuehbeck and Bernstein in the action:

This complaint is an outrageous falsehood and was filed in a clear effort to extract money from an internationally respected author and journalist and to slander a wonderful woman. **[*11]** Carl Bernstein and his wife have filed formal complaints against Mr. Silver with the NYPD and the Manhattan DA's office for making death threats against them, continual harassment and stalking, and other abusive conduct. We are anxious for the truth to be known about Mr. Silver's motivations and actions--including his record of bizarre and violent behavior against others as well.

(Id. P138.) On February 9, 2005, Silver filed the First-Amended Complaint, which added Abady as a defendant and added a claim against him for libel and slander based on Abady's comments quoted in the newspaper article.

In sum, the Complaint asserts a total of fourteen claims for relief: (1) malicious prosecution by Kuehbeck and Bernstein; (2) abuse of process by Kuehbeck and Bernstein; (3) intentional infliction of emotional distress by Kuehbeck and Bernstein; (4) prima facie tort by Kuehbeck and Bernstein; (5) tortious interference with business relations by Kuehbeck and Bernstein; (6) quantum meruit; (7) assault by Bernstein; (8) negligence by Bernstein; (9) slander by Bernstein; (10) slander by Kuehbeck; (11) malicious prosecution and false arrest and imprisonment by Detective Ryan **[*12]** and John Does 1-20; (12) violation of *42 U.S.C. § 1983* by Detective Ryan and John Does 1-20; (13) conspiracy to violate *42 U.S.C. § 1983* by Kuehbeck and Bernstein; and (14) libel and slander by Abady.

**DISCUSSION**

**I. Standard for Motion to Dismiss**

A court reviewing a motion to dismiss pursuant to *Rule 12(b)(6) of the Federal Rules of Civil Procedure* must accept as true all factual allegations in the complaint and draw all reasonable inferences in favor of the plaintiff. *Schnall v. Marine Midland Bank, 225 F.3d 263, 266 (2d Cir. 2000).* "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is

entitled to offer evidence to support the claims." *Villager Pond, Inc. v. Town of Darien, 56 F.3d 375, 378 (2d Cir. 1995)* (internal quotation marks omitted). A complaint should not be dismissed under *Rule 12(b)(6)* "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Shakur v. Selsky, 391 F.3d 106, 112 (2d Cir. 2004)* (quoting **[*13]** *Conley v. Gibson, 355 U.S. 41, 45-46, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957)).* A court must limit its review to the complaint, documents attached or incorporated by reference thereto, and "documents that the plaintiffs either possessed or knew about and upon which they relied in bringing the suit." *Rothman v. Gregor, 220 F.3d 81, 88 (2d Cir. 2000).*

**II. Kuehbeck's and Bernstein's Motion to Dismiss**

For purposes of clarity, this Opinion will group Silver's claims for relief against Kuehbeck and Bernstein into three categories. The first category includes claims arising from Silver's August 2004 arrest. The second category includes claims arising from Kuehbeck's withdrawal of the power of attorney in June 2004. The third category includes other tort claims arising from Kuehbeck's and Bernstein's actions affecting Silver.

**A. Claims Arising From Silver's August 2004 Arrest**

1. Malicious Prosecution

Silver's First Claim for Relief for malicious prosecution arises Plaintiff's claim that Kuehbeck swore to a criminal complaint and an affidavit with the Manhattan District Attorney's office accusing Silver of stalking and harassment. (Compl. PP46, 52-54.) Silver claims **[*14]** that Kuehbeck knew that the allegations were false and intended to case Silver's arrest. (Id. P55.) According to the Complaint, Bernstein acted in concert with Kuehbeck and determined that the false sworn complaint and affidavit would be filed. (Id. P56.)

"Under New York law, a plaintiff suing for malicious prosecution must establish: (1) the initiation or continuation of a criminal proceeding against plaintiff; (2) termination of the proceeding in plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for defendant's actions." *Russell v. Smith, 68 F.3d 33, 36 (2d Cir. 1995).*

Kuehbeck and Bernstein dispute the sufficiency of

the allegations with respect to the first element of malicious prosecution--the initiation of a "criminal proceeding" against Silver. The New York Court of Appeals discussed this element of malicious prosecution in Broughton v. State:

> The essence of malicious prosecution is the perversion of proper legal procedures. Thus, it has been held that some sort of prior judicial proceeding is the sine qua non of a cause of action in malicious prosecution. Such a judicial **[*15]** proceeding may be either an evaluation by a Magistrate of an affidavit supporting an arrest warrant application, or an arraignment or an indictment by a Grand Jury.

*37 N.Y.2d 451, 457, 335 N.E.2d 310, 373 N.Y.S.2d 87 (1975)* (citation omitted). Thus, a malicious prosecution "may arise only after an arraignment or indictment or some other 'evaluation by a neutral body that the charges [were] warranted.'" *Stile v. City of New York, 172 A.D.2d 743, 743, 569 N.Y.S.2d 129 (2d Dept. 1991)* (quoting *Broughton, 37 N.Y.2d at 459*).

Here, the Complaint does not allege that Silver was arraigned, indicted, or that an arrest warrant was evaluated by a Magistrate; it states only that "on or about August 4, 2004, Defendant Kuehbeck swore to a criminal complaint." (Compl. P52.) Silver contends that this allegation is sufficient to plead the first element of a malicious prosecution claim because, under *Section 100.05 of the New York Criminal Procedure Law,* n3 the filing of an accusatory instrument, such as a misdemeanor complaint, is the procedural equivalent of an indictment insofar as both commence a criminal action.

> n3 This section of the New York Criminal Procedure Law, entitled "Commencement of action; in general," states the following:
>
>> A criminal action is commenced by the filing of an accusatory instrument with a criminal court, and if more than one such instrument is filed in the course of the same criminal action, such action commences when the first of such instruments is filed. The only way in which a criminal action can be commenced in a superior court is by the filing therewith by a grand jury of an indictment against a defendant who has never been held by a local criminal court for the action of such grand jury with respect to any charge contained in such indictment. Otherwise, a criminal action can be commenced only in a local criminal court, by the filing therewith of a local criminal court accusatory instrument, namely:
>>
>>> 1. An information; or
>>>
>>> 2. A simplified information; or
>>>
>>> 3. A prosecutor's information; or
>>>
>>> 4. A misdemeanor complaint; or
>>>
>>> 5. A felony complaint.
>>
>> *N.Y. Crim. Proc. Law § 100.05.*

[*16]

Plaintiff points to no holding by any court that the first element of a civil claim for malicious prosecution is satisfied when a complaint is sworn to by the complaining party. Thus, under the New York decisions, the threshold trigger for the tort of malicious prosecution is a judicial proceeding where the charges against the accused are reviewed and evaluated by a neutral body. *Broughton, 37 N.Y.2d at 459* (emphasis added). A Magistrate's evaluation of an affidavit supporting an arrest warrant application, an arraignment, and an indictment by a Grand Jury each involve some kind of "evaluation by a neutral body that the charges [were] warranted." *Stile, 172 A.D.2d 743, 569 N.Y.S.2d 129.* The pleading in the complaint of a sworn complaint and an affidavit against Silver are not shown to have involved any evaluation by a neutral body. Furthermore, as stated in Broughton, the essence of the claim for malicious prosecution is the perversion of the legal process thereafter. *37 N.Y.2d at 457.*

Silver argues that, as a result of the actions taken by Bernstein and Kuehbeck, he "suffered damages including, but not limited to, (i) legal fees and expenses [*17] incurred in his defense, (ii) damage to his reputation in the business community, and (iv) pain and suffering." (Compl. P64.) The Second Circuit noted in Bender v. City of New York that under New York law, "damages for malicious prosecution are to compensate for injuries *after* arraignment." *78 F.3d 787, 793 n.3 (2d Cir. 1996)* (emphasis added) (citing *Hygh v. Jacobs, 961 F.2d 359, 366 (2d Cir. 1992); Dabbs v. State, 59 N.Y.2d 213, 218, 451 N.E.2d 186, 464 N.Y.S.2d 428 (1983)).* Because Silver has not pleaded that he was arraigned on the complaint in the instant case, he has not pleaded a claim for damages for malicious prosecution. Therefore, his First Claim for Relief for malicious prosecution is dismissed.

2. Abuse of Process

Silver's Second Claim for Relief alleges that Kuehbeck and Bernstein "used regularly issued criminal process, namely a criminal complaint and an affidavit, for the purpose of procuring [Silver's] arrest, detention, and prosecution" and that they did so "with the intent of doing harm to [Silver]" and "to obtain a collateral objective." (Compl. PP66-68.)

"Abuse of process" is defined as "the improper and tortious use of a legitimately [*18] issued court process to obtain a result that is either unlawful or beyond the process's scope." Black's Law Dictionary 10 (7th ed. 1999). Under New York law, abuse of process has three essential elements: "(1) regularly issued process, either civil or criminal, (2) an intent to do harm without excuse or justification, and (3) use of the process in a perverted manner to obtain a collateral objective." *Curiano v. Suozzi, 63 N.Y.2d 113, 116, 469 N.E.2d 1324, 480 N.Y.S.2d 466 (1984).* In addition, a plaintiff bringing an abuse of process claim must allege special damages. See *Bd. of Educ. v. Farmingdale Classroom Teachers Ass'n, 38 N.Y.2d 397, 405, 343 N.E.2d 278, 380 N.Y.S.2d 635 (1975).*

Kuehbeck and Bernstein first dispute the sufficiency of the allegations with respect to the third element of an abuse of process claim--use of process in a perverted manner to obtain a collateral objective. In *Jones v. Maples, No. 98 Civ. 7132 (SHS), 2002 U.S. Dist. LEXIS 3175 (S.D.N.Y. Feb. 26, 2002),* Judge Stein explained what a Complaint must allege to plead adequately this element of an abuse of process claim.

