UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

HOWARD JOHN GOMBERT, JR.,:    PRISONER
    Plaintiff        :    CIVIL ACTION NO. 3:01CV1913(DJS)
                    :
v.                     :
                    :
LARRY LYNCH and WILLIAM   :
KAMINSKI,             :
    Defendants      :    OCTOBER 24, 2006

## MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANTS' RENEWED MOTION FOR SUMMARY JUDGMENT

## I.     INTRODUCTION

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, Local Rule 56, and this Court's Order of October 3, 2006, permitting the filing of renewed cross motions for summary judgment, Defendants Larry Lynch and William Kaminski, both Investigators with the New Milford Police Department ("NMPD"), respectfully submit this Memorandum of Law in support of their Renewed Motion for Summary Judgment.

## II.     FACTUAL BACKGROUND

### A.     The Narrow Fourth Amendment Issue to Be Decided

In its Ruling on Cross Motions for Summary Judgment, dated February 15, 2005, (the "Summary Judgment Ruling"), the Court granted Investigators Lynch and Kaminski summary judgment on all issues in this action except one: whether the removal of items

from the plaintiff's 1984 white Pontiac Firebird (the "Firebird") on March 1, 2000, gave rise to a claim under the Fourth Amendment, via 42 U.S.C. §1983. See Summary Judgment Ruling, at 9-13. The Court determined that there was a narrow question of fact concerning the removal of certain property from the Firebird on March 1, 2000, which precluded the entry of summary judgment. Id. The Court determined that, based upon the parties' conflicting affidavits concerning whether the rear hatch of the Firebird was open, or closed, there was "an issue that must be resolved by the trier of fact and cannot be resolved by the court on summary judgment." Summary Judgment Ruling, at 10.

The Court also raised the issue of the "plain view exception," and held that, "the defendants have presented no evidence to show that the items were covered by this exception to the warrant requirement." Id. Investigators Lynch and Kaminski did not argue in their earlier Motion for Summary Judgment, dated November 23, 2004, and do not argue here, that the plaintiff's property was removed from the Firebird pursuant to the "plain view" exception. Rather, the defendants argued, inter alia, that they were protected from liability by the

doctrine of qualified immunity because their conduct was objectively reasonable.  <u>See</u> Mem. of Law in Supp. of Def.s' Mot. Summ. Judg., 11/23/04, at 15-17.[1]

Admittedly, this narrow issue was not well fleshed out in the initial cross motions for summary judgment.  That is because the plaintiff's pro se complaint was scattered, not broken into separately numbered paragraphs and concisely pleaded counts as required by Rule 10(b) of the Federal Rules of Civil Procedure, and was premised upon a laundry list of poorly framed legal theories.  <u>See</u> Complaint of 3/10/03.  The defendants' initial Motion was focused on the plaintiff's Equal Protection claim and his challenge to the March 1, 2000 and May 9, 2000 search warrants.

The Court granted summary judgment for the defendants on all issues alleged in the complaint, except the narrow issue concerning the items taken from the Firebird on March 1, 2000.[2] On October 3, 2006, based upon the plaintiff's request to renew

_____

[1]  Specifically, Investigators Lynch and Kaminski argued that, even if they erred in some way in connection with their execution of the search warrants on March 1, 2000 and May 9, 2000, their conduct was objectively reasonable based upon the circumstances.  Mem. of Law in Supp. of Def.s' Mot. Summ. Judg., 11/23/04, at 16.

[2]  In particular, the Court has already held that the plaintiff's challenge to the two search warrants executed by the NMPD, on March 1, 2000 and May 9, 2000, fail as a matter of law.  Ruling, at 11.

his Motion for Summary Judgment on the remaining narrow Fourth Amendment question, the Court agreed to allow the defendants to renew their Motion for Summary Judgment.  <u>See</u> Order of 10/3/06.

Now that the Court has narrowed the issue to the removal of items from the plaintiff's Firebird on March 1, 2000, Investigators Lynch and Kaminski submit herewith an abundance of evidence demonstrating that they are entitled to summary judgment.

**B.**     **<u>The Plaintiff's February 29, 2000 Arrest</u>**

Familiarity is assumed with the Court's prior Summary Judgment Ruling and the undisputed facts that have already been established by the Court.  <u>See</u> Summary Judgment Ruling, at 4-6. Those undisputed facts are incorporated herein and are supplemented by additional undisputed material facts set forth in the Defendants' Rule 56 Statement of Undisputed Facts, dated October 24, 2006.

On February 29, 2000, the plaintiff lived at 322A Aspetuck Ridge Road, New Milford (hereinafter "the Residence") with his girlfriend J.[3] and their infant daughter.[4]  That morning, the

_____

[3]  Pursuant to Connecticut General Statutes §54-86e, the plaintiff's ex-girlfriend will be referred to only as "J," since she was the victim of a sex crime that the plaintiff was convicted of committing.

plaintiff went to court for a motor vehicle offense.  Deposition of Howard J. Gombert, Jr. of 8/4/04 (hereinafter "Pl.'s Dep. Tr.") at 26, 29 (Exhibit A).  Sometime around 9:30 a.m., or thereafter, he left court, used cocaine, and returned to the Residence.  Id. at 33.

