UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| HOWARD JOHN GOMBERT : | |
|    Plaintiff, : | |
| : | Civil Action No. |
| v. : | 3:01 CV 1913 (DJS) |
| : | |
| LARRY LYNCH and WILLIAM KAMINSKI : | |
|    Defendants. : | November 7, 2006 |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION
PURSUANT TO RULE 56(f) IN RESPONSE TO DEFENDANTS'
<u>RENEWED MOTION FOR SUMMARY JUDGMENT</u>**

**I.     Introduction**

Nearly two and one-half years after filing their Answer and Special Defenses, the Defendants, Larry Lynch and William Kaminski (the "Defendants"), filed a Renewed Motion for Summary Judgment, dated October 24, 2006 (the "Renewed Motion"), asserting and seeking summary judgment on an affirmative defense that the Defendants failed to plead and failed to assert in their prior motion for summary judgment dated November 23, 2004.  Indeed, until fourteen days ago, neither the Court nor the Plaintiff, Howard John Gombert ("Gombert" or the "Plaintiff"), had any indication that the Defendants believed their unlawful search and seizure of Gombert's property is excused from the Fourth Amendment's warrant requirement under the Defendants' purported "safekeeping" or "community caretaking" theory.  By delaying the assertion of this defense until long after formal discovery has closed and for the over three years that Gombert represented himself *pro se*, the Defendants have deprived Gombert of any opportunity whatsoever to prepare a response to this defense or to conduct any discovery related to it.  Accordingly, pursuant to Fed.R.Civ.P 56(f), the Defendants' Renewed Motion should be denied or, at a minimum, the Court should grant a continuance of sixty (60) days from the date

on which the Court decides this motion to permit Gombert to conduct necessary discovery before being required to respond to the Defendants' Renewed Motion.

## II.     Factual Background

The Plaintiff filed the operative complaint in this case on or about March 12, 2003, alleging claims against the Defendants under 42 U.S.C. § 1983 arising from the Defendants' warrantless search and seizure of Gombert's property. Affidavit of Kate K. Simon at ¶4. After filing two failed motions to dismiss -- one for insufficiency of process and one for failure to state a claim -- the Defendants finally filed an Answer and Special Defenses on July 2, 2004. *Id*. The only defenses the Defendants pled were failure to state a claim upon which relief may be granted and qualified immunity.[1]  *Id*.

Until June 2006, Gombert, an individual without any formal legal training, represented himself *pro se* in this action and successfully survived summary judgment as to certain of his claims. Id. at ¶5. At that point, this Court appointed the undersigned as *pro bono* counsel ("Bingham"). *Id*.

Due to the Plaintiff's confinement at the MacDougall-Walker Correctional Institution in Suffield, Connecticut, and frequent relocations, he was not able to maintain organized files regarding his case. *Id*. at ¶6. Because of this, Bingham requested that Defendants permit an independent, outside copy service to make a copy of the discovery requests and responses served to date, at Bingham's expense, and immediately return the documents. *Id*. Despite Bingham's repeated requests for this professional courtesy and efforts to minimize any inconvenience to the

---

[1] The Defendants' Answer and Special Defenses sets forth three affirmative defenses; however, the second and third affirmative defenses both concern elements of qualified immunity. Gombert mistakenly stated in his Memorandum of Law In Support of His Motion for Partial Summary Judgment dated October 24, 2006, that the Defendants had pled the "plain view" exception to the Fourth Amendment's warrant requirement as an affirmative defense. The Defendants did not so plead and, according to the Defendants, the plain view exception is no longer at issue in this case.

Defendants, the Defendants did not respond to Bingham until July 7, 2006, at which point Bingham immediately arranged to obtain a copy of the discovery. *Id*. Bingham did not receive a substantially complete copy of the discovery in this matter until September, 2006. *Id*.

Following Bingham's analysis of the discovery, it became apparent that discovery was not adequately developed for the Plaintiff to take his case to trial. *Id*. at ¶7. As the formal discovery period in this case expired prior to Bingham's appointment, Plaintiff initiated discussions with the Defendants that resulted in an informal agreement to allow additional discovery without a court order, including the Defendants' depositions, which had never been taken, and the issuance of a subpoena for the production of records directed to the New Milford Police Department (the "NMPD"). *Id*. Accordingly, the Plaintiff served the subpoena on the NMPD on September 11, 2006 and noticed the Defendants' depositions and served them with supplemental requests for written discovery on September 22, 2006. *Id*. at ¶8. The Defendants and the NMPD have failed to comply with any of the requested discovery. *Id*.

Notwithstanding the parties' agreement to allow additional discovery, on September 25, 2006, Defendants' counsel, acting on behalf of the Defendants and the NMPD, moved to quash the subpoena served on the NMPD (the "Motion to Quash"). *Id*. at ¶9. Notably, the Defendants argued in the Motion to Quash that the NMPD's policies and procedures are not subject to discovery because they are irrelevant to the issues in this case and are not likely to lead to the discovery of admissible evidence. Motion to Quash at 8-9. Consequently, in addition to opposing the Motion to Quash, on October 23, 2006, the Plaintiff moved the Court for a formal order extending the discovery for a limited period of sixty (60) days from the date of the entry of the Court's order to allow him to complete necessary additional discovery. *Id*. The Plaintiff's Motion to Reopen Discovery (Doc. No. 96) is pending before this Court. *Id*.