> Not every use of process motivated by selfishness or maliciousness gives rise to an abuse [*19] of process claim. See *Curiano, 63 N.Y.2d at 117* (citing *Hauser v. Bartow, 273 N.Y. 370, 374, 7 N.E.2d 268 (1937)* ("Every one has a right to use the machinery of the law, and bad motive does not defeat that right.")). There must be an abuse of process which has as its direct object an effect outside the intended scope of operation of the process employed. Compare *Curiano, 63 N.Y.2d at 116* (no abuse of process where defendant initiated libel action with dual purpose of punishing free speech and electoral participation and inflicting expense and burden), and *Hauser, 273 N.Y. at 374* (no abuse of process where the defendant initiated incompetency proceeding with dual purpose of damaging the alleged incompetent and enriching herself), with *Board of Educ. v. Farmingdale Classroom Teachers Ass'n, 38 N.Y.2d 397, 404, 343 N.E.2d 278, 380 N.Y.S.2d 635 (1975)* (abuse of process where the defendant

subpoenaed 87 of school district's teachers to testify on the same day with purpose of inflicting economic harm on the school district) and *Dean v. Kochendorfer, 237 N.Y. 384, 390, 143 N.E. 229 (1924)* [*20] (abuse of process where magistrate issued an arrest warrant for disorderly conduct with purpose of bringing arrested person into court for an unrelated disciplinary rebuke). Thus, without an allegation that the process has been improperly perverted "after" its issuance, a claim of abuse of process must be dismissed, even though the defendant acted maliciously in initiating the process. *Curiano, 63 N.Y.2d at 117.*

*Id. 2002 U.S. Dist. LEXIS 3175, at *23-24* (emphasis in original).

Here, the Complaint alleges that Kuehbeck and Bernstein "used" criminal process "for the purpose of procuring [Silver's] arrest, detention and prosecution"; "with the intent of doing harm to [Silver]"; and "in a perverted manner to obtain a collateral objective." (Compl. PP66-68.) The Complaint alleges that Kuehbeck and Bernstein "coldly conspired to do [Silver] grievous harm, and concocted a vicious scheme designed quite simply to destroy [Silver], his reputation, career and very life." (Id. P9.) These conclusory allegations are not sufficient to adequately plead a claim of abuse of process. See *Wynder v. McMahon, 360 F.3d 73, 80 (2d Cir. 2004)* (observing that, regardless of the [*21] complaint's satisfaction of the generous requirements of *Rule 8(a)(2)*, a *Rule 12(b)(6)* motion will "lie to permit each particular defendant to eliminate those causes of action as to which no set of facts has been identified that support a claim against him") (emphasis omitted). Since Plaintiff's pleadings have not identified how Defendants used court process after its issuance to cause grievous harm to Silver, Silver's abuse of process claim against Kuehbeck and Bernstein is dismissed.

Kuehbeck and Bernstein also dispute the sufficiency of the allegations with respect to special damages. In opposition, Silver contends that the Complaint satisfies this pleading requirement because, even though the damages attributed to Kuehbeck's and Bernstein's abuse of process is included together with eight other causes of

action for a total of three million dollars ($ 3,000,000), this amount is "specifically identified and causally related to the allegedly tortious conduct." (Silver Opp. Mem. at 12.) As Kuehbeck and Bernstein point out, however, courts have dismissed special damages claims where, as here, a complaint "sets forth damages in round numbers." *Vigoda v. DCA Prods. Plus, Inc., 293 A.D.2d 265, 266, 741 N.Y.S.2d 20 (1st Dept. 2002)*; [*22] *Ann-Margret v. High Society Magazine, Inc., 498 F. Supp. 401, 408 (S.D.N.Y. 1980)*. Thus, Silver's abuse of process claim also fails with respect to his allegations of damages.

3. Intentional Infliction of Emotional Distress

Silver's Third Claim for Relief alleges that Kuehbeck and Bernstein intentionally inflicted emotional distress by engaging in a course of conduct that was "extreme and outrageous," with the intent or knowledge that their conduct would cause the distress and suffering of Silver. (Compl. P72.)

To state a valid claim for intentional infliction of emotional distress ("IIED") under New York law, a plaintiff must show: "(1) extreme and outrageous conduct, (2) intent to cause severe emotional distress, (3) a causal connection between the conduct and the injury, and (4) severe emotional distress." *Bender v. City of New York, 78 F.3d 787, 790 (2d Cir. 1996)*; see also *Howell v. New York Post Co., Inc., 81 N.Y.2d 115, 121, 612 N.E.2d 699, 596 N.Y.S.2d 350 (1993)*.

Kuehbeck and Bernstein dispute the sufficiency of the allegations with respect to the first element of Silver's IIED claim--that the conduct complained of was "extreme and outrageous." To [*23] satisfy this element, New York law requires that their alleged conduct must have been "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Murphy v. American Home Prods. Corp., 58 N.Y.2d 293, 303, 448 N.E.2d 86, 461 N.Y.S.2d 232 (1983)*. Even assuming that all of Silver's factual allegations are true, and resolving all ambiguities and drawing all inferences in Silver's favor, the conduct alleged in the Complaint does not meet this test and is insufficient to support an IIED claim. Accordingly, this claim is dismissed.

4. Negligence

Silver's Eighth Claim for Relief alleges that Silver

suffered injuries that were proximately caused by Bernstein when he "negligently failed to use ordinary care in investigating Kuehbeck's charges before participating in any scheme to file such complaint and affidavit and procuring [Silver's] arrest, detention and prosecution." (Compl. PP96-97.)

In order to prevail on a negligence claim under New York law, a plaintiff must establish "(1) the existence of a duty on defendant's part as to plaintiff; (2) a breach of this duty; and (3) **[*24]** injury to the plaintiff as a result thereof." *Akins v. Glens Falls City Sch. Dist., 53 N.Y.2d 325, 333, 424 N.E.2d 531, 441 N.Y.S.2d 644 (1981)*. The existence of a duty of care is a "legal, policy-laden declaration reserved for Judges to make prior to submitting anything to fact-finding or jury consideration." *Palka v. Servicemaster Mgmt. Servs. Corp., 83 N.Y.2d 579, 585, 634 N.E.2d 189, 611 N.Y.S.2d 817 (1994)*. "Absent a duty running directly to the injured person there can be no liability in damages, however careless the conduct of foreseeable the harm." *532 Madison Ave. Gourmet Foods, Inc. v. Finlandia Center, Inc., 96 N.Y.2d 280, 289, 750 N.E.2d 1097, 727 N.Y.S.2d 49 (2001)*.

At issue here is whether Bernstein owed a duty of care to Silver. Silver contends that the claim against Bernstein should not be dismissed because "it is clear that as citizens of a civil society we each owe an ordinary duty of care to our fellow man not to behave in this manner and furthermore, to investigate the truthfulness of a criminal complaint before swearing one out against an innocent man." (Silver Opp. Mem. at 19.) However, Silver fails to cite any cases or other authority that establish the existence of such a duty. Silver's negligence claim therefore **[*25]** is dismissed.

5. Conspiracy to Violate *42 U.S.C. § 1983*

Silver's Thirteenth Claim for Relief alleges that Kuehbeck and Bernstein conspired with Detective Ryan and John Does 1-20 to deprive Silver of his rights, privileges, and immunities under the *Fourth, Sixth*, and *Fourteenth Amendments to the United States Constitution*, in violation of *42 U.S.C. § 1983* ("*Section 1983*"). (Compl. PP134-35.) In particular, Kuehbeck and Bernstein allegedly "procured the assistance of Defendants Ryan and John Does 1-20 and . . . acted in concert with said persons to procure the unlawful arrest, detention and prosecution of [Silver]." (Id. P135.)

"To state a claim under *§ 1983*, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins, 487 U.S. 42, 48, 108 S. Ct. 2250, 101 L. Ed. 2d 40 (1988)*. Private persons can only be subject to liability under *Section 1983* if they were "jointly engaged with state officials in the challenged action." *Scotto v. Almenas, 143 F.3d 105, 114 (2d Cir. 1998)* **[*26]** (quoting *Dennis v. Sparks, 449 U.S. 24, 27-28, 101 S. Ct. 183, 66 L. Ed. 2d 185 (1980)*).

Kuehbeck and Bernstein contend that this claim should be dismissed because the Complaint does not adequately allege that they conspired with Detective Ryan or acted in concert with him to deprive Silver of his civil rights. "Merely filing a complaint with the police, reporting a crime, requesting criminal investigation of a person, or seeking a restraining order, even if the complaint or report is deliberately false, does not give rise to a claim against the complainant for a civil rights violation." *Vazquez v. Combs, No. 04 Civ. 4189 (GEL), 2004 U.S. Dist. LEXIS 22137, at *11 (S.D.N.Y. Oct. 22, 2004)*. See also *Jones v. Maples, 2002 U.S. Dist. LEXIS 3175, at *16 (S.D.N.Y. Feb. 26, 2002)* ("providing false information to an arresting officer is not, by itself, sufficient to state a claim against [a] private party under *§ 1983*"); *Lugar v. Edmondson Oil Co., 457 U.S. 922, 939 n.21, 102 S. Ct. 2744, 73 L. Ed. 2d 482 (1983)* (merely invoking state legal procedures against another private person does not constitute "joint participation" or "conspiracy" with state officials so as to satisfy the **[*27]** *§ 1983* requirement of action under color of law).

Here, the Complaint alleges that Detective Ryan told Silver that he had called Kuehbeck and Bernstein, that they told him they "wished to press charges," and that "'Bernstein is all over the case.'" (Compl. P45) Such allegations do not show conspiracy or actions in concert that are necessary to establish a *§ 1983* violation; otherwise complainants in all arrests could be subject to retaliatory *§ 1983* actions.

The Complaint further alleges that Kuehbeck and Bernstein "utilized [Bernstein's] influence with the New York City Police to procure [Silver's] arrest," and that the police department "followed Bernstein's and Kuehbeck's instructions with respect to whether to arrest [Silver], when and where to arrest him, and what to charge him with." (Compl. P57.) Such conclusory allegations are not

sufficient to state a claim for a *§ 1983* conspiracy. Furthermore, they are not consistent with the Complaint's rendition of the events immediately preceding Silver's arrest, specifically the allegation that Silver returned to the 19th Precinct of his own volition on the day of his arrest. See *First Nationwide Bank v. Gelt Funding Corp., 27 F.3d 763, 772 (2d Cir. 1994)* **[*28]** ("Courts do not accept conclusory allegations on the legal effect of the events plaintiff has set out if these allegations do not reasonably follow from his description of what happened."). Accordingly, Silver's *§ 1983* conspiracy claim against Kuehbeck and Bernstein is dismissed.