At approximately 5:46 p.m. on February 29, 2000, Officer Kaminski, Sgt. Duda, Sgt. Buckley, Officer Marino and Officer Nunnick traveled to the Residence.  Affidavit of William Kaminski of 11/23/04 (hereinafter "Kaminski Aff. 11/23/04"), ¶14.  The plaintiff was outside the house, and attempted to flee on foot, but was apprehended in the woods and arrested.  Pl.'s Dep. Tr. at 30; Kaminski Aff. 11/23/04, ¶16; Affidavit of Henry Marino of 10/24/06 (hereinafter "Marino Aff.") (Exhibit C), ¶6.  The plaintiff was then taken to the NMPD Headquarters and charged with sexual assault in a cohabitating relationship in violation of Connecticut General Statutes §53a-70b; risk of injury to a minor in violation of Connecticut General Statutes §53-21; and assault in violation of Connecticut General Statutes § 53a-61.  Kaminski Aff. 11/23/04, ¶18.

---

[4]  To avoid duplication, and as requested by the Court during the October 3, 2006 Status Conference, Investigators Lynch and Kaminski refer throughout this Memorandum to Exhibits already on file the with their November 23, 2004 Motion for Summary Judgment, rather than submitting those exhibits again.

C.    **The 27 Hour Period Between the Plaintiff's February 29, 2000 Arrest and the March 1, 2000 Execution of the Search Warrant**

On February 29, 2000, after the plaintiff was taken into custody, his bail was set at $500,000, which he was unable to post.  Pl.'s Dep. Tr. at 42; Affidavit of William Kaminski of 10/24/06 (hereinafter "Kaminski Aff. 10/24/06), (Exhibit B) ¶¶4-5.  The plaintiff later pled guilty under the Alford doctrine to these charges.  Pl.'s Dep. Tr. at 12.  The plaintiff has been incarcerated since his arrest on February 29, 2000, and has never returned to the Residence.  Pl.'s Dep. Tr. at 42; Kaminski Aff. 10/24/06, ¶6.

After the plaintiff was taken into custody on February 29, 2000, the NMPD considered the Residence to be a crime scene for purposes of investigating the sexual assault complaint made by J.  Kaminski Aff. 10/24/06, ¶¶7,8; Affidavit of Larry Lynch of 10/24/06 (hereinafter "Lynch Aff. 10/24/06") (Exhibit D), ¶5,6; Affidavit of James Mullin of 10/24/06 (hereinafter "Mullin Aff.") (Exhibit E), ¶¶5,6.  Because the Residence was considered a crime scene, members of the NMPD stood watch at the Residence to preserve the scene.  Kaminski Aff. 10/24/06, ¶¶15-16.

On the evening of February 29, 2000, after Officer Kaminski assisted with the processing of the plaintiff at NMPD

Headquarters, he returned to the Residence and stood watch until approximately 2:30 a.m. on March 1, 2000. Id., ¶¶9,10. At that time, NMPD Officer Jerome Dombrowski relieved Officer Kaminski and took over watch duty at the residence. Id., ¶11. Officer Dombrowski remained on watch at the Residence for twelve hours, until approximately 2:30 p.m. on March 1, 2000, at which time Officer Kaminski returned to relieve Officer Dombrowski. Id., ¶¶12-13. Officer Kaminski stood watch again from approximately 2:30 p.m. until 8:00 p.m. on March 1, 2000. Id., ¶14. During the period between the evening of February 29, 2000 and 8:00 p.m. on March 1, 2000, while the house was under watch, Officer Kaminski did not enter the Residence. Id., ¶17.

Meanwhile on March 1, 2000, Investigators Lynch and Mullin continued their investigation of J.'s complaint. Lynch Aff. 10/24/06, ¶7; Mullin Aff., ¶7. The Investigators met with J. at police headquarters. Lynch Aff. 10/24/06, ¶¶8-9; Mullin Aff., ¶8. Officer Mullin also had J. sign a consent to search form for the Residence. Lynch Aff. 10/24/06, ¶10; Mullin Aff., ¶9. Investigator Lynch conferred with Assistant State's Attorney Guy Wolf ("ASA Wolf") regarding obtaining evidence from the Residence. Kaminski Aff. 10/24/06, ¶11; Mullin Aff., ¶11. ASA

Wolf counseled Investigator Lynch that the NMPD should also obtain a search warrant for the Residence because the plaintiff and J. had been cohabitating.  Lynch Aff. 10/24/06, ¶12; Mullin Aff., ¶12.