3

On October 24, 2006, in adherence to the schedule set by the Court, the parties simultaneously filed cross motions for summary judgment. *Id.* at ¶10. Gombert's motion seeks summary judgment on basis that his car was searched by the Defendants without a warrant and in violation of his Fourth Amendment rights. *Id.* Gombert's motion also refutes the defenses previously raised by the Defendants and/or articulated in the Court's prior summary judgment ruling; namely, Gombert argues that his property was not in "plain view" when the Defendants seized it and that the Defendants are not entitled to qualified immunity. *Id.* By contrast, the Defendants' Renewed Motion is founded on a purported "exception" to the warrant requirement for safekeeping or community caretaking that was not raised in the Defendants' Answer and Special Defenses dated June 30, 2004, as required by Fed.R.Civ.P. 8(c), or in the Defendants' previous motion for summary judgment.

### III. Argument

#### A. Legal Standard

Federal Rule of Civil Procedure 56(f) provides that if a party cannot adequately defend a summary judgment motion, the court may (1) deny the motion; (2) order a continuance to permit discovery to be had; or (3) make any other order that is just. District courts have a duty under Rule 56(f) to ensure that parties have been given a reasonable opportunity to make their record complete before ruling on a motion for summary judgment. *See Hellstrom v. U.S. Dept. of Veterans Affairs*, 201 F.3d 94, (2d Cir. 2000) ("The nonmoving party must have had the opportunity to discover information that is essential to his opposition to the motion for summary judgment.") (citation and internal quotation marks omitted); *Strougo ex rel. Brazilian Equity Fund, Inc. v. Bassini*, 1999 U.S. Dist. LEXIS 5951, *17-18 (S.D.N.Y. 1999) ("[I]t is the duty of this court under 56(f) to ensure that the parties have been given a reasonable opportunity to make

their record complete before ruling on a motion for summary judgment.") (citation and internal quotation marks omitted). Accordingly, Rule 56(f) must be liberally construed. *Four Star Capital Corp. v. Nynex Corp.*, 183 F.R.D. 91, 99 (S.D.N.Y. 1997) ("rule [56] is to be applied with a spirit of liberality") (citation and internal quotation marks omitted).

   **B.** **Defendants' Renewed Motion Should Be Denied Because It Is Premised On A Defense That Defendants Failed to Plead And Have Never Asserted.**

  In their Renewed Motion, the Defendants raise an affirmative defense -- namely, a purported "safekeeping" or "community caretaking" exception to the Fourth Amendment's warrant requirement -- that they failed to raise in their Answer and Special Defenses. This is a clear violation of Fed.R.Civ.P 8(c), which requires the responding party to plead "any . . . matter constituting an avoidance or affirmative defense" in the first responsive pleading. *See Funk v. F&K Supply, Inc.*, 43 F.Supp. 2d 205, 221-222 (N.D.N.Y. 1999) (allowing a defense not pled in original or amended pleadings is inconsistent with notice function of Fed.R.Civ.P. 8(c)). Accordingly, the Defendants' motion should be denied.

  A critical purpose of Rule 8(c) is to prevent surprise, allowing the opposing party to investigate the claims made and then respond. *See Blonder-Tongue Labs., Inc. v. University of Ill. Found.*, 402 U.S. 313, 350 (1971) (purpose of requiring affirmative defense to be pled is to give opposing party notice and chance to argue why defense is inappropriate). This rule is particularly important in cases such as this one where the plaintiff represented himself *pro se*. *See Satchell v. Dilworth*, 745 F.2d 781, 784-785 (2d Cir. 1984) (police officer who had not pled affirmative defense of qualified immunity, but raised defense in summary judgment motion, could not obtain judgment against *pro se* claimant based on unpled defense because notice was insufficient). Here, the Defendants filed their Answer and Special Defenses on July 2, 2004. The only defenses that the Defendants pled were failure to state a claim upon which relief may

be granted and qualified immunity. Now, nearly two and a half years after filing their Answer and Special Defenses, and long after formal discovery has closed, the Defendants seek to assert a new affirmative defense of "safekeeping" or "community caretaking." By doing so, the Defendants have deprived the Plaintiff of the opportunity to conduct any discovery relative to this defense and prepare a response to it.

The Defendants appear to have surprised even themselves with their belated community caretaking defense. As discussed in greater detail on pages 7 and 8 below, the Defendants' community caretaking theory is applicable only where the police take and inventory property according to standardized policies and procedures. Yet just over one month ago the Defendants filed their Motion to Quash seeking to prevent Gombert from discovering, among other things, the NMPD's policies and procedures related to searching, seizing, and inventorying property. Motion to Quash at 8-9. Shockingly, the Defendants stated that:

> The police policies and training procedures in place on the date of the plaintiff's arrest is [sic] February 2000, and any subsequent changes to those procedures, <u>are not relevant to the issue remaining for trial</u>; namely, the conduct of the two individual defendants on March 1, 2000 and whether that conduct can sustain the plaintiff's Fourth Amendment search and seizure claim.