**B. Claims Arising From Kuehbeck's Withdrawal of the Power of Attorney in June 2004**

1. Tortious Interference with Business Relations

Silver's Fifth Claim for Relief alleges that in June 2004 Kuehbeck and Bernstein tortiously interfered with his contractual and business relations with Wolf Popper LLP, the law firm representing the plaintiffs in a class action securities fraud lawsuit in which Kuehbeck was the lead plaintiff. The Complaint alleges that Plaintiff had invested for Kuehbeck in Genesis Microchip, Inc., whose shares dropped sharply. (Compl. P22.) The Complaint also alleges that Plaintiff conceived and organized a class action lawsuit against the company, hired Wolf Popper LLP, and agreed to serve as a consultant (to Wolf Popper) with Kuehbeck's knowledge and consent. (Id.) In connection with the lawsuit, Kuehbeck gave Plaintiff power of attorney to act on her behalf. (Id.) **[*29]**

To establish a claim for tortious interference with business relations, a plaintiff must show: "(1) business relations with a third party; (2) the defendant's interference with those business relations; (3) the defendant acted with the sole purpose of harming the plaintiff or used dishonest, unfair, or improper means; and (4) injury to the business relationship." *Nadel v. Play-By-Play Toys & Novelties, Inc., 208 F.3d 368, 382 (2d Cir. 2000)* (citing *Purgess v. Sharrock, 33 F.3d 134, 141 (2d Cir. 1994)).*

Kuehbeck and Bernstein first dispute the sufficiency of the allegations with respect to the first element -- that a valid "business relationship" existed between Silver and Wolf Popper LLP. The Complaint alleges that Silver "agreed to serve as consultant" to Wolf Popper LLP (Compl. P22) and that he had "contractual and business relations with the Wolf Popper firm" (Id. P82). Thus,

although the Complaint does not specify what Silver was to be paid, how often he would work, or what exactly he would do, the allegations are sufficient to plead the first element of this tort.

Kuehbeck and Bernstein next dispute the sufficiency of the allegations with **[*30]** respect to the second element -- that they intentionally interfered with a business relationship between plaintiff and a third party. Silver alleges that Bernstein "orchestrated Kuehbeck's withdrawal of the power of attorney issued in favor of Plaintiff." (Compl. P82.) The withdrawal of a power of attorney is not an interference with Plaintiff's relationship with a third party, namely Wolf Popper LLP. Withdrawing her power of attorney is a decision by Kuehbeck that involves her own relationship with Silver, not the relationship of Silver and Wolf Popper. Therefore, Kuehbeck's withdrawal of her power of attorney does not amount to intentional interference with a business relationship.

Kuehbeck and Bernstein also dispute the sufficiency of the allegations with respect to the third element -- that they acted with the sole purpose of harming Silver or used dishonest, unfair, or improper means. Silver, citing Paragraphs 34 and 35 of the Complaint, contends that Kuehbeck and Bernstein "acted solely to harm [Silver] and his business relationship with Wolf Popper." (Silver Opp. Mem. at 24 (citing Compl. PP34-35 (emphasis added)).) However, Paragraphs 34 and 35 of the Complaint, quoted **[*31]** below in their entirety, do not allege that Kuehbeck and Bernstein acted with such a single-minded intent.

> 34. Now, the depth of Bernstein's "investigation" into [Silver's] private affairs was becoming apparent. [Silver] also learned from Wolf Popper that prior to this period Bernstein had begun inserting himself into the class action securities suit brought in Kuehbeck's name, and had repeatedly urged them privately to ignore and cease dealing with [Silver] in any respect. [Silver] has since heard nothing from the firm.

> 35. As [Silver] discovered later, the letter contained a "Notice of Revocation of Power of Attorney," purportedly signed by Kuehbeck. Upon information and belief, the notice was drafted by Bernstein, who

compelled Kuehbeck to sign through a combination of threats and the refusal to comply with obligations of their pre-nuptial agreement. This notice purported to withdraw the power of attorney that Kuehbeck had given to [Silver] in connection with activity in her behalf in the securities fraud class action and purported to discharge [Silver] from any further involvement, meaning that his agreement with Wolf Popper could no longer be performed. Not **[*32]** only was the letter hand delivered to [Silver], but a copy of the purported notice was faxed to one of [Silver's] unrelated business colleagues in a transparent effort to embarrass [Silver].

(Compl. PP34-35.) Considerably later in the Complaint, Silver alleges that "Bernstein and Kuehbeck acted purposefully and knowingly and with the intent of harming [Silver]."

(Id. P83.) The clear import of Paragraphs 34 and 35, however, is that Kuehbeck took actions to prevent Plaintiff from continuing to act as her agent. Read as a whole, the Complaint does not imply that these Defendants' actions at Wolf Popper were taken solely to harm Plaintiff.

The Complaint further alleges that Bernstein repeatedly urged Wolf Popper LLP to ignore Silver and cease dealing with him, and that Bernstein drafted and compelled Kuehbeck to sign a "Notice of Revocation of Power of Attorney." (Compl. PP34-35). Silver charges that Bernstein communicated with individuals at Wolf Popper "to convince them to sever their relationship with Plaintiff in connection with the securities class action litigation in which Kuehbeck serves as name Plaintiff." (Compl. P82.) However, the Complaint does not **[*33]** allege that Kuehbeck and Bernstein used dishonest or unfair means, nor do the allegations amount to improper means. New York's Court of Appeals has noted that "there is no liability in tort unless the means employed to effect the interference was wrongful." *Guard-Life Corp. v. S. Parker Hardware Mfg. Corp., 50 N.Y.2d 183, 196, 406 N.E.2d 445, 428 N.Y.S.2d 628 (1980).* The Court then stated that "wrongful means" include "physical violence, fraud or misrepresentation, civil suits and criminal prosecutions, and some degrees of economic

pressure; they do not, however, include persuasion alone although it is knowingly directed at interference with the contract." *Id. at 191.* Silver's claims involve persuasion, but "mere knowing persuasion would not be sufficient." *Id. at 196.* Therefore, even assuming that all of Silver's factual allegations are true, the conduct alleged in the Complaint is insufficient to support a claim for tortious interference. Accordingly, Bernstein and Kuehbeck's motion to dismiss the tortious interference with business relations claim is granted.

2. Quantum Meruit

Silver's Sixth Claim for Relief alleges that he is entitled to recover as damages **[*34]** the reasonable value of the services he has performed, at Kuehbeck's request, for Kuehbeck and the class that she represents. Specifically, the Complaint alleges that "Kuehbeck asked [Silver] to be one of her investment advisors" (Compl. P22) and that "in the course of conceiving, researching and preparing the securities class action lawsuit in which Kuehbeck is the name plaintiff, [Silver] spent hundreds of hours working on Kuehbeck's behalf and on behalf of the class that Kuehbeck represents." (Compl. P87).

"In order to recover in quantum meruit, New York law requires a claimant to establish (1) the performance of services in good faith, (2) the acceptance of the services by the person to whom they are rendered, (3) an expectation of compensation therefor, and (4) the reasonable value of the services." *Longo v. Shore & Reich, Ltd., 25 F.3d 94, 98 (2d Cir. 1994)* (internal quotation marks and citation omitted).

Kuehbeck disputes the sufficiency of the allegations with respect to the third element of Silver's quantum meruit claim -- expectation of compensation. In response, Silver states in his memorandum of law that he "did not do all of this work out **[*35]** of the goodness of his heart without expecting some compensation in return." (Silver Opp. Mem. at 22.) However, because the Complaint alleges that Silver agreed to serve as a consultant to Wolf Popper LLP (Compl. P22) and that Silver was a long-time friend and some-time lover of Kuehbeck (Id. at PP21-22), any claim of expectation of compensation is undercut. The Complaint does not include any allegations suggesting that Silver had a "reasonable expectancy of receiving such compensation" from Kuehbeck, *Argo Marine Sys., Inc. v Camar Corp., 755 F.2d 1006, 1011 (2d Cir. 1985)*, this claim is dismissed.

### C. Other Tort Claims Against Kuehbeck and Bernstein

#### 1. Slander

Silver's Ninth Claim for Relief alleges that Bernstein slandered Silver by knowingly and intentionally making disparaging and false statements about Silver to third parties, namely an individual named Ira Garr. Bernstein allegedly stated, inter alia, that Silver is a "'stalker,'" that he is "'crazy,'" and that he was "'harassing'" Kuehbeck and Bernstein. (Compl. PP100-01.)

"The elements of a cause of action for slander under New York law are (i) a defamatory statement of fact, (ii) that is false, [*36] (iii) published to a third party, (iv) 'of and concerning' the plaintiff, (v) made with the applicable level of fault on the part of the speaker, (vi) either causing special harm or constituting slander per se, and (vii) not protected by privilege." *Albert v. Loksen, 239 F.3d 256, 265-66 (2d Cir. 2001).* As Judge Scheindlin explained in *Mobile Data Shred, Inc. v. United Bank of Switz., No. 99 Civ. 10315 (SAS), 2000 U.S. Dist. LEXIS 4252, at *19 (S.D.N.Y. Apr. 5, 2000),* "in evaluating the sufficiency of claims of slander, the courts in this Circuit have required that the complaint adequately identify the allegedly defamatory statements, the person who made the statements, the time when the statements were made, and the third parties to whom the statements were published." *Id. 2000 U.S. Dist. LEXIS 4252, at *19* (citing *Ives v. Guilford Mills, Inc., 3 F. Supp. 2d 191, 199 (S.D.N.Y. 1998); Broome v. Biondi, No. 96 Civ. 805 (RLC), 1997 U.S. Dist. LEXIS 1431 (S.D.N.Y. Feb. 10, 1997); Reeves v. Continental Equities Corp. of Am., 767 F. Supp. 469, 473 (S.D.N.Y. 1991)).*

Silver has failed to adequately plead the slander claim against [*37] Bernstein. The Complaint identifies only one person, Ira Garr, to whom Bernstein allegedly made defamatory statements about Silver. Mr. Garr was Bernstein's attorney at the time the statements were made and therefore Bernstein's communications with him were privileged. The attorney-client privilege "requires that the asserted holder of the privilege is or sought to become a client, that the person to whom the communication was made is an attorney admitted to practice, and that the communication was made while that person was acting as an attorney. *Hydraflow v. Enidine, 145 F.R.D. 626, 630 (W.D.N.Y. 1993).* The purpose of the privilege is "to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice." *Upjohn Co. v. United States, 449 U.S. 383, 398, 101 S. Ct. 677, 66 L. Ed. 2d 584 (1981).* Here, Mr. Garr was acting as Bernstein's attorney at the time Bernstein allegedly made defamatory statements to him, and full communication between Bernstein and Garr is protected by the attorney-client privilege. Thus, the statements were privileged and as such, the communications between Bernstein [*38] and Mr. Garr cannot serve as the basis for Silver's slander claim. Because the Complaint does not identify any other third parties to whom Bernstein made the alleged statements about Silver, n4 this claim is dismissed.