On March 1, 2000, Investigators Lynch and Mullin prepared an Application for a Search Warrant of the Residence and traveled to Kent, Connecticut, to the home of Superior Court Judge Alexandra DiPetima to have the search warrant approved. Lynch Aff. 10/24/06, ¶¶13-15; Mullin Aff., ¶¶13-15.  In the early evening of March 1, 2000, Judge DiPentima signed the search warrant.  Lynch Aff. 10/24/06, ¶16; Mullin Aff., ¶16.

### D.    The March 1, 2000 Search of the Residence

On March 1, 2000, at approximately 8:00 p.m., Investigators Lynch, Mullin, and Officer Earl Wheeler arrived at the Residence to execute the search warrant.  Lynch Aff. 11/23/04, ¶19; Mullin Aff., ¶18. Investigator Lynch and Officer Wheeler arrived at the Residence in the NMPD's Crime Scene Van.  Lynch Aff. 11/23/04 ¶20; Mullin Aff., ¶19.  Investigator Mullin arrived at the Residence accompanied by J.  Lynch Aff. 10/24/06, ¶¶23-24; Mullin Aff., ¶¶21-22.  The search commenced at approximately 8:00 p.m. on March 1, 2000, and was conducted by Investigators

Lynch, Kaminski, Mullin and Officer Wheeler.  Kaminski Aff. 10/24/06, ¶19; Lynch Aff. 10/24/06, ¶43; Mullin Aff., ¶32.

Because of his incarceration, the plaintiff was not present during the March 1, 2000 search. Pl.'s Dep. Tr. at 42; Kaminski Aff. 10/24/06, ¶6.  In fact, it is undisputed that the March 1, 2000 search of the Residence commenced approximately 27 hours after the plaintiff's arrest, and concluded approximately 31 hours after his incarceration began.  Kaminski Aff. 10/24/06, ¶¶19-20.  Based on these undisputed facts, the plaintiff is unable to controvert the defendants' version of what transpired on the evening of March 1, 2000, when the Search Warrant was executed at the Residence.

### E.      The Removal of Property From the Plaintiff's Firebird for Safekeeping

During the course of the search, J. showed the officers items that she thought might be of interest to law enforcement, including the plaintiff's collection of women's undergarments. Lynch Aff. 10/24/06, ¶¶26-27; Mullin Aff., ¶¶24-25.  J. also showed the officers the plaintiff's Firebird, which was parked at the Residence.  Lynch Aff. 10/24/06, ¶28; Mullin Aff., ¶26.

On February 29, 2000, when the police arrived at the Residence to arrest the plaintiff, he had been attempting to

repair the radiator on the Firebird.  Pl.'s Dep. Tr. at 47.  As a result, the hood of the Firebird was open.  Id.  The plaintiff had also been packing his belongings into the Firebird and, when the police arrived to arrest him, the Firebird, according to the plaintiff's testimony, was "pretty much closed up, but it wasn't locked."  Id. at 53.  The rear hatch of the Firebird was also open when the officers arrested the plaintiff on February 29, 2000, although the plaintiff contests this fact.  Marino Aff., ¶¶7-8.

On the evening of March 1, 2000, more than 27 hours after the plaintiff's arrest, when J. showed the members of the NMPD the Firebird, the engine hood and rear hatch were in the open position.  Lynch Aff. 10/24/06, ¶ 30; Mullin Aff., ¶30.  During the execution of the search warrant, Investigator Lynch took a number of photographs to document the crime scene, including photographs of the Firebird.  Lynch Aff. 10/24/06, ¶¶31,32; Mullin Aff., ¶29.

The photographs show that, during the March 1, 2000 search of the Residence, the engine hood and the rear hatch of the Firebird were open.  Lynch Aff. 10/24/06, ¶34; Mullin Aff., ¶30. The photographs also show that there were items visible in plain

view in the open rear hatch of the Firebird.  Kaminski Aff.
10/24/06, ¶23; Lynch Aff. 10/24/06, ¶36; Mullin Aff., ¶31.  The
plaintiff has not, and cannot controvert this undisputed
evidence concerning what transpired on March 1, 2000, when he
was incarcerated.

The officers completed their search and inventory of the
items seized from the Residence at approximately 1:00 a.m. on
March 2, 2000.  Kaminski Aff. 10/24/06, ¶20; Lynch Aff.
10/24/06, ¶44; Mullin Aff., ¶33.  They then ensured that the
Residence was secure because the plaintiff was being held on
$500,000 bond, which he did not appear likely to meet, and J.
had told them she was leaving the state.  Kaminski Aff.
10/24/06, ¶21; Lynch Aff. 10/24/06, ¶¶45,46; Mullin Aff.,
¶¶34,35.  J. informed Investigator Lynch that she did not intend
to stay at the Residence because she was concerned for her
safety.  Lynch Aff. 10/24/06, ¶25; Mullin Aff., ¶23.