*Id.* at 9 (emphasis added). Granting summary judgment in favor of the Defendants on a theory that they have never asserted before would be extremely prejudicial to the Plaintiff who has been afforded no opportunity to conduct discovery on the factual underpinnings of this new defense or to establish any opposition to it. The Court should therefore deny the Defendants' Renewed Motion.

      **C.**    **Alternatively, the Court Should Order a Continuance To Permit Plaintiff to Conduct Discovery Necessary To Respond To Defendants' Renewed Motion.**

Should the Court determine that denial of the Defendants' Renewed Motion is not appropriate at this stage, the Court should continue its consideration of the Renewed Motion to

6

allow the Plaintiff to conduct discovery that is necessary for him to respond. Further discovery is clearly warranted in light of the new theories articulated for the first time in the Renewed Motion and, in fact, has already been sought by Plaintiff's counsel. Specifically, the Defendants' new theory that their actions were exempt from the Fourth Amendment's protections against unreasonable search and seizure under a "safekeeping" or "community caretaking" exception relies upon the existence of clearly-established, standardized police procedures, which the Defendants have refused to produce to the Plaintiff, and upon the Defendants' adherence to such procedures, which information the NMPD and the Defendants have also refused to produce.

The cases that the Defendants cite in support of their "safekeeping" theory are clear that safekeeping-type searches are permissible only if conducted pursuant to standardized police procedures.[2] *See* Defs. Mem. at 18 (citing *Colorado v. Bertine*, 479 U.S. 367 (1987); *South Dakota v. Opperman*, 428 U.S. 364, 375 (1976); *Cady v. Dombrowski*, 413 U.S. 433 (1973)). The United States Supreme Court is explicit that its "[community caretaking] decisions have always adhered to the requirement that inventories be conducted according to standardized criteria." *Bertine*, 479 U.S. at 374; *see Cady*, 413 U.S. at 442-43 (emphasizing two facts: (1) that police had custody of the automobile searched; and (2) the search was conducted pursuant to standard police procedures). The stated purpose of this requirement is to ensure that protective searches are conducted only to maintain public safety and not for investigative purposes. *Opperman*, 428 U.S. at 375 (1976) ("The Court carefully noted that the protective search was carried out in accordance with *standard procedures* in the local police department, a factor tending to ensure that the intrusion would be limited in scope to the extent necessary to carry out

---

[2] It should be noted that standardized police procedures are necessary, but are not sufficient by themselves to justify a safekeeping search.

7

the caretaking function.") (emphasis in original; internal citation omitted). Any purported safekeeping search that was not conducted pursuant to standard procedures or a warrant is presumed to violate the Fourth Amendment. *See Cady*, 413 U.S. at 439 ("[E]xcept in certain carefully defined classes of cases, a search of private property without proper consent is 'unreasonable' unless it has been authorized by a valid search warrant."); *Opperman*, 428 U.S. at 387 (Marshall, J., dissent) ("[I]t is equally clear that the word automobile is not a talisman whose presence the Fourth Amendment fades away.") (citing and quoting *Coolidge v. New Hampshire*, 403 U.S. 443, 461 (1971)).

Until very recently, Gombert has represented himself *pro se*. After he survived summary judgment, the Court saw fit to appoint Bingham as his counsel. Unfortunately, it has become apparent that discovery is deficient in very significant ways. Most importantly for purposes of this motion, the Defendants have never been deposed, Gombert does not have a copy of the police policies and procedures manual pursuant to which the NMPD, including the Defendants, should have operated when searching, seizing and handling Gombert's property, and it is unclear whether the Defendants have produced a complete copy of Gombert's police file and any other documentation that the NMPD has that pertains to Gombert and/or his property.[3]

Despite the undersigned counsel's discovery requests, including requests for police procedure manuals and other information relevant to the affirmative defense the Defendants now seek to advance, the Defendants and the NMPD have refused to respond and, instead, have opposed the discovery. Critically, as noted above, the Defendants unabashedly stated that the NMPD's policies and procedures are irrelevant to the "narrow" issues in this case despite that the

---

[3] In his discovery requests, subpoena to the NMPD, and discovery motions, Gombert seeks discovery including, among other things, a complete copy of his police file (and any other documentation the NMPD may have that pertains to Gombert and/or his property).

defense upon which the Defendants now premise their Renewed Motion requires the existence of such standardized police procedures. Plaintiff has sought to depose the Defendants, but they have refused to appear for examination. Accordingly, if the Court does not deny the Defendants' Renewed Motion outright (which it should), the Court should order a continuance of proceedings on the Renewed Motion so that the Plaintiff may conduct the discovery he clearly needs in order to fully and fairly respond to the Renewed Motion. Any other result would be inequitable and highly prejudicial to the Plaintiff -- in essence, it would reward the gamesmanship and unsavory litigation tactics that the Defendants champion in their Renewed Motion.