> n4 Silver states that Bernstein hired Mr. Garr to write and send the letter to Silver, "as well as others." (Silver Opp. Mem. at 26 (citing Compl. P100).) However, the Complaint fails to identify any third parties, aside from Mr. Garr, to whom the statements about Silver were published.

Silver's Tenth Claim for Relief alleges that Kuehbeck slandered Silver by knowingly and intentionally making defamatory and false statements about Silver to third parties. (Id. PP105-06.) Kuehbeck allegedly stated, inter alia, that Silver "'tried to kill her.'" (Id. P105.) The Complaint does not identify any "third parties" to whom Kuehbeck made the alleged statements. Accordingly, the slander claim against Kuehbeck is dismissed.

#### 2. Assault

Silver's Seventh Claim for Relief alleges that Bernstein [*39] assaulted him when the two encountered each other on July 17, 2004. According to the Complaint, "Bernstein approached [Silver], and said, in a threatening voice, 'you and I are taking a walk.' [Silver] told Bernstein that he had nothing to say to him, and kept walking. As [Silver] walked away, Bernstein turned to [Silver] and said, 'I'm going to have you taken care of.'" (Compl. PP38, 91.)

To establish a claim for assault under New York law, a plaintiff must show "an intentional placing of another person in fear of imminent harmful or offensive contact." *Girden v. Sandals Int'l, 262 F.3d 195, 203 (2d Cir. 2001)*

(emphasis added). "Threats, standing alone, do not constitute an assault." *Carroll v. New York Property Ins. Underwriting Ass'n, 88 A.D.2d 527, 527, 450 N.Y.S.2d 21, 22 (1st Dept. 1982)* (citation omitted). Bernstein's alleged comments to Silver as he was walking away and as Silver walked away do not suggest "imminent" harmful contact, and Silver makes no arguments in opposition to the motion to dismiss this claim of the Complaint. The assault claim against Bernstein therefore is dismissed.

3. Prima Facie Tort

Silver's Fourth **[*40]** Claim for Relief alleges that Kuehbeck and Bernstein engaged in a course of conduct comprised of various acts with the intent and purpose of causing harm to Silver, giving rise to a claim for prima facie tort.

"The requisite elements of a cause of action for prima facie tort are (1) the intentional infliction of harm, (2) which results in special damages, (3) without any excuse or justification, (4) by an act or series of acts which would otherwise be lawful." *Freihofer v. Hearst Corp., 65 N.Y.2d 135, 142-43, 480 N.E.2d 349, 490 N.Y.S.2d 735 (1985).*

Silver's prima facie tort claim must be dismissed because it alleges no facts not included in his other claims for relief, and it completely overlaps the other claims alleged in the Complaint. To the extent that allegations provide grounds for other causes of action included in the Complaint, those allegations cannot give rise to a prima facie tort claim. See *Chen v. United States, 854 F.2d 622, 628 (2d Cir. 1988)* (stating that "a set of facts giving rise to a common-law tort is fatal to a prima facie tort claim"). With respect to the other allegations underlying this claim, those allegations are insufficient to adequately **[*41]** plead a prima facie tort claim.

Silver's prima facie tort claim must also be dismissed because the Complaint fails to plead special damages. According to the Complaint, Silver demands judgment against Kuehbeck and Bernstein on the prima facie tort claim, along with eight other claims, in the amount of three million dollars ($ 3,000,000). (Compl. at 35.) As already noted, courts have dismissed special damages claims where the claim, like Silver's claim, "set forth damages in round numbers." *Vigoda v. DCA Prods. Plus, Inc., 293 A.D.2d 265, 266, 741 N.Y.S.2d 20 (1st Dept. 2002)*; *Ann-Margret v. High Society Magazine, Inc., 498 F. Supp. 401, 408 (S.D.N.Y. 1980).* Accordingly, Silver's prima facie tort claim is dismissed.

### III. Abady's Motion to Dismiss

Silver's libel and slander claim against Abady, the Fourteenth Claim for Relief, arises from a statement made by Abady that was quoted by a New York Post article. The statement announcing that Silver had commenced this action was published two days after its filing in this Court. Abady's statement, as quoted in the Complaint, reads as follows:

> This complaint is **[*42]** an outrageous falsehood and was filed in a clear effort to extract money from an internationally respected author and journalist and to slander a wonderful woman. Carl Bernstein and his wife have filed formal complaints against Mr. Silver with the NYPD and the Manhattan DA's office for making death threats against them, continual harassment and stalking, and other abusive conduct. We are anxious for the truth to be known about Mr. Silver's motivations and actions -- including his record of bizarre and violent behavior against others as well.

(Compl. P138.) Silver alleges that Abady's statement was materially false in a number of respects and that Abady made the statement knowing that it was false and with the intent to defame Silver, to cause damage to Silver's reputation, and to cause Silver mental and emotional distress and suffering. (Id. PP139-41.)

*Section 74 of the New York Civil Rights Law* ("*Section 74*") provides, in relevant part, that "[a] civil action cannot be maintained against any person, firm or corporation, for the publication of a fair and true report of any judicial proceeding." *N.Y. Civil Rights Law § 74*. "For a report to be characterized **[*43]** as 'fair and true' within the meaning of the statute . . . it is enough that the substance of the article be substantially accurate." *Holy Spirit Ass'n for Unification of World Christianity v. New York Times Co., 49 N.Y.2d 63, 67, 399 N.E.2d 1185, 424 N.Y.S.2d 165 (1979).* "New York courts have extended the privilege to comments made by attorneys to the press in connection with the representation of their clients." *McNally v. Yarnall, 764 F. Supp. 853, 856 (S.D.N.Y.*

*1991*) (citing *Branca v. Mayesh, 101 A.D.2d 872, 476 N.Y.S.2d 187 (2d Dept. 1984); Ford v. Levinson, 90 A.D.2d 464, 454 N.Y.S.2d 846 (1st Dept. 1982)).*

Abady contends that, like the comments made by the defamation defendant in McNally v. Yarnall, his statement is absolutely protected by *Section 74* because he was merely summarizing his client's position in the litigation. (Abady Mem. at 9.) In McNally, the plaintiff moved to add a cause of action for libel against his opposing party's attorney based on comments the attorney made to a newspaper about the litigation. Judge Sweet denied the motion, holding that statements made by a party's attorney concerning a potential defense in a **[*44]** pending action were protected by *Section 74*. See *McNally, 764 F. Supp. at 856*. In reaching this conclusion, Judge Sweet explained that the attorney's comments "related directly to a possible position to be taken by [his client] as a defense to [the defamation plaintiff's] charges," and that the attorney's "alleged statement was merely restating his client's position in defending the action." Id.

In opposition, Silver first argues that Abady's statement is not protected by *Section 74* because it falls within an exception to that privilege recognized by the New York Court of Appeals in *Williams v. Williams, 23 N.Y.2d 592, 246 N.E.2d 333, 298 N.Y.S.2d 473 (1969)*. In Williams, the court concluded that *Section 74* was not intended to protect a party that "maliciously institutes a judicial proceeding alleging false and defamatory charges" and then publicizes those charges in the press. *Id. at 599*. However, the Williams exception does not apply here for the same reasons it was inapplicable in McNally. Unlike the defamation defendant in Williams, neither Abady nor Kuehbeck and Bernstein instituted the underlying litigation in order to publicize false **[*45]** and defamatory charges against Silver. Rather, it was Silver who instituted the litigation giving rise to Abady's statement. The Complaint does not allege that Abady called a press conference or sought to publicize his statement in any way; in fact, there is no allegation that Abady's statement was anything other than a response to a media inquiry about the complaint filed by Silver. Furthermore, Abady's statement appeared in an article reporting on the lawsuit that discussed both sides of the controversy and identified Abady as Kuehbeck's and Bernstein's attorney. n5 Accordingly, even when accepting the allegations in the Complaint as true, the situation that gave rise to Abady's statement is

distinguishable from the "unusual fact pattern" considered in Williams. Cf. *McNally, 764 F. Supp. at 856* (distinguishing Williams where defamation defendant did not initiate the underlying action, did not seek publicity for the action, and the attorney's comments appeared in a balanced article about the controversy).

> n5 On a motion to dismiss, the Court may take judicial notice of documents such as the New York Post article that Silver "either possessed or knew about and upon which [he] relied in bringing the suit." *Rothman v. Gregor, 220 F.3d 81, 88 (2d Cir. 2000)*.

**[*46]**

Silver also contends that Abady's statement is not protected by *Section 74* because the statement was not a "fair and true report" of the litigation. To be privileged by *Section 74*, a report of a judicial proceeding must be "substantially accurate." A statement is "substantially accurate" "if, despite minor inaccuracies, it does not produce a different effect on a reader than would a report containing the precise truth." *Zerman v. Sullivan & Cromwell, 677 F. Supp. 1316, 1322 (S.D.N.Y. 1988)* (citations omitted). According to Silver, Abady's statement erroneously stated that Kuehbeck and Bernstein "have filed formal complaints" against Silver, that Silver made "death threats" against Kuehbeck and Bernstein, and that Silver has a "record of bizarre and violent behavior against others." However, in view of the entire article in which Abady's statement appeared, the Court finds that Abady's statement was a substantially accurate account of his clients' position in the litigation initiated by Silver's complaint. Accordingly, the Fourteenth Claim for Relief is dismissed.

**IV. Detective Ryan's Motion to Dismiss**

Silver brings two claims against Detective Ryan. The **[*47]** Eleventh Claim for Relief charges Detective Ryan with malicious prosecution and false arrest in violation of New York state law, n6 and the Twelfth Claim for Relief charges Detective Ryan with malicious prosecution and false arrest in violation of *Fourth*, *Sixth*, and *Fourteenth Amendment* rights as secured by *42 U.S.C. § 1983*.

> n6 The Eleventh Claim for Relief also

refers to false imprisonment. However, because "in New York, the tort of false arrest is synonymous with that of false imprisonment," *Posr v. Doherty, 944 F.2d 91, 96 (2d Cir. 1991)*, the Court's discussion of the false arrest claim will apply to the false imprisonment claim.