Investigator Lynch concluded that it was his responsibility
to safeguard the items that were in the Firebird because they
appeared to have some value.  Kaminski Aff. 10/24/06, ¶22; Lynch
Aff. 10/24/06, ¶47; Mullin Aff., ¶36.  In addition, there seemed
to be some dispute between the plaintiff and J. regarding some

of the property.  Lynch Aff., 10/24/06, ¶47.  Rather than leave the items in the Firebird where they could be stolen, Investigator Lynch took them to the NMPD Evidence/Property room for safekeeping.  Kaminski Aff. 10/24/06, ¶22; Lynch Aff. 10/24/06, ¶49; Mullin Aff., ¶38.[5]

Investigator Lynch took these items for safekeeping, and did not open the containers or examine the contents until months later, after he had obtained a second Search Warrant, dated May 8, 2000, based on a new complaint made by J. regarding property she claimed the plaintiff had stolen from her.  Lynch Aff. 10/24/06, ¶51.  The items in the Firebird that were taken for safekeeping were items that the plaintiff was worried about someone stealing.  Pl.'s Dep. Tr. at 53.  The police did not provide the plaintiff with a receipt of the seized property because the search warrants were sealed and the plaintiff was incarcerated.  Lynch Aff. 11/23/04, ¶33.

**F.    The Necklace Removed From J.'s Vehicle and its Release to the Carmel, New York Police Department**

---

[5] The items taken from the Firebird include: one black sports cam bag; one maroon premier collection bag with brown trim, one brown leather bag with Winston rodeo awards label; one Bradlees shopping bag; one brown strongbox; one gray briefcase; one black nylon case ("Case Logic"); and one gray/black Jordash travel type bag.  Lynch Aff. 10/24/06, ¶50.

During the search on March 1, 2000, Investigator Lynch photographed J.'s motor vehicle, a red Fiero bearing Connecticut registration # 905-MWN (the "Fiero").  Lynch Aff. 10/24/06, ¶37; Mullin Aff., ¶39.  Hanging from the rear view mirror of the Fiero was a bronze type necklace with black beads and a circle medallion devil sign (pentagram) (the "Necklace").  Lynch Aff. 10/24/06, ¶38; Mullin Aff., ¶40.  The Necklace was removed from the Fiero with J.'s permission; it was not listed in the inventory of evidence seized pursuant to the warrant because it was in J.'s car and she allowed the police to take it.  Lynch Aff. 10/24/06, ¶42.

At some point between February 29, 2000 and March 3, 2000, Investigator Mullin spoke with Officers Randy Tompkins and Brian Karst of the Carmel, New York Police Department.  Mullin Aff., ¶ 41.  Officer Tompkins and Karst informed Investigator Mullin that the plaintiff was a suspect in a missing person's case in Carmel, New York.  Id., ¶42.  The victim of that crime, Robin Frances Murphy, whose date of birth was January 11, 1978, disappeared when she was seventeen years old.  Id., ¶¶43,45. Ms. Murphy was last seen on or about April 9, 1995 at a shopping

plaza in Carmel, New York where the plaintiff worked at a laundry.  Id., ¶¶44,46.

The plaintiff was acquainted with Ms. Murphy and was the last person to be seen with her before her disappearance.  Id., ¶47.  Ms. Murphy's personal belongings, including her keys, wallet, and identification, were found near the shopping plaza where the plaintiff worked at the time of her disappearance. Id., ¶48.  Officers Tompkins and Karst informed Investigator Mullin that foul play was suspected in the disappearance of Ms. Murphy and that the plaintiff was their prime suspect in her disappearance and suspected death.  Id., ¶¶49,50.

On or about March 3, 2000, Officers Tompkins and Karst came to New Milford to interview J. regarding the plaintiff's connection to Ms. Murphy's disappearance.  Id., ¶51.  J. provided evidence to Officers Tompkins and Karst potentially linking the plaintiff to Ms. Murphy's disappearance.  Id., ¶52. The plaintiff has acknowledged that he was a "major suspect" in the disappearance of Robin Murphy.  Pl.'s Dep. Tr. at 78.  On or about March 3, 2000, Investigator Mullin released the Necklace that was in J.'s Fiero to Officer Tompkins.  Mullin Aff., ¶53.

### G.     The Disposition of the Plaintiff's Property

The plaintiff has claimed that the police took his pornography collection.  Pl.'s Dep. Tr. at 94.  The plaintiff admitted, however, that he does not know exactly what property the police took, and he also has alleged that after he was incarcerated, J. gave away and sold his belongings.  Id. at 57. In fact, in 2003, the plaintiff sued J. in Small Claims Court for allegedly disposing of his personal belongings.  Id. at 61- 62; see Howard J. Gombert v. [J.], No. SCAL-65722, 108050, Superior Court, Small Claims Area at Bantam (Ex. F, G).