### IV.     Conclusion

For the foregoing reasons, the Plaintiff respectfully requests that the Court deny the Defendants' Renewed Motion for Summary Judgment or, alternatively, grant a continuance of sixty (60) days from the Court's ruling on this Motion to permit Gombert to conduct discovery.

                              PLAINTIFF,
                              HOWARD JOHN GOMBERT

                              By: /s/ Kate K. Simon
                                  Ben M. Krowicki [ct06153]
                                  Kate K. Simon [ct23489]
                                  Brian R. Hole [ct26608]
                                  BINGHAM McCUTCHEN LLP
                                  One State Street
                                  Hartford, CT 06103
                                  Telephone: (860) 240-2700
                                  Facsimile: (860) 240-2800
                                  ben.krowicki@bingham.com
                                  kate.simon@bingham.com
                                  brian.hole@bingham.com
                                  His attorneys

## CERTIFICATE OF SERVICE

I hereby certify that a true and accurate copy of the foregoing was sent via the Court's electronic notification system or by first class U.S. mail, postage prepaid, on the 7th day of November, 2006, upon the following counsel of record:

James N. Tallberg, Esq.
Karsten & Dorman, LLC
29 South Main Street
West Hartford, CT  06107

                                                  /s/ Kate K. Simon
                                                  Kate K. Simon

LEXSEE 1999 U.S. DIST. LEXIS 5951

ROBERT STROUGO, on behalf of The Brazilian Equity Fund, Inc., Plaintiff, - against - EMILIO BASSINI, RICHARD WATT, DANIEL SIGG, DR. ENQIEUE R. ARZAC, JAMES J. CATTANO, PETER A. GORDON, GEORGE W. LANDAU, MARTIN M. TORINO and BEA ASSOCIATES, Defendants. - and - THE BRAZILIAL EQUITY FUND, INC., Nominal Defendant.

97 Civ. 3579 (RWS)

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

*1999 U.S. Dist. LEXIS 5951*

**April 26, 1999, Decided**
**April 28, 1999, Filed**

**SUBSEQUENT HISTORY:** [*1]

Counsel Amended April 30, 1999.

**DISPOSITION:** Defendants' motion will be adjourned pending further discovery by Strougo.

**COUNSEL:** STUART D. WECHSLEER, ESQ., JOEL C. FEFFER, JR., ESQ., JEFFREY M. HABER, ESQ., Of Counsel, WECHSLER HARWOOD HALEBIAN & FEFFER, New York, NY, for Plaintiff.

LAWRENCE O. KAMIN, ESQ., Of Counsel, WILLKIE FARR & GALLAGHER, New York, NY, for BEA Associates, Emilio Bassini, Richard Watt and Daniel Sigg, Defendants.

JACK C. AUSPITZ, ESQ., LEV L. DASSIN, ESQ., Of Counsel, MORRISON & FOERSTER, New York, NY, for Dr. Enrique R. Arzac, James T. Cattano, Peter A. Gordon, George W. Landau and Martin M. Torino, Defendants.

MARTIN LONDON, ESQ., RICHARD A. ROSEN, ESQ., STEVEN R. HOWARD, ESQ., TRACY ANBINDER BARON, ESQ., Of Counsel, PAUL, WEISS, RIFKIND, WHARTON & GARRISON, New York, NY, for The Brazilian Equity Fund, Inc., Nominal Defendant.

**JUDGES:** ROBERT W. SWEET, U.S.D.J.

**OPINION BY:** ROBERT W. SWEET

**OPINION:**

OPINION

**Sweet, D.J.**

Nominal defendant The Brazilian Equity Fund, Inc. (the "Fund"), defendants BEA Associates ("BEA"), Emilio Bassini (Bassini), Richard Watt (Watt), Daniel Sigg ("Sigg") (the "BEA Defendants"), and defendants Dr. Enrique R. Arzac ("Arzac"), James J. Cattano ("Cattano"), Peter A. Gordon ("Gordon"), George W. [*2] Landau ("Landau") and Martin M. Torino ("Torino") (the "Outside Directors," and together with the Fund, BEA and the BEA Defendants, the "Defendants") have moved to dismiss the shareholder derivative complaint of Robert Strougo ("Strougo") under *Rule 12(b)(6) Fed. R. Civ. P.*, or, in the alternative, for summary judgment pursuant to *Rule 56 Fed. R. Civ. P.*, based upon the determination of a Special Litigation Committee of the Fund's Board of Directors (the "SLC") that the continued prosecution of this action is not in the best interest of the Fund and its shareholders.

For the reasons set forth below, the motion will be adjourned pending further discovery by Strougo.

**Prior Proceedings**

The parties, prior proceedings and factual background of this action are set forth in a prior opinion of this Court, familiarity with which is assumed. See *Strougo v. Bassini, 1 F. Supp. 2d 268 (S.D.N.Y. 1998).* Prior proceedings and facts relevant to this motion are set forth below.