False arrest and malicious prosecution claims brought under New York state law are "substantially the same" as *§ 1983* false arrest and malicious prosecution claims rooted in the *Fourth* and *Fourteenth Amendments*, *Boyd v. City of New York, 336 F.3d 72, 75 (2d Cir. 2003)*, with the exception that *§ 1983* requires that the defendant **[*48]** act "under color of state law," *Weyant v. Okst, 101 F.3d 845, 852 (2d Cir. 1996)*. n7

n7 Here, because the parties do not dispute that Detective Ryan was acting in his capacity as a police officer during all times relevant to this dispute, he was clearly acting "under color of state law."

To establish a false arrest claim, a plaintiff must show that: (1) the defendant intentionally confined the plaintiff; (2) the plaintiff was aware of the confinement; (3) the plaintiff did not consent to the confinement; and (4) the confinement was not otherwise privileged. *Bernard v. United States, 25 F.3d 98, 102 (2d Cir. 1994); Davis v. City of New York, 373 F. Supp. 2d 322, 329 (S.D.N.Y. 2005)*. Probable cause to believe that the plaintiff committed a crime constitutes a privilege justifying the arrest. *Marshall v. Sullivan, 105 F.3d 47, 50 (2d Cir. 1996)*.

"To state a claim under New York law for the tort of malicious prosecution, a plaintiff must show: (1) **[*49]** that the defendant commenced or continued a criminal proceeding against him; (2) that the proceeding was terminated in the plaintiff's favor; (3) that there was no probable cause for the proceeding; and (4) that the proceeding was instituted with malice." *Kinzer v. Jackson, 316 F.3d 139, 143 (2d Cir. 2003)*. For a malicious prosecution claim under *§ 1983*, a plaintiff must also demonstrate that the defendant's conduct "resulted in a constitutionally cognizable deprivation of liberty." *Id. at 143*. Probable cause defeats a malicious prosecution claim. *Boyd v. City of New York, 336 F.3d 72, 75 (2d Cir. 2003)*.

Thus, the lack of probable cause is an essential element of both a false arrest and a malicious prosecution claim. See *Boyd, 336 F.3d at 75* ("If there was probable cause for the arrest, then a false arrest claim will fail. Similarly, if there was probable cause for the prosecution, then no malicious prosecution claim can stand.") (citation and footnote omitted). Detective Ryan seeks to dismiss the claims against him on the ground that Silver has not pleaded sufficient facts in the Complaint to establish a lack of **[*50]** probable cause, thus defeating the claims for false arrest and malicious prosecution. Because the "probable cause determination relevant to a malicious prosecution claim differs from that relevant to a false arrest claim," *Mejia v. City of New York, 119 F. Supp. 2d 232, 254 (E.D.N.Y. 2000)*, these two determinations are considered separately.

**A. Probable Cause for Silver's Arrest**

Probable cause to arrest exists "when the arresting officer has knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested." *Escalera v. Lunn, 361 F.3d 737, 743 (2d Cir. 2004)* (quoting *Weyant v. Okst, 101 F.3d 845, 852 (2d Cir. 1996))*. An arresting officer may rely on the report of a victim of a crime. See *Loria v. Gorman, 306 F.3d 1271, 1290 (2d Cir. 2002)*. "Once officers possess facts sufficient to establish probable cause, they are neither required nor allowed to sit as prosecutor, judge or jury." *Krause v. Bennett, 887 F.2d 362, 372 (2d Cir. 1989)*; see also *Ricciuti v. N.Y.C. Transit Auth., 124 F.3d 123, 128 (2d Cir. 1997)* **[*51]** (officer "not required to explore and eliminate every theoretically plausible claim of innocence before making an arrest" once reasonable basis for believing there is probable cause). That the plaintiff was found not guilty of the crimes for which he was arrested has no bearing on his false arrest claim. See *Singer, 63 F.3d 110, 118* ("a favorable termination of the proceedings is not an element of [the] tort [of false arrest]"). "The question of whether or not probable cause existed may be determinable as a matter of law if there is no dispute as to the pertinent events and the knowledge of the officers." *Weyant, 101 F.3d at 852*.

Detective Ryan argues that the false arrest claim must be dismissed because "Kuehbeck's complaint to the NYPD, in and of itself, provided the probable cause for

[Silver] to have been arrested." (Ryan Mem. at 6.) According to the Complaint, "on or about August 4, 2004, Defendant Ryan conducted an interview of Bernstein and Kuehbeck during which Kuehbeck falsely alleged that [Silver] had been 'stalking' and 'harassing' her." (Compl. P113.) Silver contends that Kuehbeck's allegations, as recounted in the Complaint, did **[*52]** not give rise to probable cause because, in view of the fact that that Silver had previously filed a criminal complaint with a different detective in the same police precinct (Compl. P39), Detective Ryan "knew or should have known immediately that there was a history between the parties and that this raised inherent doubts as to the veracity of the Bernstein and Kuehbeck story" (Silver Opp. at 5).

"When information is received from a putative victim or an eyewitness, probable cause exists, unless the circumstances raise doubt as to the person's veracity." *Curley v. Vill. of Suffern, 268 F.3d 65, 70 (2d Cir. 2001)* (emphasis added). Taking the facts alleged in the Complaint as true, there is no showing that Detective Ryan had reason to doubt Kuehbeck's veracity. Although Silver had previously filed a criminal complaint in the same precinct against Bernstein, Kuehbeck's husband (Compl. P39), Silver alleges no facts showing that Detective Ryan knew of that complaint. To be sure, the Complaint alleges that, after Detective Ryan informed Silver of Kuehbeck's criminal complaint on August 9, 2004,

> [Silver] related a number of facts to Detective Ryan, including the **[*53]** fact that only five days earlier, he and Kuehbeck had met at the Lake for as swim and had consensual sex. Fortunately, Kuehbeck's message arranging for the tryst was preserved on [Silver's] answering machine, and he played the message for the police. Detective Ryan was apparently surprised, and told [Silver] that he could leave because he now had to call Bernstein and Kuehbeck who were in Europe.

(Compl. P44.) However, the Complaint does not allege that Detective Ryan believed what Silver told him. Silver evidently did not reach that conclusion because he alleges that he returned to the 19th Precinct on the following day, August 10, 2004, "to try to offer additional evidence that [Kuehbeck's] complaint was nonsense." (Compl. P45.)

According to the Complaint, the following unfolded:

> [Detective Ryan] then told [Silver] that Bernstein and Kuehbeck wished to press charges, and that he therefore had no choice but to arrest [Silver]. [Silver] asked the precise basis upon which he was being arrested, and Ryan answered that it was on the basis of "many threatening phone messages." [Silver], puzzled, asked Detective Ryan if he found such supposed messages threatening, **[*54]** and Ryan replied "not to my ears, but when a woman is involved we tend to bend over backwards." Upon information and belief, there were no such "messages." Ryan then said that "Bernstein is all over the case, and I'm going to recommend that the ADA interview her separately." He declined to delay his decision pending an investigation of the actual facts. [Silver] was placed in a detention area in the police station behind a locked door, until his release later that day.

(Id. P45.)

In any event, the Complaint does not allege that Detective Ryan had any reason to question Kuehbeck's veracity in her claims that Silver was stalking or harassing her. Silver presented no evidence to demonstrate that Ryan knew of any previous complaint filed by Kuehbeck or any history between the parties. Therefore, information received from Kuehbeck provided Ryan with probable cause to arrest Silver, thereby defeating Silver's false arrest claim.

**B. Probable Cause for Silver's Prosecution**

Probable cause also defeats a malicious prosecution claim. See *Boyd v. City of New York, 336 F.3d 72, 75*; see also *Kinzer v. Jackson, 316 F.3d 139, 143*. For purposes of the tort of malicious prosecution, **[*55]** probable cause has been defined as "the knowledge of facts, actual or apparent, strong enough to justify a reasonable man in the belief that he has lawful grounds for prosecuting the defendant in the manner complained of" or whether "a discreet and prudent person would be led to the belief that a crime had been committed by the person charged." *Morillo v. City of New York, 1997 U.S. Dist. LEXIS 1665*

*at *14 (S.D.N.Y.)* (citing *Loeb v. Teitelbaum, 77 A.D.2d 92, 432 N.Y.S.2d 487, 494 (1980))*. "The existence of probable cause is measured as of the time the prosecution was initiated and is based on facts known to or believed to be true by the defendant at that time." Id. (citing *432 N.Y.S.2d at 494-95*). Here, Detective Ryan had probable cause based on defendant Kuehbeck's complaint to the police that was strong enough to justify him in the belief that he had lawful grounds to arrest and prosecute Silver. Nor has Plaintiff shown that a judicial proceeding was instituted, which is the first element of a malicious prosecution claim. See *supra 1997 U.S. Dist. LEXIS 1665, at *8-10*. Accordingly, Silver's malicious prosecution claim is dismissed.

**CONCLUSION**

For the foregoing **[*56]** reasons, Kuehbeck and Bernstein's motion to dismiss Silver's claims for relief are granted as to the First, Second, Third, Fourth, Fifth, Sixth, Seventh, Eighth, Ninth, Tenth and Thirteenth Claims for Relief; Abady's motion to dismiss is granted as to the Fourteenth Claim for Relief; and Detective Ryan's motion to dismiss is granted as to the Eleventh and Twelfth Claims for Relief.

IT IS SO ORDERED.

Dated: New York, New York

November 7, 2005

Robert P. Patterson, Jr.

U.S.D.J.

LEXSEE 2006 U.S. APP. LEXIS 23424

**MARTIN ZELNIK, Plaintiff-Appellant, v. FASHION INSTITUTE OF TECHNOLOGY, STATE UNIVERSITY OF NEW YORK, JOYCE F. BROWN, individually as PRESIDENT OF FASHION INSTITUTE OF TECHNOLOGY, STATE UNIVERSITY OF NEW YORK, Defendants-Appellees.**

**Docket No. 05-5131-cv**

**UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT**

*2006 U.S. App. LEXIS 23424; 25 I.E.R. Cas. (BNA) 8*

**May 19, 2006, Argued**
**September 14, 2006, Decided**

**PRIOR HISTORY:** **[*1]** Appeal from a summary judgment entered in the United States District Court for the Southern District of New York (Swain, J.) dismissing claim that plaintiff was not afforded professor emeritus status in retaliation for speech related to a matter of public concern, the District Court having determined that plaintiff failed to demonstrate any material adverse change in the terms and conditions of his employment as a consequence of his speech.