Certain property seized from the plaintiff, including pornographic photos and videos, was destroyed pursuant to orders of the criminal court.  Lynch Aff. 11/23/04, ¶40.  The plaintiff has acknowledged, and the Court has already ruled that, "after [plaintiff] obtained two court orders for the release of the property, much of [plaintiff's] property that had not been destroyed was returned to him."  Summary Judgment Ruling, at 6; Pl.'s Dep. Tr. at 99.

## III.    LEGAL ARGUMENT

### A.    Investigators Lynch and Kaminski are Entitled to Summary Judgment

A motion for summary judgment should be granted if the court determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the moving party as a matter of law. Fed. R. Civ. P. 56(c); see generally Celotex Corp v. Catrett, 477 U.S. 317, 322-23 (1986); Cronin v. Aetna Life Ins. Co., 46 F.3d 196, 202 (2d Cir. 1995).  The burden of showing that no genuine factual dispute exists rests on the party seeking summary judgment.  Adickes v. S.H. Kress & Co., 398 U.S. 144 (1970); Cronin, 46 F.3d at 202.

The Second Circuit has ruled, "mere conjecture or speculation by the party resisting summary judgment does not provide a basis upon which to deny the motion."  Quarles v. General Motors Corp., 758 F.2d 839, 840 (2d Cir. 1985). Instead, "the plaintiff must offer concrete evidence raising genuine disputes of material fact tending to show that his version of events is more than fanciful," and "may not rely on conclusory allegations or unsubstantiated speculation." Jeffreys v. City of New York, 426 F.3d 549, 554 (2d Cir. 2005);

<u>Johnson v. Carpenter Technology Corp.</u>, 723 F. Supp. 180, 182 (D. Conn. 1989).  "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]."  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242 (1986).

There are no genuine issues of fact regarding the plaintiff's claim against Investigators Lynch and Kaminski. They are entitled to judgment as a matter of law.

### B. <u>The Removal of Items from the Firebird Falls Under the "Safekeeping" or "Community Caretaking" Exception to the Warrant Requirement</u>

The items removed from the plaintiff's Firebird on March 1, 2000 were in plain view in the open rear hatch of the Firebird. Lynch Aff. 10/24/06, ¶¶30, 48.  The defendants do not, and have never argued, that the items were removed under the "plain view" exception to the warrant requirement.

As the court correctly noted in its earlier Ruling, the removal of plaintiff's property from the Firebird would not properly fall under the plain view exception because Investigator Lynch did not suspect that the items were connected to criminal activity.  Summary Judgment Ruling, at 10.  The seizure of the items does, however, fall under the "safekeeping"

or "community caretaking" exception to the warrant requirement, which is more analogous to an inventory search in which the warrant requirement is not implicated.  See Colorado v. Bertine, 479 U.S. 367, 371 (1987) citing South Dakota v. Opperman, 428 U.S. 364 (1976); Cady v. Dombrowski, 413 U.S. 433 (1973).  In sum, the Court has not yet addressed this exception to the warrant requirement and its applicability to this case.

It is well established that an individual's expectation of privacy in an automobile is significantly less than that related to a home or office.  Opperman, 428 U.S. at 368.  This stems from the ambulatory nature of automobiles.  Dombrowski, 413 U.S. at 442.  In Opperman, the Supreme Court held that an inventory of the contents of an impounded vehicle did not violate the Fourth Amendment.  Id. at 374.  The Court reasoned as follows:

> The owner, having left his car illegally parked for an extended period, and thus subject to impoundment, was not present to make other arrangements for the safekeeping of his belongings.  The inventory itself was prompted by the presence in plain view of a number of valuables inside the car.  As in Cady, there is no suggestion whatever that this standard procedure, essentially like that followed throughout the country, was a pretext concealing an investigatory police motive.

Opperman, 428 U.S. at 377.

This "safekeeping" or "community caretaking" exception is generally applicable when it is apparent to law enforcement officials that the items have some value.  See Rivera v. United States, 728 F.Supp. 250, 265 (E.D.N.Y. 1990).  Nevertheless, this exception has been extended beyond items that are recognizable as valuable.  Schiff v. Kerrigan, 625 F. Supp. 704, 712 (D. Conn. 1986) citing Dale v. Bartels, 732 F.2d 278, 284 (2d Cir. 1984) (finding the seizure of documents proper where the documents were not listed on a warrant and not in plain view, but were seized to keep certain files intact).

Although the plaintiff's car was not impounded, his property was removed from the Firebird because he was incarcerated and being held on $500,000 bond, his girlfriend was abandoning the Residence that they shared, and the property, which appeared to have some value, was in plain view through the open rear hatch.  Lynch Aff. 10/24/06, ¶¶46-49.  The items were taken for safekeeping and the containers were not opened.  Id., ¶51.  Based upon these facts, there is simply no violation of the plaintiff's Fourth Amendment rights.  Schiff, 625 F. Supp. at 712.