Strougo filed the complaint in this action on May 16, 1997. The action arises from a 1996 rights offering (the "Rights Offering") by the Fund, a closed-end investment company, under which the Fund's existing [*3] shareholders were given the opportunity to purchase additional shares of newly issued Fund stock at a discount from market value. Strougo, a shareholder of the Fund, alleges that the Rights Offering constituted a breach of duty by BEA (the Fund adviser) and the Fund's directors because the offering purportedly diluted the shareholders' investments, imposed transaction costs on the Fund (such as investment banking fees), and was allegedly motivated by a desire to increase BEA's investment advisory fee. Strougo does not allege making a demand on the Fund's board of directors prior to initiating this derivative action.

The Outside Directors filed a motion to dismiss on September 15, 1997. The BEA Defendants filed a motion to dismiss on September 16, 1997. By Order and Opinion dated April 6, 1998, the Court held that demand futility had been established. The Court granted the motions to dismiss the class action claims, but denied the motions to dismiss the derivative claims and the control person claim. *Strougo v. Bassini, 1 F. Supp. 2d 268.* n1

> n1 The original complaint contained six causes of action: (1) a claim under § 36(b) the Investment Company Act of 1940, as amended, *15 U.S.C. § 80a-47*(a) (the "ICA"), for excessive fees; (2) a "control person" claim under § 48 of the ICA; (3) a direct class action claim alleging breach of fiduciary duty under section 36 (a) of the ICA; (4) a direct class action claim alleging breach of fiduciary duty under Maryland common law; (5) a derivative claim alleging breach of fiduciary duty under § 36 (a) of the ICA; and (6) a derivative claim alleging breach of fiduciary duty under Maryland common law.

[*4]

The claims remaining in the complaint are (1) breach of fiduciary duty against all defendants under ICA § 36(a) and under Maryland common law, and (2) control person liability under ICA § 48(a) against the BEA defendants. With respect to the breach of fiduciary duty claims, Strougo alleges that the Defendants breached their duty of loyalty by failing to put the interests of the Fund and the shareholders first, and breached their duty of due care by failing to adequately consider the negative effect that the Rights Offering would have on the Fund. With respect to the control person claim, Strougo alleges that BEA caused all of the directors to violate the ICA and that Bassini, Sigg, and Watt caused the Outside Directors to violate the ICA. n2

> n2 In 1996, Strougo brought a similar suit, containing the same six causes of action, concerning a rights offering conducted by a different closed-end fund that invests in the securities of Brazil, the Brazil Fund, managed by Scudder, Stevens & Clark. See Strougo v. Padegs, No. 96 Civ. 2136 (RWS).

[*5]

The instant motion was filed on December 30, 1998. Oral argument was heard on February 3, 1999, at which time the motion was deemed fully submitted.

**Facts**

**A. The Rights Offering**

The Fund is a non-diversified, publicly traded, closed-end investment company registered under the ICA and incorporated under the laws of Maryland that invests primarily in the securities of Brazilian companies. The Fund's shares are traded on the New York Stock Exchange.

BEA is the investment adviser of the Fund and manages the Fund's operations and investments subject to the governance of an eight member board of directors, made up of Bassini, Watt and Sigg who, at all relevant times, were also BEA employees and Arzac, Cattano, Gordon, Landau and Torino, who are not employed by BEA but serve on the boards of BEA advised funds.

In June of 1996, the Fund's Board of Directors decided to conduct the Rights Offering in the hopes of raising approximately $ 20 million in additional capital. The Rights Offering would provide one right per share to each shareholder and the rights were to expire on August 16, 1996. A holder of three rights could subscribe to one new share, at the subscription [*6] price, during a subscription period that would begin on July 17 and end on August 16.

The subscription price per share for the Rights Offering was set as follows: "90% of the lower of (i) the average of the last reported sales price of a share of the Fund's Common Stock on the New York Stock Exchange on the Pricing Date and on the four preceding business days thereof and (ii) the net asset value per share as of the close of business on the Pricing Date."

The prospectus for the Rights Offering stated that the Fund's board of directors had determined that the Rights Offering:

would be in the best interests of the Fund and its shareholders to increase the assets of the Fund available for investment, thereby enabling the Fund to more fully take advantage of available investment opportunities consistent with the Fund's investment objective of long-term capital appreciation. In reaching its decision, the Board of Directors was advised by BEA Associates that the availability of new funds would provide the Fund with additional investment flexibility as well as increase the Fund's ability to take advantage of what BEA Associates believes to be timely opportunities in the Brazilian [*7] market as a result of recent economic and political events and stock market developments. In evaluating such investment opportunities, the Board considered, among other things, the impact that Brazil's reform process would have on the country's stock prices, the future prospects for Brazil's growth and the likelihood of future privatizations.