**DISPOSITION:** Affirmed.

**COUNSEL:** JUDITH P. BROACH, (Joshua S. C. Parkhurst, on the brief), Broach & Stulberg, LLP, New York, N.Y., for Plaintiff-Appellant.

VICTOR A. KOVNER, (Peter Karanjia, on the brief), Davis Wright Tremaine, LLP, New York, N.Y., for Defendants-Appellees.

**JUDGES:** Before: MINER and POOLER, Circuit Judges, and RAKOFF, District Judge. *

         * The Honorable Jed S. Rakoff, District Judge for the Southern District of New York, sitting by designation.

**OPINION BY:** MINER

**OPINION:**

    MINER, Circuit Judge:

Plaintiff-appellant Martin Zelnik ("Zelnik") appeals from a summary judgment entered in the United States District Court for the Southern District of New York (Swain, J.) in favor of defendants-appellees, Fashion Institute of Technology, State University **[*2]** of New York ("FIT"), and the President of FIT, Dr. Joyce Brown ("Brown"). Zelnik brought this action to remedy alleged deprivations of the right of free speech, the right of free association, and the right to petition the government for redress of grievances. The alleged deprivations were pleaded in claims made pursuant to *42 U.S.C. § 1983*; the *First* and *Fourteenth Amendments to the United States Constitution*; and Article I, *Sections 8* and *9* of the New York State Constitution. A claim of defamation also was alleged, pursuant to New York State law, but was later voluntarily withdrawn by Zelnik. Following cross-motions for summary judgment, the District Court granted the motion of the defendants-appellees and dismissed the Complaint. The District Court determined that Zelnik could not establish that he had suffered an "adverse employment action," an element of his prima facie case, as he was unable to demonstrate the loss of a benefit resulting from FIT's retaliatory failure to afford him professor emeritus status. The District Court also found that no reasonable fact-finder could have determined that the conduct of defendant-appellee Brown constituted harassment **[*3]** of the type that would have deterred a reasonable person from exercising his free speech rights. The District Court's dismissal of Zelnik's *First Amendment* claim for failure to demonstrate retaliation by adverse employment action is the only ruling challenged on appeal. For the reasons that follow,

2006 U.S. App. LEXIS 23424, *3; 25 I.E.R. Cas. (BNA) 8

we affirm the judgment of the District Court.

## BACKGROUND

Zelnik is a retired faculty member of the Fashion Institute of Technology ("FIT"). FIT, located in New York City, is a public institution of higher learning in the State University of New York ("SUNY") system. FIT is located in a single block on West 27th Street between Seventh and Eighth Avenues in Manhattan. Brown has been FIT's president since June of 1998.

Zelnik was a member of the FIT faculty from 1969 through December of 1999, holding the title of Professor in the Interior Design Department at the time of his retirement. During Zelnik's thirty years of service at FIT, he made major contributions to the Interior Design Department and the school and served in many leadership positions. Zelnik occasionally has taught classes at the school as an Adjunct Professor since his retirement.

Zelnik is also a 50% owner of **[*4]** a six-and-a-half-story building located at 242 West 27th Street (between Seventh and Eighth Avenues). This building is situated on the same block as the FIT buildings. Zelnik and his joint business partner of thirty-five years, Julius Panero ("Panero"), operate their architecture and interior design practice, Panzel Development Associates ("Panzel"), there. Zelnik and Panero purchased the property for approximately $ 90,000 some years ago. Zelnik estimated the property to be worth approximately $ 5 million in October of 2004.

I. Zelnik's Opposition to the Streetscape Project

Sometime in February of 1999, Zelnik, as a property owner, received a letter from a law firm representing FIT, informing him that FIT intended to permanently close a portion of 27th Street between Seventh and Eighth Avenues as part of its "Streetscape" Project ("Streetscape" or the "Project"). This Project involved designs to create a campus-type environment for FIT on the closed portion of 27th street. Streetscape originally was proposed in 1979 in response to a traffic accident that resulted in an injury to a student. As originally conceived, Streetscape called for turning all or a substantial portion **[*5]** of West 27th Street into a pedestrian area mall, which would be closed to all thru-traffic. The original plans called for the remainder of West 27th Street to be left open for two-way traffic, with the navigable portion of West 27th Street terminating in a cul-de-sac and "turnaround" for vehicles directly outside the FIT building in which the President's office is located. The 1979 plans, however, never were actualized.

The 1999 design of the Streetscape Project was substantially similar to the original 1979 design, but the "turnaround" was to be placed near Zelnik's property at 242 West 27th Street. Although Zelnik generally was in favor of the Streetscape Project, he and other members of the community formed an informal organization called the "27th Street Block Association" (the "Association") to discuss FIT's Streetscape plans and propose alternatives.

Zelnik's activity on behalf of the Association included, inter alia, various efforts in opposition to the Project. For example, after attending a July 1999 meeting with representatives from FIT and other interested parties regarding Streetscape, Zelnik prepared and distributed a memorandum to community members outlining his concerns **[*6]** about various aspects of the proposed Project. In that letter, Zelnik raised his concern that the portion of the street remaining open for automobile traffic, culminating in a cul-de-sac or "turnaround," presented a danger to pedestrians. Given as an example was the exposure of pedestrians to danger from large trucks maneuvering through the turnaround.

Also in July of 1999, Zelnik wrote a letter to a New York City Commissioner regarding the Association's opposition to Streetscape. In September 1999, Zelnik wrote a letter to FIT on behalf of the Association, asking for additional information. In March of 2000, Zelnik's business partner, Panero, spoke before two community boards on behalf of himself and Panzel and described the Streetscape project as a "disaster waiting to happen."

In June of 2000 Zelnik wrote a letter to a New York State Assemblyman, explaining the potential safety problems with the Streetscape design and traffic flow. Zelnik stated in that letter that the project would create a condition that would "ultimately result in the loss of life and limb and will cause serious bodily damage to students, staff, faculty, residents and tenants of the block."

In October of **[*7]** 2000, Panzel, the Association, and other individual petitioners (collectively, the "Petitioners") commenced an Article 78 proceeding, pursuant to the New York State Civil Practice Law and Rules, in the Supreme Court of the State of New York, County of New York, against the Dormitory Authority of

the State of New York ("DASNY") and the Department of Transportation ("DOT") to block the execution of the Project. The Petitioners sought (i) to annul and vacate the relevant "approvals granted and the environmental quality findings made" by DASNY and DOT; (ii) to declare "the State Environmental Quality Review Negative Declaration issued by DASNY to be in violation of the State Environmental Quality Review Act and 6 N.Y.C.R.R. Part 617"; (iii) to declare "the City Environmental Quality Review Negative Declaration issued by DOT to be in violation of City Environmental and Quality Review, and Mayoral Executive Order 91 of 1977"; (iv) to annul and vacate, or prohibit, certain DOT designations of the relevant streets; and (v) costs and "other and further relief as is just and proper." The Article 78 proceeding was eventually dismissed by the court but reinstated by the New York State Appellate **[*8]** Division, First Department. The Petitioners subsequently failed to pursue this litigation.

In February of 2001 Zelnik gave an interview to a reporter with the Village Voice, a New York City weekly news publication, which was a part of a published article discussing the "traffic nightmare for private businesses and residents at the block's western end" and FIT's "small assault on the quality of everyday life -- imposed by politically powerful players -- that turns complacent New Yorkers into outraged citizen warriors ready to descend on city hall." In March of 2001, Zelnik wrote a letter to the editor of the daily newspaper, Newsday. In that letter, Zelnik described the Project as a "dead-end crisis that will also end up being a potential killer."

II. Professor Zelnik's Nomination for the Status of Professor Emeritus

In June of 2000, the Interior Design Department (the "Department") nominated Zelnik for "emeritus status." According to FIT, emeritus status is "an exceptional honor signifying excellence and one that is rarely granted." Indeed, it appears that emeritus status at FIT has been conferred only once in the past decade. President Brown noted that emeritus status has **[*9]** "no remuneration" but brings with it only a "continued association with the institution and the value that such status would confer." FIT views professors with emeritus status as "representative[s] of the college." Zelnik asserts that emeritus status brings with it tangible benefits, as well as prestige, status, and respect "within FIT and the wider academic and professional communities." FIT

takes the position that emeritus status carries with it no real benefit beyond the honorific title.

Zelnik claims that all faculty members in the past who (i) have met the requisite criteria for emeritus status and (ii) have either requested emeritus status, or have been nominated for emeritus status, have ultimately received emeritus status. n1 In the past twenty years, every retired Full Professor who met the threshold criteria for a conferment of emeritus status, and who had been nominated by his department for emeritus status, had ultimately received such status by the Board of Trustees.

> n1 Neither party claims that satisfaction of the threshold criteria for emeritus status, coupled with either a request for emeritus status made by the retired professor or a nomination from the department, automatically entitles a retired Full Professor to emeritus status.

**[*10]**

The criteria and procedures for obtaining emeritus status were established by resolutions of the Board of Trustees of FIT and are published in the FIT Faculty Handbook. Currently at FIT, and during the time that the underlying events of this action took place, in order to satisfy the criteria to have emeritus status conferred a faculty member (i) must have held the rank of Full Professor at the time of retirement; (ii) must have been a member of the faculty of the college for a minimum of twenty-five years or a "prime mover in the introduction, organization, and development of a department or an area of study within a department in the college which has been continued for a minimum of ten years"; and (iii) must have "gained recognition in the college for the quality of service to [FIT] above and beyond the requirements of the positions held." (emphasis in original). Neither the Faculty Handbook nor any other FIT publication describes any specific benefits attached to Professor Emeritus status.

The procedures for the conferral of emeritus status, according to the Board of Trustees' resolution dated October 21, 1991, are as follows. First, the retired full Professor **[*11]** must be nominated by the Department or Divisional Dean. Next, the Vice President of Academic Affairs must receive the nomination and recommendation from the Division Dean. Third, the President of FIT must

receive the nomination and recommendation from the Vice President of Academic Affairs. Finally, the President of FIT must recommend the nomination to the FIT Board of Trustees, who then may approve the nomination.

By memorandum dated February 8, 2000, following Zelnik's retirement, Professor Joan Melnick of the FIT Interior Design Department proposed that the Department nominate Zelnik for emeritus status. The Department's faculty unanimously voted in favor of the proposal on May 18, 2000. On June 1, 2000, Frank Memoli, Chair of the Interior Design Department, by memorandum, notified the FIT Board of Trustees, Brown, and Dario Cortes, Vice President for Academic Affairs of FIT, of the nomination and requested their "concurrence and approval in the granting of [the] well-deserved distinction."