After the officers completed their search of the Residence, they ensured that it was secure. Lynch Aff., 10/24/06, ¶45. Investigator Lynch was aware that the plaintiff was incarcerated and unable to post his bond, and therefore not likely to return to the Residence for some time, if ever. Id., ¶46. In addition, J., who was a victim of a sexual assault committed by the plaintiff, told the Investigators that she intended to leave the state and abandon the Residence. Id. Investigator Lynch was faced with the choice of leaving the property visible and susceptible to theft and damage from the weather, or taking the property back to the NMPD for safekeeping. Investigator Lynch determined that it was his responsibility to safeguard the items, as they appeared to have some value. Id., ¶47. As a result, the defendants are entitled to summary judgment. Opperman, 428 U.S. at 377; Schiff, 625 F. Supp. at 712.

The property removed from the Firebird may not have been immediately apparent as valuable. Nonetheless, the officers had no way of knowing that the items contained in the bags were *not* valuable. Investigator Lynch concluded in observing the bags that the property may have had some value, and indeed, the plaintiff himself characterized those items as things he "was

worried about somebody stealing." Pl.'s Dep. Tr. at 53. The police have a duty to safeguard both individuals and their property from harm. See United States v. Best, 415 F. Supp.2d 50, 56 (D. Conn. 2006). Leaving the plaintiff's valuable property exposed to both passers-by and the weather does not comport with this duty.

The concept of reasonableness is the "'touchstone of the constitutionality of a governmental search.'" MacWade v. Kelly, 460 F.3d 260, 267 (2006), quoting Bd. of Educ. v. Earls, 536 U.S. 822, 828 (2002). In this case, it was eminently reasonable for Investigator Lynch, acting within the safekeeping exception to the warrant requirement, to remove the property from the Firebird to protect it from theft or damage. His intent to merely protect the property is clearly demonstrated by the fact that he stored the property as he found it in the NMPD Evidence Room. Lynch Aff. 11/23/04, ¶21. It was not until after J. made a report that the bags may contain some of her property, and a second search warrant was obtained, that the bags were opened. Id., ¶¶26,29,30.

That the rear hatch was open on March 1, 2000, is not in dispute. The plaintiff, having been arrested on February 29,

2000 and being unable to post bond, was still incarcerated on March 1, 2000.  Pl.'s Dep. Tr. at 42.  It is undisputed, therefore, that he was not present at the search, and had not been present at the Residence at any time after his arrest on February 29, 2000.  Id.

Conversely, multiple officers were present at the Residence on the evening of March 1, 2000 and observed the condition of the Firebird with its hood and rear hatch open, and items plainly visible in the rear hatch.  Kaminski Aff. 10/24/06, ¶23; Lynch Aff. 10/24/06, ¶36; Mullin Aff., ¶31.  They further state that J. led them to the car in this condition.  Id.

The plaintiff claims that the trunk of the Firebird was closed when he was arrested.  Considering the fact that the plaintiff had used cocaine earlier in the day on February 29, 2000, his memory of that date is suspect.  Pl.'s Dep. Tr. at 33.  The plaintiff may not rest on his bare assertion that the trunk was closed, but rather must present concrete evidence that would allow a jury to find in his favor.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986); Johnson v. Carpenter Technology Corp., 723 F. Supp. 180, 182 (D. Conn. 1989).  The plaintiff's claim about the condition of the car on February 29,

2000 is not concrete evidence that the car was in that condition approximately 30 hours later.  Rather, it is unsubstantiated speculation and the plaintiff has presented no evidence to contradict the officers' statements regarding the condition of the car on the evening of March 1, 2000.  See Jeffreys v. City of New York, 426 F.3d 549, 554 (2d Cir. 2005).

There is nothing in the record to support the plaintiff's allegations about the condition of the car on the evening of March 1, 2000.  Even drawing all inferences in the light most favorable to him, no reasonable person could believe the plaintiff's testimony.  See id. at 555.  The plaintiff's mere recollection, under the influence of cocaine, of the condition of the Firebird on February 29, 2000, which he alleges was also the condition of the car on March 1, 2000, a fact which has been contradicted by multiple individuals who actually observed the car on March 1, 2000, is not sufficient to allow a reasonable jury to find in his favor.  Instead, the plaintiff cannot establish that a genuine issue of material fact is in dispute; therefore, the defendants are entitled to summary judgment. Jeffreys, 426 F.3d at 554.

### C.    Investigators Lynch and Kaminski are Entitled to Qualified Immunity

Even if the Court were to conclude that the plaintiff stated a claim upon which liability may lie, or that factual disputes preclude a finding for the defendants, a proposition that the defendants dispute, they are still entitled to qualified immunity both because their conduct did not violate a clearly established statutory right and because their conduct was objectively reasonable.  Moore v. Vega, 371 F.3d 110, 114 (2d Cir. 2004).