The Board of Directors also considered that a well-subscribed rights offering may reduce the Fund's expense ratio, which may be of a long-term benefit to shareholders. In addition, the Board of Directors considered that such a rights offering could result in an improvement in the liquidity of the trading market for shares of the Fund's common stock ("Common Stock") on the New York Stock Exchange, where the shares are listed and traded. The Board of Directors also considered the proposed terms of the Offer ... including the expenses of the Offer, and its dilutive effect, including the effect on non-exercising shareholders of the Fund. After careful consideration, the Fund's Board of Directors unanimously voted to approve the Offer.

On the day the Rights Offering was announced the stock had closed at 13-1/2. On June 7, a day later, the [*8] stock closed up 1/8 to 13-5/8. On June 24, 1996, just over two weeks after the announcement of the Rights Offering, the shares closed at 14-3/4. Within the month following the announcement, the stock never closed lower than 13-3/8. However, before the announcement of the Rights Offering on May 30, 1996, shares of the Fund were trading at a 7.7% discount to net asset value ("NAV"). At the close of business on June 6, 1996, that discount was 13%. By July 18, 1996, it was 22.7%.

### B. The SLC

On May 22, 1998, the Fund's Board of Directors, by consent resolution, created the SLC to consider the allegations raised in the present action and to review the facts underlying those allegations. The SLC was given "all of the powers and authority of the Board of Directors" to, among other things, investigate all matters alleged in or relating to this action, retain legal counsel or other advisers as it deems appropriate to assist its investigation, appear, through its separate counsel, on behalf of the Fund in this action, and direct the representation of the Fund's interests in this action. (Barron Aff. Exh. 1 at 2-3).

The consent resolution adopted by the Board of Directors on May 22, [*9] 1998 to create the SLC also appointed Robert J. McGuire to the Board of Directors and as a member of the SLC. On August 11, 1998, the Board of Directors appointed Miklos A. Vasarhelyi as a director and as a member of the SLC.

From June through November, 1998, the SLC conducted an investigation of the Rights Offering and the allegations raised in this action. This process involved the collection of documents and the interviewing of witnesses from BEA, the Fund's Board of Directors, and Bear Stearns -- the investment banking firm that served as dealer-manager for the Rights Offering. Strougo and his counsel did not participate in the SLC's investigation, although they were invited to do so.

Counsel for the SLC reviewed approximately 36,000 pages of documentary evidence and other information (including data compilations) from the BEA Defendants, the Outside Directors and Bear Stearns. Members of the SLC personally reviewed all of the documents that "counsel believed were particularly pertinent," in addition to the documents used in the witness interviews and any other documents that the SLC members specifically requested to review.

The SLC and its counsel interviewed a total of eleven [*10] witnesses. These included Bassini, Sigg and Watt, Michael Pignataro, a non-defendant employee of BEA who was the Fund's Chief Financial Officer, Arzac, Landau, Cattano, Torino, and three witnesses from Bear Stearns. Counsel conducted follow-up telephone interviews of Bassini and Pignataro. n3

---

n3 The SLC did not interview Gordon because Gordon suffered a stroke prior to the events surrounding the Rights Offering and did not par-

Case 3:01-cv-01913-DJS    Document 108    Filed 11/07/2006    Page 14 of 16

Page 4
1999 U.S. Dist. LEXIS 5951, *

ticipate in the decision to conduct the Rights Offering.

Both members of the SLC participated -- either in person or by telephone -- in seven of the witness interviews. In three of the witness interviews, one of the members of the SLC participated. In one witness interview and in the follow-up telephone interviews of Bassini and Pignataro, neither SLC member was able to participate. After every interview, the SLC's counsel drafted an in-depth summary, which was reviewed and approved by the members of the SLC.

The first formal meeting of the SLC with its counsel was held on July 8, 1998. [*11] During the SLC's investigation, two additional formal meetings were held -- one on August 12, 1998 and one on September 14, 1998. Numerous informal meetings of the SLC were held as well to discuss the progress of the SLC's investigation, the witness interviews, and the collection and review of documents.

On December 15, 1998, the SLC held its final formal meeting with counsel. The SLC members determined that their investigation was complete, that there was no evidence supporting plaintiff's allegations, and that dismissal of the action would best serve the interests of the Fund and its shareholders.

The SLC found no evidence that the Defendants breached their duty of loyalty. The SLC concluded that BEA and the Board of Directors waited patiently until the time when they thought market conditions were optimal and selected the fund-raising method that was predicted to maximize the benefits to all shareholders. The SLC found that each decision made by the Defendants was made in an effort to help the Fund and its shareholders take advantage of the investment opportunities in Brazil while minimizing any negative effects that the Rights Offering might cause.

The SLC found no evidence [*12] that the Defendants breached their duty of care, finding instead that the Defendants exhaustively considered any potential negative effects. The Report of the SLC (the "Report") states that the Defendants sought the opinions of two respected investment banking firms, analyzed the data prepared by those firms to determine which approach would work best, required Bear Stearns to revise and supplement its materials so that other options could be considered, and discussed the advantages and disadvantages of each decision at great length.