Approximately six months after Brown was notified of the recommendation, Nicholas Politis ("Politis"), a faculty member in the Department, contacted Brown's assistant to inquire as to the [*12] status of the nomination. Politis was informed that the nomination was still on Brown's desk. In February 2001, Politis again inquired about the status of Zelnik's nomination, and Politis was told that, although it was still on Brown's desk, it was "at the bottom of the pile." In April 2001, after a third inquiry, Politis was explicitly told that the delay in reviewing appellant's nomination was due to Zelnik's opposition to the Streetscape project.

The Department sent a memorandum, dated December 12, 2001, to Brown inquiring about FIT's failure to respond to, or act on, Zelnik's nomination for emeritus status. In that memorandum, the Department stated that it had been informed by Brown's office that the nomination was put "on hold" and that "[i]t has been suggested by some that the reason for [the] delay is the fact that Professor Zelnik was among those in the community that voiced their opposition to the proposed Streetscape plan, as designed."

On January 4, 2002, Brown responded by memorandum to the faculty members of the Department, stating that she had been in receipt of the December 12, 2001, memorandum; that "[e]meritus status is an honor, not a right"; that a "faculty [*13] member does not achieve it automatically upon the completion of a list of stated requirements"; that the fact that the Department voted to nominate Zelnik "does not require [FIT] to

endorse the nomination uncritically"; and that the "procedures to be followed in evaluating a nomination once made . . . have not been followed . . . making your request to [Brown] at the very least premature." Brown then stated in that memorandum that the "threshold criteria" for emeritus consideration were set forth in the Faculty Handbook (Part III, section M.5) and that "[i]t is only on completion of those requirements that the faculty member is 'entitled to request' [nomination for] the honor of the emeritus title."

While Brown stated in her memorandum of January 4, 2002, that the failure to recommend Zelnik for emeritus status was not due to his voiced opposition to Streetscape and that she "welcome[d] the opinion of every member of the FIT community on every project that the College takes on," Brown also stated:

> Professor Zelnik did not simply join members of the community in opposing the Streetscape plan because of fears that it "posed a threat to the safety and welfare of [*14] the community . . . ." Rather, Professor Zelnik owns property at that end of 27th Street, and his interest in opposing the plan was personal, involving access to his building. Professor Zelnik confirmed that fact when he continued his efforts to prevent Streetscape, unabated, even after the College responded to his complaints and those of his fellow property owners by enhancing the scenic aspects of that end of the street, as they had demanded, and by moving the turnaround farther east to facilitate access to their property. Our concessions did nothing to stanch Professor Zelnik's efforts to prevent Streetscape.
>
> Furthermore, Professor Zelnik has chosen to advance those personal interests in a manner that is nothing less than dishonorable. He has falsely impugned the College's motives, intentions, and reputation in a very public way, and has joined the chorus of accusers charging the [C]ollege with irresponsible behavior and of deliberately endangering the welfare of the elderly, the young, and the infirm in order to selfishly take real estate away

2006 U.S. App. LEXIS 23424, *14; 25 I.E.R. Cas. (BNA) 8

from the community in pursuit of an "elitist" agenda. . . .

Thus, even if Professor Zelnik had met the threshold requirements for consideration, **[*15]** and even if you had obtained the necessary administrative recommendations, I could not in good conscience recommend that the College honor Professor Zelnik at this time. There is nothing that would require the object of Professor Zelnik's slanderous statements -- our College -- to pay honor to the individual maligning it, and I would not recommend that it do so.

Brown concluded her memorandum, however, by stating that she "might consider" recommending Zelnik's nomination in the future once litigation between Zelnik and FIT had terminated.

On November 21, 2002, the Department again nominated Zelnik for emeritus status. This nomination followed the procedures established by the FIT Board of Trustees and included a recommendation to the Dean of the Art and Design Division. Brown, on March 28, 2003, responded by a memorandum to Takashyi Kamiya, the Chair of the Interior Design Department, in which she recognized that the nomination "follow[ed] the procedures and criteria established by the Faculty Handbook and the Board of Trustees" in that the Department requested recommendations from the Division Dean and the Vice President for Academic Affairs. Brown explained, however, **[*16]** that she had considered the nomination "anew" and found "nothing in it that would persuade [her], at [that] time, to recommend the elevation of Professor Zelnik to emeritus status to FIT's Board of Trustees." Brown once again stated that Zelnik "dishonored FIT in his personal behavior in the course of his opposition to our proposed Streetscape plan." Brown noted in her memorandum of March 28 that while the Dean of Arts and Design had recommended the designation of Zelnik as Professor Emeritus, the Vice President of Academic Affairs had not made the same recommendation. FIT does not raise this procedural omission as part of its argument on appeal. To this date, Zelnik has not yet been granted the status of Professor Emeritus by FIT.

III. Proceedings in the District Court

Zelnik filed his Complaint in the United States District Court for the Southern District of New York on October 16, 2003, alleging, pursuant to *42 U.S.C. § 1983*, violations of his *First Amendment* and New York State Constitutional rights. Following discovery, the parties cross-moved for summary judgment. In a decision read from the bench on September 2, 2005, the District Court dismissed **[*17]** Zelnik's Complaint in its entirety. The District Court, citing *Galabya v. New York City Bd. of Educ., 202 F.3d 636 (2d Cir. 2000)*, determined that Zelnik could not prove one of the prima facie elements of a *First Amendment* retaliation claim, to wit, an adverse employment action. According to the court, Zelnik failed to demonstrate that denial of emeritus status was a materially adverse change in the terms and conditions of employment. Specifically, the court found that Zelnik had failed to demonstrate that he suffered a demotion or other detriment in his current terms of FIT employment, as the status of Professor Emeritus was simply an honorific title, which carried no additional benefits. The District Court, citing *Phillips v. Bowen, 278 F.3d 103, 109 (2d Cir. 2002)*, also found that Zelnik failed to establish a sufficient pattern of repeated and severe incidents of workplace harassment that, taken as a whole, would probably deter an average person from the exercise of their *First Amendment* rights.

Notice of Appeal was filed on September 23, 2005. Judgment was entered on September 27, 2005. This Court has jurisdiction pursuant to *28 U.S.C. § 1291* **[*18]** .

**DISCUSSION**

I. Standard of Review

A district court's grant of summary judgment is reviewed de novo. *Allianz Ins. Co. v. Lerner, 416 F.3d 109, 113 (2d Cir. 2005)*. This Court "utilizes the same standard as the district court: summary judgment is appropriate where there exists no genuine issue of material fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law." *D'Amico v. City of New York, 132 F.3d 145, 149 (2d Cir. 1998)*. A material fact is one that would "affect the outcome of the suit under the governing law," and a dispute about a genuine issue of material fact occurs if the evidence is such that "a reasonable [factfinder] could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)*; *R.B. Ventures, Ltd. v. Shane,*

2006 U.S. App. LEXIS 23424, *18; 25 I.E.R. Cas. (BNA) 8

*112 F.3d 54, 57 (2d Cir. 1997)*. In determining whether there is a genuine issue of material fact, the court must resolve all ambiguities, and draw all inferences, against the moving party. *United States v. Diebold, Inc., 369 U.S. 654, 655, 82 S. Ct. 993, 8 L. Ed. 2d 176 (1962)* **[*19]** (per curiam); *Donahue v. Windsor Locks Bd. of Fire Comm'rs, 834 F.2d 54, 57 (2d Cir. 1987)*. However, with respect to a properly supported summary judgment motion, the party opposing summary judgment "may not rest upon the mere allegations or denials of the adverse party's pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Fed. R. Civ. P. 56(e)*.

## II. Definition of Adverse Employment Action

As this Court has recently reaffirmed,

> [w]here the plaintiff is a public employee alleging that he suffered an adverse employment action as retaliation for the exercise of his *First Amendment* rights, . . . a plaintiff must initially show that
>
> (1) the speech at issue was made as a citizen on matters of public concern rather than as an employee on matters of personal interest, . . . . (2) he or she suffered an adverse employment action, . . . and (3) the speech was at least a substantial or motivating factor in the [adverse employment action] . . . .

*Morrison v. Johnson, 429 F.3d 48, 51 (2d Cir. 2005)* (per curiam) (selected alterations in Morrison **[*20]** ); see also *Cobb v. Pozzi, 363 F.3d 89, 102 (2d Cir. 2004)*. For purposes of the instant appeal, defendants-appellees have "concede[d] that [Zelnik's] speech related to a matter of public concern and that [Brown's] decision not to grant emeritus status was linked to his speech." Apparently, they also concede that Zelnik is an employee, despite his status as a retiree. Moreover, it is uncontested that Zelnik exercised his right of speech as a private citizen and not as part of his official duties. Cf. *Garcetti v. Ceballos, 126 S. Ct. 1951, 1960, 164 L. Ed. 2d 689 (2006)* (holding that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for *First Amendment* purposes, and the Constitution does not insulate their communications from employer discipline").

Accordingly, the only issue here is whether Zelnik is able to demonstrate that he suffered an adverse employment action. The gravamen of Zelnik's argument as presented to this Court is that the term "adverse employment action" has a different meaning in free speech retaliation cases than in Title VII and other discrimination cases **[*21]** and that the District Court applied the incorrect standard for measuring his adverse employment action claims. Zelnik also argues that the District Court erred in finding that the status of Professor Emeritus does not confer any tangible benefits and that FIT and its officials did not engage in conduct that would have deterred a reasonable similarly situated individual from exercising his or her *First Amendment* rights.

Galabya, the case upon which the District Court relied, involved a claim of discrimination brought pursuant to the Age Discrimination in Employment Act of 1967, Pub. L. 90-202, 81 Stat. 602 (codified at *29 U.S.C. §§ 621 et seq.*) ("ADEA"). In that case, we determined that "[a]n adverse employment action" within the meaning of the relevant legal standards is generally characterized as a "materially adverse change in the terms and conditions of employment." *Galabya, 202 F.3d at 640* (internal quotation marks omitted). It may include "termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, **[*22]** or other indices unique to a particular situation." *Id. at 640*. Because Zelnik could not demonstrate any material change in the terms and conditions of his employment, the District Court granted summary judgment to the defendants.