The qualified immunity defense protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Kerman v. New York, 261 F.3d 229, 236 (2d Cir. 2001), quoting Harlow v. Fitzgerald, 457 U,S. 800, 818 (1982).  "The doctrine protects public officials from personally facing the risk of incurring serious liability in the form of money damages, which would deter qualified people from public service. It also safeguards the public interest in having its employees act with independence and without fear of consequences."  Eng v.

Coughlin, 858 F.2d 889, 895 (2d Cir. 1988) (internal quotation and citation omitted).

First, the defendants in this action are immune from suit because their conduct did not violate a "clearly established" statutory right in existence at the time of the search.  See Moore, 371 F.3d at 114.  The court must look at the right alleged to have been violated in a particular sense and determine whether, "[t]he contours of the right [were] sufficiently clear that a reasonable official would understand that what he is doing violates that right."  Kerman, 261 F.3d at 236; Hart v. Myers, 183 F. Supp. 2d 512, 525 (D. Conn. 2002) (internal quotations omitted).

A defendant is entitled to summary judgment when "no reasonable jury looking at the evidence in the light most favorable to, and drawing all inferences most favorable to the plaintiff, could conclude that it was objectively reasonable for the defendant to believe that he was acting in a manner that did not clearly violate an established right."  Lennon v. Miller, 66 F.3d 416, 420 (2d Cir. 1995), quoting Robinson v. Via, 821 F.2d 913, 921 (2d Cir. 1987).

Investigator Lynch, in removing the property clearly visible within the open rear hatch of the Firebird, was attempting to act within the safekeeping exception to the warrant requirement.  That exception has received very little treatment in the Second Circuit, and its parameters are not clearly defined.  That property is recognizably valuable is a clear justification for seizing property under the safekeeping exception.  See Dale v. Bartels, 732 F.2d 278, 284 (2d Cir. 1984); Rivera v. United States, 728 F.Supp. 250, 265 (E.D.N.Y. 1990).  Nevertheless, this exception has been extended to items that are not recognizably valuable.  Schiff v. Kerrigan, 625 F. Supp. 704, 712 (D. Conn. 1986).

In safekeeping the plaintiff's exposed property of unknown value, Investigator Lynch was adhering to his duty to protect the plaintiff's property.  If he exceeded the boundaries of the safekeeping exception, he is nonetheless protected by qualified immunity because his alleged violation was not apparent to him. See Kerman, 261 F.3d at 237.  As the alleged unlawfulness of the removal of the property was not apparent to Investigator Lynch, he cannot be said to have violated a clearly established right

of the plaintiff.  See Moore, 371 F.3d at 114; Hart v. Myers,
183 F. Supp. 2d 512 (D. Conn. 2002).

The defendants are also entitled to qualified immunity
because it was objectively reasonable for them to believe that
their actions were lawful at the time.  See Moore, 371 F.3d at
114.  Government officials enjoy immunity from liability "as
long as their actions could reasonably have been thought
consistent with the rights they are alleged to have violated."
Id. at 114-115 (internal quotations omitted).  Investigator
Lynch's decision to remove the property from the Firebird was
reasonable, even if it was mistaken, and he is therefore
entitled to qualified immunity.  Moore, 371 F.3d at 117 (finding
that a police officer's warrantless entry into a home where she
mistakenly believed that an absconded parolee was located
violated the Fourth Amendment, but that she was nonetheless
entitled to qualified immunity because she reasonably believed
that she was justifiably entering the home of the parolee).[6]

Qualified immunity applies if "officers of reasonable
competence could disagree about the legality of the defendants'

---

[6] There is no dispute that Investigator Lynch safeguarded the property from
the Firebird, not Investigator Kaminski.  Lynch Aff. 10/24/06, ¶47.  As a
result, Investigator Kaminski is entitled to summary judgment because there
is not even an allegation that he committed any violation.

actions." <u>Hart</u>, 183 F. Supp. 2d at 525 (internal quotations omitted).  An officer's actions will be found objectively unreasonable and summary judgment will be denied only if "no officers of reasonable competence could have made the same choice in similar circumstances." <u>Id.</u> (internal quotations omitted).

In <u>Hart</u>, the court found that a conservation officer had violated the plaintiff's Fourth Amendment rights by conducting a warrantless search on the plaintiff's property.  <u>Id.</u> Nevertheless, it also found that the officer was entitled to qualified immunity because the area searched was not clearly within the curtilage of the plaintiff's home, and the officer's actions were therefore not objectively unreasonable.  <u>Id.</u>  In coming to this conclusion, the court recognized that the officer was faced with a "difficult and complex question" regarding whether a warrantless search was proper.  <u>Id.</u>  Although the court determined that the warrantless search was in fact improper, it recognized that because reasonable officers could have disagreed about the legality of the search, the defendant officer's action was reasonable, and he was therefore entitled to qualified immunity.  <u>Id.</u> at 525–526.