Finally, the SLC found that even if there were evidence supporting the substantive allegations in the complaint, the damages to be recovered would be negligible at best. According to the Report, although the Fund's per-share NAV and the market price of its shares declined in the short term, those deadlines were not permanent. The Report notes that by November 21, 1996, about three months after the Rights Offering had been completed, the per-share NAV had returned to its pre-offering level. By January 5, 1997, the stock price had rebounded to its pre-offering level as well. The SLC found that one year after the Rights Offering, a shareholder who did not [*13] participate in the Rights Offering owned the same shares as before, but at a higher market price and a higher NAV. A shareholder who did participate in the Rights Offering had the added benefit of purchasing additional shares of the Fund at a significant discount to the market price.

**Discussion**

### A. Standard of Review

A special litigation committee has the power to terminate a derivative action to the extent allowed by the state of incorporation. See *Burks v. Lasker, 441 U.S. 471, 486, 60 L. Ed. 2d 404, 99 S. Ct. 1831*. The Fund is incorporated in Maryland, and under Maryland law, a committee of disinterested and independent directors of a corporation may move to terminate a pending shareholder derivative action which the committee determines in good faith to be contrary to the corporation's best interests. See e.g., *O'Donnell v. Sardegna, 336 Md. 18, 26, 646 A.2d 398, 402 (Md. 1994); Rosengarten v. Buckley, 613 F. Supp. 1493, 1499 (D.Md. 1985); Grossman v. Johnson, 89 F.R.D. 656, 663 (D.Mass. 1981)* aff'd, *674 F.2d 115 (1st Cir. 1982)*.

For the reasons set forth by this Court in a related action, *Strougo v. Padegs, 1 F. Supp. 2d 276, 280-82* [*14] *(S.D.N.Y. 1998)*, the standard articulated in *Zapata Corp. v. Maldonado, 430 A.2d 779 (Del. 1981)* (hereinafter "Zapata") will apply in this case. In Zapata, the Supreme Court of Delaware articulated a two step standard of review applicable to motions to terminate derivative actions based on the recommendation of a special litigation committee:

> First, the Court should inquire into the independence and good faith of the committee and the bases supporting its conclusions . . . The corporation should have the burden of proving independence, good faith and a reasonable investigation, rather than presuming independence, good faith and reasonableness.

*430 A.2d at 788*. Once the reviewing court is satisfied that the committee has met its burden of proving good

Case 3:01-cv-01913-DJS   Document 108   Filed 11/07/2006   Page 15 of 16

Page 5
1999 U.S. Dist. LEXIS 5951, *

faith and reasonableness, the court, in its discretion, may proceed to the second prong. That prong requires the court to "determine, applying its own business judgment, whether the motion should be granted." *Id., at 788-89.* See also *Abramowitz v. Posner, 672 F.2d 1025 (2d Cir. 1982); Joy v. North, 692 F.2d 880 (2d Cir. 1982)* (applying Connecticut law). The "function of the court's review is to determine [*15] the balance of probabilities as to likely future benefit to the corporation, not to render a decision on the merits, fashion the appropriate legal principles or resolve issues of credibility. Where the legal rule is unclear and the likely evidence in conflict, the court need only weigh the uncertainties, not resolve them. The court's function is thus not unlike a lawyer's determining what the case is 'worth' for purposes of settlement." *Joy v. North, 692 F.2d at 892.*

Pursuant to the language of Zapata a motion to terminate a derivative suit is neither a motion to dismiss under Rule 12(b), nor is it a motion for summary judgment pursuant to Rule 56. This is because it is not addressed to the adequacy of the cause of action alleged in the complaint, on the one hand, nor on the other, is it addressed to the merits of the issues joined by the pleadings. Rather, the motion is a "hybrid" one, derived by analogy to a motion to dismiss a derivative suit based upon a voluntary settlement reached between the parties and to a motion brought pursuant to Rule 41(a)(2) whereby a plaintiff unilaterally seeks a voluntary dismissal of the complaint subsequent to the filing of an answer by [*16] the defendant. As such it is addressed necessarily to the reasonableness of dismissing the complaint prior to trial without any concession of liability on the part of the defendants and without adjudicating the merits of the cause of action itself. *Zapata, 430 A.2d at 787-88; Kaplan v. Wyatt, 484 A.2d 501, 505-07 (Del.Ch.1984)* aff'd *499 A.2d 1184 (Del.1985).* Although the motion is not strictly one for summary judgment, the corporation moving for termination bears the burden of proving the independence, good faith, and reasonableness of the SLC's review by evidence sufficient to eliminate any genuine questions of fact with regard to these issues. *Kaplan, 484 A.2d at 507.*

Therefore, Defendants have the burden to establish that the SLC was independent, that the investigation was conducted in good faith and that the SLC had a reasonable basis for its conclusion. In addition the Report must satisfy the business judgment of the Court.