The standard applied by the District Court, however, is a more demanding standard than the one we have applied to *First Amendment* retaliation claims. "In the context of a *First Amendment* retaliation claim, we have held that '[o]nly retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights constitutes an adverse action.'" *Washington v. County of Rockland, 373 F.3d 310, 320 (2d. Cir. 2004)* (quoting *Dawes v. Walker, 239 F.3d 489, 493 (2d Cir. 2001)* (alteration in Washington)); see also *Hoyt v. Andreucci, 433 F.3d 320, 328 (2d Cir. 2006)*. In this context, "[a]dverse employment actions include discharge, refusal to hire, refusal to promote, demotion, reduction in pay, and reprimand." *Morris v. Lindau, 196 F.3d 102, 110 (2d Cir. 1999)*. This list of retaliatory conduct is certainly not

exhaustive, **[\*23]** however, and "lesser actions may also be considered adverse employment actions." Id. "Adverse employment actions may include negative evaluation letters, express accusations of lying, assignment of lunchroom duty, reduction of class preparation periods, failure to process teacher's insurance forms, transfer from library to classroom teaching as an alleged demotion, and assignment to classroom on fifth floor which aggravated teacher's physical disabilities." Id. (citing *Bernheim v. Litt, 79 F.3d 318, 324-26 (2d Cir. 1996)*).

While our cases thus have recognized a number of employment actions that we have characterized as adverse, we are guided by the general rule that "whether an undesirable employment action qualifies as being 'adverse' is a heavily fact-specific, contextual determination." *Hoyt, 433 F.3d at 328*. n2 A plaintiff cannot support such a determination unless he can show that an alleged act of retaliation is more than de minimis. See *Davidson v. Chestnut, 193 F.3d 144, 150 (2d Cir. 1999)* (collecting cases). Indeed, "[i]t would trivialize the *First Amendment* to hold that harassment for exercising the right **[\*24]** of free speech was always actionable no matter how unlikely to deter a person of ordinary firmness from that exercise . . . ." *Bart v. Telford, 677 F.2d 622, 625 (7th Cir. 1982)*.

> n2 We also note that although a public employee "may be required to show that the adverse action is of a type that, objectively 'would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights,'" *Morrison, 429 F.3d at 51* (quoting *Washington, 373 F.3d at 320*), this Court has not held that "a public employee plaintiff is required to show that the defendants' action had an actual chilling effect." Id. (emphasis supplied). "[I]t is well settled that public employees alleging retaliation for engaging in protected speech are not normally required to demonstrate a chill subsequent to the adverse action taken against them." Id. (quoting *Gill v. Pidlypchak, 389 F.3d 379, 382 (2d Cir. 2004))* (emphasis omitted).

**[\*25]**

Zelnik quotes a passage in *Rutan v. Republican Party of Illinois, 497 U.S. 62, 110 S. Ct. 2729, 111 L. Ed. 2d 52 (1990)*, for the proposition that the *First Amendment* protects public employees "from even an act of retaliation as trivial as failing to hold a birthday party for a public employee . . . when intended to punish her for exercising her free speech rights," *id. at 75 n.8* (internal quotation marks and citation omitted), but the quoted language is dicta and should not be read "literally," see *Pierce v. Tex. Dep't of Criminal Justice, Institutional Div., 37 F.3d 1146, 1149 n.1 (5th Cir. 1994)* ("We choose not to read the Supreme Court's dicta literally; rather, we apply the main analysis of Rutan to retaliation claims and require more than a trivial act to establish constitutional harm."); *Davidson, 193 F.3d at 150* (characterizing the "birthday party" passage as dicta). The Supreme Court quoted the "birthday party" passage from the opinion of the Seventh Circuit Court of Appeals in that case, *Rutan v. Republican Party of Illinois, 868 F.2d 943, 954 n.4 (7th Cir. 1989)*, which in turn inaccurately characterized **[\*26]** the circuit's own holding in Bart. See *Thaddeus-X v. Blatter, 175 F.3d 378, 398 (6th Cir. 1999)* (recounting the history of the "birthday party" passage).

In Bart the court strongly indicated that not holding a birthday party would be de minimis and would not, therefore, support a retaliation claim. *677 F.2d at 626*. However, in Bart the employee was "ridicule[d] for bringing a birthday cake to the office on the occasion of the birthday of another employee," even though bringing a birthday cake into work for another employee's birthday was a common practice in the office. *Id. at 624*. Moreover, this ridicule was considered a part of a larger "campaign of harassment which though trivial in detail may have been substantial in gross," and therefore was actionable. *Id. at 625*. This Court's jurisprudence has recognized such "substantial in gross" claims before. See *Phillips, 278 F.3d at 109* ("Our precedent allows a combination of seemingly minor incidents to form the basis of a constitutional retaliation claim once they reach a critical mass."). As noted, the District Court found that Zelnik could **[\*27]** not demonstrate such a "critical mass."

By focusing on "material adverse changes" in Zelnik's employment, rather than on the effect of FIT's actions on the exercise of free speech rights of a "person of ordinary firmness," we hold that the District Court applied the wrong standard to Zelnik's *First Amendment* retaliation claim. This conclusion is bolstered by the Supreme Court's recent decision in *Burlington Northern*

2006 U.S. App. LEXIS 23424, *27; 25 I.E.R. Cas. (BNA) 8

*and Santa Fe Ry. Co. v. White, 126 S. Ct. 2405, 165 L. Ed. 2d 345 (2006).* In Burlington Northern the Court held that "the anti-retaliation provision" of Title VII "is not limited to discriminatory actions that affect the terms and conditions of employment." *Id. at 2412-13.* Instead, the Court held that "actionable retaliation" was that which "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id. at 2415* (internal quotation marks omitted). This Court has never held that a public employee plaintiff alleging retaliation in violation of the *First Amendment* must demonstrate a material change in employment terms or conditions. Our standard for *First Amendment* retaliation claims has always **[*28]** been the equivalent to the standard set forth in Burlington Northern.

Although we conclude that the District Court applied an incorrect standard in defining adverse employment action in the *First Amendment* retaliation context, the error is of no consequence. We simply do not believe, based upon our review of the factual record, that a jury could conclude that the denial of, or the refusal to consider for, emeritus status would deter an individual of ordinary firmness, situated similarly to Zelnik, from exercising his free speech rights under the facts in this case. See *Washington, 373 F.3d at 320.*

We hold that the failure to afford Professor Emeritus status to Zelnik was not an adverse action because the benefits of such status, given the record before us, carry little or no value and their deprivation therefore may be classified as de minimis. See *Davidson, 193 F.3d at 150.* The benefit of emeritus status, such as it is in this case, is merely honorific. Zelnik has adduced no evidence in the record before us that a professor with emeritus status at FIT is entitled to any benefit or item of value beyond what is afforded to other retired faculty **[*29]** members. Zelnik alleges that professors with emeritus status at FIT are entitled to the use of FIT facilities and services. However, nothing in the record demonstrates what specific facilities and services are implicated. In any event, it appears that all retired professors are entitled to use certain FIT facilities. Zelnik therefore is entitled to the benefit of those facilities as a retired professor. His status as an Adjunct Professor also affords him access to certain institutional facilities when he is employed in that capacity. Moreover, Zelnik's title as a retired Full Professor remains intact.

Insofar as Zelnik claims that the status of professor emeritus carries with it things of intangible value, such as prestige, status, and respect within the FIT and wider academic community, he has failed to adduce any evidence of such matters beyond his conclusory statements. However, because the finding of an adverse employment action "is a heavily fact-specific, contextual determination," *Hoyt, 433 F.3d at 328,* we do not determine that denial of emeritus status could never support a finding of *First Amendment* retaliation. Indeed, at some institutions other than FIT, **[*30]** emeritus status apparently carries with it specific and well-defined benefits. See, e.g., JAMES E. MAUCH, JACK W. BIRCH, & JACK MATTHEWS, EMERITUS RANK IN MAJOR RESEARCH UNIVERSITIES: RETIREE PERQUISITES AND PRIVILEGES, EDUC. RES. INFO. CTR., U.S. DEP'T OF EDUC., OFFICE OF EDUC. RESEARCH AND IMPROVEMENT 1, 14 (1993) (summarizing the results of a questionnaire sent to members of the American Association of INSTITUTIONAL. PLANNING FOR EMERITUS FACULTY, EDUC. RES. INFO. CTR., U.S. DEP'T OF EDUC., OFFICE OF EDUC. RESEARCH AND IMPROVEMENT 16 (1990) (encouraging educational institutions to "put real meaning and distinction into the emeritus rank and reserve it for active and interested faculty" and noting that "[f]aculty then might be more likely to treat the rank as an opportunity to make additional contributions, rather than as an honorific title without responsibilities or challenges"), at http://www.eric.ed.gov.

Zelnik did present to the District Court a declaration from a former FIT employee, Victoria Barbero, who worked in the FIT President's Office, attesting to tangible benefits afforded to professors emeriti. These benefits, according to Barbero, were enumerated in an **[*31]** unproduced university document and were "office space, access to FIT's library and a phone line." The document was said to have existed "during [her] tenure," which ended before Zelnik's retirement. Barbero attributes the non-existence of the document to a supposition that the "document must have been misplaced at some time between 1998 and the present." The current employee holding Barbero's position, Jeffrey Slonin, and the Vice President of Human Resources and Labor Relations at FIT, Annette Piecora, attested to the fact that the records of FIT do not contain such a document. We agree with the District Court that the affirmation of Barbero was insufficient to raise a genuine issue of material fact as to whether professors emeriti at FIT are afforded anything

2006 U.S. App. LEXIS 23424, *31; 25 I.E.R. Cas. (BNA) 8

of value. It is significant that FIT does not have in place any written description of the benefits attendant to emeritus status.

It should also be noted that the criteria for receiving Professor Emeritus status are vague, imprecise, and highly discretionary. Such standardless criteria necessarily entail subjective determinations and do not permit this Court to ascertain or quantify the likelihood of an award of emeritus **[*32]** status to retired a Full Professor at FIT. The uncertainty of having the title of emeritus status conferred further undermines the potential value of such status. As a consequence, it is even less likely that an individual of ordinary firmness would be deterred or dissuaded from exercising his free speech rights if threatened with the withholding of this purely honorific title. We have considered all of Zelnik's other claims and find them to be without merit.

**CONCLUSION**

In accordance with the foregoing, the summary judgment entered in the District Court dismissing Zelnik's Complaint is hereby affirmed.