Similarly, Investigator Lynch was faced with a difficult question about whether to remove the property in the plaintiff's Firebird.  It was objectively reasonable for him to safeguard the property left in open view and exposed to the weather and potential theft based upon his belief that the Residence was essentially being abandoned by J.  See id.  There is no suggestion that Investigator Lynch seized this property for his own personal use, for investigatory purposes, or for any other improper purpose.  Lynch Aff. 10/24/06, ¶¶19, 21.  At the very least, officers of reasonable competence could have disagreed about whether to remove the property.  Id.  As such, his actions were objectively reasonable, and both he and Investigator Kaminski are entitled to qualified immunity.  Moore, 371 F.3d at 114.

### D.    The Removal of the Property Did Not Rise to the Level of a Constitutional Violation

A negligent or intentional deprivation of property by a state actor does not implicate a Constitutional violation, at least in the Due Process context, if the state provides meaningful post-deprivation remedies.  Id. at 533; Parratt v. Taylor, 451 U.S. 527, 543 (1981).  Connecticut state law provides a number of remedies, including actions for conversion

and trespass to chattel.  See Simms v. Chaisson, 277 Conn. 319, 331 (2006); Suarez-Negrete v. Trotta, 47 Conn. App. 517, 521 (1998).  There was no bar to the plaintiff pursuing these claims if he wished to assert that he was entitled to some sort of compensation for his property.  The state, therefore, provides a meaningful remedy for the alleged deprivation of property.  In any event the issue is moot because the plaintiff's property was eventually all released.

The plaintiff has alleged that defendants violated Connecticut General Statutes § 54-36f by not providing him with a receipt of the property seized from him.  Complaint, at 4. Moreover, the plaintiff did file motions in the criminal court pursuant to this state law statutory scheme.  Summary Judgment Ruling at 6.  Because Connecticut provides an adequate post deprivation remedy, which the plaintiff in fact employed, the plaintiff's claim does not rise to the level of a constitutional violation.

Connecticut General Statutes § 54-36f provides that a law enforcement agency seizing the property shall give a receipt to the persons from whom the property was seized.  The officers did not give a receipt to the plaintiff for the property seized

during the March 1, 2000 search for several reasons.  First, the
plaintiff was incarcerated at the time the property was seized,
and indeed, is still incarcerated to this day.  Second, because
the police were investigating a crime of sexual assault, the
search warrant was sealed.  Lynch Aff. 11/23/04, ¶33.  Releasing
a list of the property seized would undermine the purpose of
sealing search warrants in cases of sexual assault.  See Conn.
Gen. Stat. § 54-86e.

The plaintiff's allegations regarding the police's failure
to provide him with a receipt and loss of property following its
seizure are not relevant to his Fourth Amendment claim.  "The
loss, theft, or destruction of property has not . . .ever been
thought to state a Fourth Amendment claim.  Rather, improper
inventories, defective receipts, and missing property have long
been redressable in tort by actions for . . .trespass to chattel
and conversion."  Hudson v. Palmer, 468 U.S. 517, 540 (1984)
(O'Connor, J., concurring).

Moreover, essentially all of the property at issue in this
case has been either returned to the plaintiff or destroyed
pursuant to an order of the criminal court.  Pl.'s Dep. Tr. at
99; Lynch Aff. 11/23/04, ¶45.  There are only two items of

property that the plaintiff claims have not been returned: a camera and the Necklace.  The camera, which the police found to be stolen, was returned to its owner, the plaintiff's landlord. Lynch Aff. 11/23/04, ¶47.  The Necklace, which was taken from J.'s car with her permission was released to the Carmel, New York Police Department as evidence in a missing person case in which the plaintiff was the prime suspect.  Id., ¶25.

There is no dispute that Investigator Mullin, a non-party to this action, released the Necklace to the Carmel police.  See Mullin Aff. 10/24/06, ¶¶53-54.  Neither Investigators Lynch nor Kaminski can be held liable for the release of the Necklace. For the reasons stated above, the release of the Necklace does not rise to the level of a constitutional claim in any event because the Necklace was in J.'s car and was released to law enforcement officials by J.  Mullin Aff. 10/24/06, ¶¶40, 52. For this additional reason, the defendants are entitled to summary judgment.

## IV.    <u>CONCLUSION</u>

For the foregoing reasons, Defendants Larry Lynch and William Kaminski respectfully request that the Court grant their Renewed Motion for Summary Judgment.

```
                              DEFENDANTS,
                              LARRY LYNCH and WILLIAM KAMINSKI
                                                       BY
                              /S/_____
                                James N. Tallberg
                                Federal Bar No.: ct17849
                                Karsten & Dorman, LLC
                                29 South Main Street
                                West Hartford, CT 06107
                                Tel. 860-521-4800
                                Fax. 860-521-7500
                                jtallberg@karstendorman.com
```

## **CERTIFICATION**

I hereby certify that, on October 24, 2006, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing.  Parties may access this filing through the Court's system.

/SS/_____
James N. Tallberg