**B. Further Discovery is Appropriate**

Strougo notes that factual issues are presented by the Zapata standard and has pressed his demand for further discovery under Rule 56(f). n4 Strougo has requested the production of: (a) all [*17] outlines prepared for use during any witness interview; (b) all notes or transcripts prepared in connection with any witness interview; (c) all notes or other documents prepared or distributed in connection with meetings or other SLC activities; (d) all drafts or outlines of the Report; (e) all bills rendered to or in connection with the SLC by SLC members, counsel, and others and all backup information; (f) all other documents prepared, received, or reviewed in connection with the SLC's investigation and report; and (g) depositions of the members of the SLC and its counsel.

n4 Rule 56(f) provides that "should it appear from the affidavits of a party opposing the motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as just."

This Court has held that "it is [*18] the duty of this court under 56(f) to ensure that the parties have been given a reasonable opportunity to make their record complete before ruling on a motion for summary judgment." *Elliott Assocs., L.P. v. The Republic of Peru, 961 F. Supp. 83, 86 (S.D.N.Y. 1997).* As set forth by the Supreme Court of Delaware in Zapata, "limited discovery may be ordered to facilitate" the court's inquiries into the independence and good faith of an SLC and the bases for its conclusions. *430 A.2d at 788.* Discovery under such circumstances "is not by right, but by order of the Court, with the type and extent of discovery left totally to the discretion of the Court." *Kaplan, 499 A.2d at 1192.*

In Strougo v. Padegs, in order to give plaintiff the opportunity to discover with respect to the elements of the Zapata standard, Strougo was granted sixty days to (1) inspect the documents made available to the SLC; (2) inspect the notes of interviews and drafts of the Report; and (3) depose the members of the SLC. See *1 F. Supp. 2d at 282.* In the present action, Strougo's requests for discovery are considerably more substantial and exceed the limited discovery envisioned by Zapata. See [*19] e.g., *Abbey v. Computer & Communications Technology Corp., 1983 Del. Ch. LEXIS 511, *8, 1983 WL 18005* at *3 (Del. Ch. April 13, 1983)* (denying plaintiff's request for broad discovery and granting only the deposition of the SLC members and the production of "documentary materials utilized or relied upon by the Committee during its investigation"); *Carlton Investments v. TLC Beatrice Int'l Holdings, Inc., 1997 Del. Ch. LEXIS 4, *14, 1997 WL 38130 (Del. Ch. January 29, 1997)* (allowing deposition of SLC members and production of "docu-

ments narrowly related to the independence and good faith of the SLC").

Faced with a similarly broad request by a derivative plaintiff in Abbey, the Delaware Chancery Court held that granting such far-reaching discovery would discredit the holding of Zapata:

> What the plaintiff seeks in an effort to combat the motion of the Committee to dismiss is for all practical purposes all of the discovery she would need to prepare her case. Obviously, one way to attack the reasonableness of a special litigation committee's investigation is to take full discovery over all ground covered by the complaint in an effort to see what holes, if any, can be found in the committee's approach. But if a derivative [*20] plaintiff is to be permitted full discovery of his case under the guise of making a record in opposition to a motion to dismiss brought by a special litigation committee, what would be the need for having the special litigation committee to begin with? Surely the Supreme Court [in Zapata] must have intended something else. Otherwise it would not have made the reference to limited discovery.

*1983 Del. Ch. LEXIS 511,* \*6-\*7, *1983 WL 18005* at \*2-3.

Strougo maintains that it is necessary to depose counsel for the SLC because counsel played "a pivotal role" in the investigation and preparation of the Report and because it "injected itself into this matter." (Plaintiff's Brief at 5-6). However, "as a general rule . . . counsel to special litigation committees are not deposed regarding the type of assistance or advice they provide to their clients in this type of action." *Carlton, 1997 WL 38130* at \*5. Strougo offers no compelling reason why this "general rule" should be broken here. As the court in Carlton stated, "what is important at this stage in the proceedings is what the SLC knew and did during the investigation and in reaching their conclusions. This information can be obtained by [plaintiff] [*21] in deposing the SLC members themselves." Id. n5

> n5 The legal authority relied upon by Strougo is support of his application to depose the SLC's counsel is distinguishable from the present case. In Weiser v. Grace, Index No. 106285/95, slip op. at 9 (Sup. Ct. N.Y. Co. September, 10, 1998), counsel conducted ten out of fourteen witness interviews without any participation from the SLC members. Similarly, in Rosen v. Bernard, Index No. 17200/1982 slip op. at 2 (Sup. Ct. Kings Co. April 16, 1987), there were "no stenographic records or minutes kept of interviews" and several interviews were "unattended by any member of the committee." In the present action, plaintiff has detailed interview summaries, the Fund is willing to provide the interview notes, and only one witness interview and two follow up interviews were conducted without the participation of at least one SLC member.

Accordingly, Strougo may (1) inspect the documents made available to the SLC, (2) inspect the notes of interviews and drafts [*22] of the Report, and (3) depose the members of the SLC.

**Conclusion**

For the reasons set forth above, Defendants' motion will be adjourned pending further discovery by Strougo. The discovery provided here will be completed within sixty (60) days and this motion renewed on September 1, 1999, unless counsel agree otherwise.

It is so ordered.

**New York, N. Y.
April 26, 1999**

**ROBERT W. SWEET**

**U.S.D.J.**