# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

HOWARD JOHN GOMBERT           :
     Plaintiff,                 :
                              :       Civil Action No.
     v.                          :       3:01 CV 1913 (DJS)
                              :
LARRY LYNCH and WILLIAM KAMINSKI   :
     Defendants.             :       January 19, 2007

## PLAINTIFFS' OPPOSITION TO DEFENDANTS' RENEWED MOTION FOR SUMMARY JUDGMENT

Defendants have changed their tune: they now contend that their admittedly warrantless search and seizure of items from Plaintiff, Howard Gombert's ("Gombert"), white Pontiac Firebird (the "Firebird") is excused under the "safekeeping" or "community caretaking" doctrine. Defendants have never made this argument before. Until they filed their Renewed Motion for Summary Judgment dated October 24, 2006 (the "Renewed Motion"), both the Court and Gombert were convinced that Defendants were seeking to justify their misconduct under the plain view doctrine. Indeed, the Court spent its time and effort to debunk that theory in its Ruling on Cross-Motions for Summary Judgment, dated February 15, 2005. Only after the Court rejected option A (the plain view exception) did Defendants decide to employ option B (the purported safekeeping doctrine). Defendants are simply hiding the ball from Gombert and the Court. They should not be permitted to raise, let alone seek, summary judgment, on a defense that they did not plead and that they have never before raised. The Renewed Motion should be denied for this reason alone.

Even if the Court were to consider Defendants' belated contentions, the safekeeping doctrine does not excuse Defendants' warrantless search and seizure of items in Gombert's Firebird. The law is clear that the safekeeping doctrine applies to exonerate warrantless searches of an automobile only if: (1) the vehicle is lawfully in police custody; (2) the search is conducted to secure the car and its contents, and not for investigatory purposes; and (3) the search is conducted pursuant to standard police procedures. Defendants' search of the Firebird does not meet any of these criteria and thus their safekeeping arguments fail as a matter of law.

Defendants' qualified immunity defense is equally deficient. The Court already held that Gombert's Fourth Amendment right to be free from unlawful searches and seizures is clearly established and that finding is not subject to contradiction here. Moreover, given that Defendants failed to cite to a single "safekeeping" case authorizing a search under the circumstances presented here -- where the car was on private property, it was not impounded, and the officers looked into the car for investigative purposes -- it is absurd to contend that a reasonable officer would have acted as Defendants did. Reasonable officers simply do not conduct "presumptively unreasonable" searches.

Because Defendants' safekeeping and qualified immunity defenses fail as a matter of law, the Renewed Motion should be denied. Moreover, denial of the Renewed Motion necessitates that Gombert's Motion for Partial Summary Judgment dated October 24, 2006 ("Gombert's Motion") be granted because Defendants will have no remaining defenses to

liability.[1]  By granting Gombert's Motion and denying the Renewed Motion, the Court will have

decided liability in Gombert's favor and the case may then proceed to a trial on damages.

## FACTS

This is an action under 42 U.S.C. § 1983 arising out of Defendants' warrantless search

and seizure of Gombert's property on March 1 and March 2, 2000.  Defendants are New Milford

Police officers.  Gombert is an individual who, on February 29, 2000, resided at 322A Aspetuck

Ridge Road in New Milford, Connecticut (the "Residence") with his girlfriend J and their

daughter.

## I.    J's February 29 Complaint to the New Milford Police Department.

On the morning of February 29, 2000, Howard Gombert left his house for court, leaving

his white Pontiac Firebird (the "Firebird") in its usual spot in the driveway.  (Transcript of J's

12/13/06 Deposition ("J Dep.") Tr. at 44).[2]  Shortly thereafter, J left to take their daughter to the

doctor because she was sick.  (*Id.* at 13, 44).  When J left the Residence on February 29, the

Firebird was parked at the Residence and it was entirely closed.  (*Id.* at 44-45).  J did not return

to the Residence until after Defendants arrived there on March 1, 2000.  (*Id.* at 45).

At some point on February 29, 2000, J ended up at the New Milford hospital.  (*Id.* at 9,

13).  Personnel from a local women's shelter contacted the New Milford Police Department (the

"NMPD") because they suspected that J had been sexually assaulted.  (*Id.* at 9).  Ultimately, J

---

[1]  Gombert hereby incorporates by reference Gombert's Motion, Plaintiff's Reply Brief In Support Of His Motion for Partial Summary Judgment dated January 19, 2007, and any and all exhibits and affidavits filed their with those pleadings.

[2]  Deposition transcripts, exhibits and any other documents cited to herein are attached as Exhibits to the Affidavit of Brian R. Hole filed contemporaneously herewith.

made a complaint to the NMPD that Gombert had sexually assaulted her two days earlier, on February 27, 2000. (*Id.* at 12-13). At approximately 11:07 a.m. on February 29, 2000, then patrol officer William Kaminski ("Kaminski") was dispatched to the hospital to interview J. (Transcript of William J. Kaminski's 11/30/06 Deposition ("Kaminski Dep.") Tr. at 65). Kaminski interviewed J and took her written statement while at the hospital. (*Id.* at 68-69). When J finished receiving treatment, she and Kaminski left the hospital and drove together to the NMPD headquarters. (*Id.* at 72).

When J arrived at the NMPD, Investigators Larry Lynch, William Kaminski, and a detective from the Carmel, New York police department spoke with her about Gombert. (J Dep. Tr. at 54-55, 68-69). Apparently, Investigator Mullin had been working with the Carmel police department to investigate Gombert in connection with the disappearance of a woman named Robin Murphy. Defendants were therefore quickly able to invite a Carmel officer to meet with J on February 29. (*See* J Dep. Tr. at 34). On February 29, the Carmel officer informed J that Gombert "was a very dangerous man and that what [J] was doing was correct because [Gombert] was wanted in connection with the case in Carmel, New York: that he's been suspected of other sexual assaults." (*Id.* at 54-55). Carmel was particularly interested in a necklace that they believed was in Gombert's possession and could link Gombert to Ms. Murphy's disappearance. (J Dep. Tr. at 29; (Transcript of James Mullin's 11/29/06 Deposition ("Mullin Dep.") Tr. at 115). Oddly, Defendants also asked whether Gombert maintained a pornography collection and, if so, where it might be located in the Residence. (Lynch Ex. 9). J remained at the NMPD through the evening of February 29, and was then transported by the police to a hotel. (J Dep. Tr. at 13-15).

**II.     <u>Gombert's February 29 Arrest.</u>**

At approximately 5:00 p.m. on February 29, 2000, Kaminski and several other officers converged on the Residence to arrest Gombert for sexual assault.  (Kaminski Dep. Tr. at 87-88).  The officers parked on the street, spread out, and approached the Residence through the woods.  (*Id.* at 90-91).  Kaminski claims that, as he moved onto the Property, he saw the Firebird and its trunk, hood, and hatch were open.  (*Id.* at 91).  At some point, Kaminski believes that he heard an officer call to someone to "give himself up," at which point Kaminski moved toward the sound of the voices and saw that Gombert had been arrested.  (Kaminski Dep. Tr. at 91).  Although Kaminski affirmed that Gombert had fled the scene, Kaminski never actually saw Gombert flee.  (*Compare* William J. Kaminski Affidavit dated 11/23/04 at ¶16 *with* Kaminski Dep. Tr. At 92-93, 151).  After his arrest, Kaminski transported Gombert to the NMPD for booking.  (Kaminski Dep. Tr. at 106).  Gombert was charged with sexual assault and risk of injury to a minor and his bail was set at $500,000.  (*Id.* at 112).  Kaminski has never seen higher bail set in a sexual assault case in his 20 years with the NMPD.  (*Id.*).  Gombert has not returned to the Residence since his arrest.

**III.     <u>Defendants Obtained a Warrant to Search Only the Residence.</u>**

At approximately 9:00 p.m., Kaminski returned to the Property while the NMPD's Investigative Services Division prepared an application for a warrant to search the Residence.  (*Id.* at 113-114).  Despite not having a warrant, Kaminski did not hesitate to look into the Firebird on February 29 "to make sure there was nothing of evidentiary value inside."  (*Id.* at 128-129).  Kaminski also collected data and transmitted it to Investigative Services so that they

could include it in their warrant application. (*Id.* at 200-202). Included in the information Kaminski communicated was a detailed description of the Firebird and its contents. (*Id.* at 204-205).

Investigators Lynch and Mullin, the NMPD's only two juvenile Investigators, were responsible for making the warrant application on March 1, 2000. (Mullin Dep. Tr. At 88; Lynch Dep. Tr. at 146-147, Mullin Ex. 8). Kaminski and "brother officers" supplied most of the information in the affidavits the Investigators made in support of the application, although Mullin believes that he may have visited the Residence on February 29. (Mullin Dep. Tr. at 89). Lynch had specific knowledge of the Firebird and its contents when making his search warrant affidavit. (Lynch Dep. Tr. at 219). Indeed, Lynch recalls having a conversation with State's Attorney Guy Wolf about the Firebird and the bags in it while Lynch was at headquarters preparing his search warrant affidavit. (*Id.* at 218-219). State's Attorney Wolf's advice regarding the bags was to "seize them, but don't look in them." (*Id.* at 217). Despite this knowledge, neither the Firebird nor its contents are mentioned in the March 1 warrant application. (*Id.* at 148; Mullin Ex. 8 at p. NMPD 00287).

Investigators Lynch and Mullin ultimately obtained a warrant on March 1, 2000 (the "March 1 Warrant"). (*Id.* at 161; Mullin Ex. 8 at p. NMPD 00290). That warrant permitted them to search only the Residence; it did not permit a search of the Firebird. (Mullin Dep. Tr. at 98-99; Mullin Ex. 8; Lynch dep. Tr. at 148). Moreover, the March 1 Warrant is specific and permits a search of the Residence only for evidence related to the alleged sexual assault on J, including pillows, clothing, and other household items that may contain bodily fluids. (Lynch

Dep. Tr. at 155).  However, Defendants did not believe that the specific limitations in the March

1 Warrant "preclud[ed them] from searching other things."  (*See* Mullin Dep. Tr. at 98).

Even though they already had the March 1 Warrant, Defendants also obtained a consent

to search the Residence from J on March 1.  (J Dep. Tr. at 20; Mullin Dep. Tr. at 94-95; Mullin

Ex. 9).  The consent to search is much broader than the March 1 Warrant, and it allowed

Defendants to seize items not listed in the March 1 Warrant, including pornography, children's

clothing, VCR tapes, photographs and things generally having to do with sex crimes involving

juveniles.  (Lynch Dep. Tr. at 153-154; Mullin Ex. 9).  Defendants asked J to sign the broad

consent form because, as of March 1, they and other agencies that Defendants were cooperating

with were investigating Gombert for a number of crimes other than the assault on J, including

Robin Murphy's disappearance in Carmel and Maryanne Measles' murder in Connecticut.

(Mullin Dep. Tr. at 111-113).

## IV.     The March 1 and March 2 Search and Seizure.

Defendants, Investigator Mullin, and Officer Earl Wheeler arrived at the Residence at

approximately 8:00 p.m. on March 1, 2000 to conduct the search.  (Kaminski Dep. Tr. at 121).

Lynch was driving a crime scene van, which the officers planned to use to transport any property

seized during the search back to the NMPD.  (Lynch Dep. Tr. at 162).  Lynch was the highest

ranking officer on the scene and he was responsible for photographing the scene and any

property removed from it.  (Kaminski Dep. Tr. at 126-127).  J arrived at the Residence shortly

after the Defendants.  (J Dep. Tr. at 17).

Defendants began by searching the Residence and that search lasted into the early morning hours of March 2, 2000. (Mullin Dep. Tr. at 101-102; Mullin Ex. 10). The officers seized certain property from the Residence and placed that property into the crime scene van. (See Lynch Dep. Tr. at 17). The officers documented the property taken from the Residence on an evidence seizure form, which they later attached to the March 1 Warrant and returned to Court. (*See* Mullin Ex. 8 at p. NMPD 00291). After completing their search, the officers believe that they locked the house in order to secure it. (*Id.* at 174).

Defendants next proceeded to search and seize items from the Firebird, despite that the March 1 Warrant did not authorize such a search and that Defendants could have obtained a warrant to search the Firebird if they had wanted to. (Kaminski Dep. Tr. at 124; 130-131). Defendants wanted to search the Firebird because "it [was] a crime scene, so [they] wanted to examine [the Firebird] before [they] left" in order to determine whether there was "evidence of a crime" inside the car. (Kaminski Dep. Tr. at 130-131). Defendants also were interested in the Firebird because J had "given information" about the Firebird, presumably when she met with NMPD and Carmel officers on February 29, 2000. (Lynch Dep. Tr. at 171). Defendants also were still looking for the pentagram necklace, which the Carmel police department thought would connect Gombert to Robin Murphy's disappearance. (*See* Mullin Dep. Tr. at 119-120).

Defendants contend that the Firebird's hood and hatch were open and that it was full of "household items," including several bags and cases. (Mullin Dep. Tr. at 114-115). Defendants contend that the bags and cases were clearly visible simply by looking through the Firebird's open hatch. (Kaminski Dep. Tr. at 133). Gombert claims that, other than an open hood, the

Firebird was completely closed when he was arrested on February 29. (Pl.'s Dep. Tr. at 51). J confirmed that when she left the Residence on February 29, the Firebird's hatch was closed. (J. Dep. Tr. at 44-45). Defendants admit that at least some of the bags were not in plain view and could only be seen by removing other bags and then lifting a door to reveal the hatch's well compartment. (Lynch Dep. Tr. at 207-209; Lynch Ex. 10 at NMPD 00551, 00527). Regardless, Defendants removed the items from the vehicle allegedly for "safekeeping" and then placed the property into the crime scene van. (Lynch Dep. Tr. at 16, 171-172). Defendants claim that they did not look inside of the bags they removed from the Firebird even though the customary practice would have been to inspect any items taken into custody for safekeeping. (Kaminski Dep. Tr. at 154-155). Defendants did not impound the Firebird after they searched it; instead, they simply left the car at the Residence and they have no specific recollection of what was done, if anything, to secure the vehicle. (Lynch Dep. Tr. at 178-180; Mullin Dep. Tr. at 174-175).

Defendants were not finished with their warrantless searches. They next searched a red Pontiac Fiero that was located on the property. (Lynch Dep. Tr. at 85-86, 92-93). Defendants were interested in the Fiero because they believed it might contain the necklace that the Carmel police were looking for. (*Id.* at 92-93; Mullin Dep. Tr. at 119-120). However, Defendants were clear that the necklace had nothing to do with the alleged assault on J because it was "a separate issue" stemming from Carmel's investigation. (Lynch Dep. Tr. at 200-202). Nevertheless, and without a warrant, Defendants proceeded to search the Fiero and claimed to find a bronze-type necklace hanging from the car's rearview mirror. (Lynch Dep. Tr. at 201). J was shocked to see the necklace hanging from the Fiero's mirror because it was her car, which she had driven to the

Residence only a few hours earlier, and the necklace had not been hanging from the mirror when she arrived. (J Depo Tr. at 29-30). Lynch photographed the necklace hanging from the mirror before seizing it and then photographed it again on the floor of the crime scene van. (Lynch Dep. Tr. at 210-211).

V.     **Defendants Admit Taking Gombert's Property for an Investigative Purpose and Holding the Property as Evidence.**

Upon completing their unlawful searches and seizures, Defendants placed the items removed from the Firebird into the crime scene van and allegedly brought them back to the NMPD headquarters. (Lynch Dep. Tr. at 17). Upon arrival, the NMPD standard procedure was to immediately log any seized property into the computer system and then to place the items into the evidence room. (Lynch Dep. Tr. at 19-20; Kaminski Dep. Tr. at 75-77). When logging the property in, the officer was required to give the property a description and assign it a "type" or "status." (Kaminski Dep. Tr. at 59-60). The officer chose the "type" or "status" of the property from a drop-down menu, which included options such as "held for safekeeping," evidence, lost or found, and none. (*Id.* at 60). The officer entering the property into the system was responsible for choosing what "type" to assign the property being entered. (Kaminski Dep. Tr. at 60-61; Lynch dep. Tr. at 60). Once the property was entered, the computer could generate a report listing a description of the property, its status or type, and the date on which the property had been entered into the system. (Lynch Dep. Tr. at 46-54; See ex Mullin Ex. 12; Kaminski Ex. 4).

Lynch was responsible for entering the property taken from the Firebird into the NMPD's computer system. (Lynch Dep. Tr. at 22; 60). However, unlike the property taken from the residence, which he logged into the computer system on March 2, 2000, Lynch did not log the items seized from the Firebird into the NMPD's computer system until March 9, 2000, a week after they were seized. (*Id.* at 26-27, 36-38, 51-54; Kaminski Ex. 4). According to Kaminski, such a delay is wholly unacceptable under the NMPD's policies and procedures. (Kaminski Dep. Tr. at 81-82). Lynch did not know where the property was during that week, and he could not "specifically recall" whether it was in the evidence room although he knew that "it should have been." (Lynch Dep. Tr. at 33, 38). The necklace Defendants seized from the Fiero was never logged into the NMPD's computer system and it was instead turned over to the Carmel police department on March 3, 2000. (Lynch. Dep. Tr. at 92; Mullin Dep. Tr. at 124-125; Mullin Ex. 11). When Lynch finally entered the items taken from the Firebird into the computer, Lynch designated them as being "evidence," and not as being "held for safekeeping," despite that the latter was an option available to him. (Lynch Dep. Tr. at 53-55). According to Lynch, when property is listed as "evidence" that "means its evidence." (*Id.* at 46-47). There is absolutely no reason why the property should have been listed as evidence if it really was being held for safekeeping. (Kaminski Dep. Tr. at 63-64).

Lynch also filled out a form entitled "Inventory of Property Seized Without A Search Warrant" on March 9, 2000, and he listed the bags and cases taken from the Firebird on that form. (Lynch Dep. Tr. at 33-38; Mullin Ex. 19). In filling out the form, Lynch checked a box for "investigation," which related to the reason why Defendants took the property. (Lynch Dep.

Tr. at 35, Mullin Ex. 19). Lynch could have, but did not, choose to mark the property as having been lost or found. (*Id.* at 64).

## VI.    Defendants' Second Search of the Residence on April 17, 2000.

On April 17, 2000, Defendants conducted a second search of the Residence purportedly because J had complained that certain of her jewelry was missing. (See Mullin Dep. Tr. at 129). They did not obtain a warrant, but instead asked J to consent to the search. (*Id.*). She consented, allowing Defendants to search the house for jewelry, pornography pictures, children's clothes, VCR tapes, and photographs even though J had never complained that Gombert stole her pornography. (Lynch Dep. Tr. at 123; Mullin Ex. 13). In truth, Defendants were conducting the April 17 search at the behest of the Carmel police department. (Mullin Dep. Tr. at 129). Indeed, at least one Carmel police officer participated in the April 17 search. (J Dep. Tr. at 37). Defendants seized items from the Residence on April 17, but they never logged those items into the NMPD's computer system or created any documentation of the seizure. (Mullin Dep. Tr. at 130). In fact, the items removed from the Residence on April 17 were taken directly from the Residence by the Carmel police department and have never been returned.

## VII.    Defendants' May 9, 2000 Search of the Property Removed From the Firebird.

Defendants claim that they did not look into the bags and cases removed from the Firebird until after May 8, 2000, when they obtained a warrant permitting them to do so. (Lynch Dep. Tr. at 172; Kaminski Dep. Tr. At 154-55). They claim that they sought a warrant to look into the bags because J had complained that some of her jewelry was missing. (Lynch Dep. Tr. at 108-09).

After obtaining the May 8 warrant, Lynch searched the bags on May 9, 2000, and he created a document listing the property removed from the bags. (Lynch Dep. Tr. at 73-74; Lynch Ex. 5). As required by NMPD policies, Lynch photographed all of the property removed from the bags while inventorying it on May 9. (Lynch Dep. Tr. at 75; Lynch Ex. 8). He conducted the search in the NMPD's roll call room and spread Gombert's property out all over the room, which was open to anyone at the NMPD. (Mullin Dep. Tr. at 144-45). Although Defendants claim that they did not open the bags before the search on May 9, certain of the photographs taken on May 9 have note cards in them stating that "CSP has tape". (Lynch Dep. Tr. at 118-19). This notation means that the Connecticut State Police had been given the item of property that should have been in the photograph at some point before May 9, 2000. (*Id.* at 118). After completing the search, Lynch filled out an inventory form listing the property taken from the bags and returned that form to Court as an attachment to the May 8 warrant. (Lynch Dep. Tr. at 111-12; Lynch Ex. 5). However, only a small number of the items taken from the bags were listed on the inventory returned to Court. (*Id*).

**VIII.  Gombert Immediately Demanded that Defendants Return his Property and Defendants Refused.**

Gombert began requesting that Defendants return his property as early as April 2000. (April 12, 2000 Authorization from H. Gombert Giving Public Defender Investigator L. Panico Permission to Retrieve Gombert's Property). Indeed, over the course of 3 years, Gombert sent no less than 6 letters requesting that Defendants return his property to him. Defendants received Gombert's demands but refused to return the property allegedly because the property was under

a Court order.  (Lynch Dep. Tr. at 130-33; *see also* Kaminski Dep. Tr. at 34).  However, a court order did not issue as to Gombert's property until January 23, 2002, almost two years after Gombert first demanded that his property be returned.  Moreover, any Court orders issued with respect to Gombert's property stated that the property should be released, not that Defendants should not return it.  Suspiciously, neither of the Defendants had ever before refused to return property purportedly being held for safekeeping when the property's owner requested its return.  (Lynch Dep. Tr. at 133-34; Kaminski Dep. Tr. at 54-56).  Defendants refused to return what was left of Gombert's property until March 31, 2004.  (Possessed Property Receipt, dated 3/31/04, signed by L. Panico and L. Lynch).

## IX.    Defendants Mishandled Gombert's Property.

During the four years that they had custody of Gombert's property, Defendants showed and shared the property with at least other NMPD officers, the Connecticut State Police, the New York State Police, the Carmel Police Department, the Putnam County Sherriff's Office, the Danbury State's Attorney's Office, the Litchfield State's Attorney's and the Selinos, who were Gombert's landlords.  (Lynch Dep. Tr. at 81, 105, 106, 228).  J is certain that Gombert's property was shared with other NMPD officers because certain of them made comments to her about having seen her nude in certain photographs.[3]  (J Dep. Tr. at 60).  Indeed, Defendants released some of the property, including Gombert's personal film, to Detective Don Elmendorf of the Connecticut State Police and the Danbury and Litchfield State's Attorneys Office.  (Lynch Dep.

---

[3] Notably, J asked for the nude photographs back and Defendants refused that request, stating that the photographs were being held as evidence.  (J Dep. Tr. at 60).

Tr. at 81-83).  Moreover, Defendants released at least the necklace to the Carmel police

department and permitted Carmel to view other of Gombert's property.  (Lynch Dep. Tr. at 85-

87).  The person responsible for monitoring the property, Lynch, has no idea whether any of

Gombert's property that he released to other agencies was ever returned.  (Lynch Dep. Tr. at 83).

In fact, the only available documentation, which is marginal because Lynch had unfettered

access to the evidence, reflects that Gombert's property never was returned to the NMPD by

these agencies.  (*see* Dep. Tr. at 97-98; Lynch Ex. 6 (stating that if the property had been

returned it would have been noted on the tracking report)).  Thus, a significant portion of the

property taken from the Firebird on March 1 and 2, 2000 is unaccounted for.

X.    **The NMPD's Policies and Procedures for Searching and Seizing Property Do Not Authorize Defendants' Search of the Firebird.**

The NMPD provides all of its officers with a set of policies and procedures detailing how

and when an officer may conduct a search and seizure of property.  The officers are expected to

review the policies and act in accordance with them.  (Kaminski Dep. Tr. at 50).  Although they

have since been superseded, the policies and procedures governing searches and seizures

conducted in March 2000 were set forth in a document dated June 8, 1989 (the "Policies").  (*Id.*

at 141-44; Lynch Dep. Tr. at 190; Mullin Ex. 4).  The Policies demonstrate that the NMPD

strongly encourages its officers to obtain a warrant before conducting a search and seizure

whenever time permits.  (Kaminski Dep. Tr. at 142-43).  If time does not permit, however, the

Policies set forth certain, well-defined circumstances in which NMPD officers may conduct a

warrantless search or seizure:  (a) when contraband is in "plain view;" (b) in a search incident to

arrest; (c) in exigent circumstances; (d) when the property has been abandoned; and (e) when inventorying items inside of a vehicle that lawfully is in police custody; (f) when given consent. (Mullin Ex. 4).  In 2000, the NMPD did not have a written policy regarding safekeeping searches.  (*See id.*).  A warrantless search simply is not authorized under the Policies unless conducted pursuant to one of the foregoing exceptions.

## XI.    Procedural History.

Gombert filed his operative complaint on March 12, 2003 (the "Complaint"), pursuant to 42 U.S.C. § 1983.  The Complaint consists of three counts.  In the first count, Gombert alleges that Defendants violated his right to equal protection under the Eighth and Fourteenth Amendments when they failed to investigate Gombert's claim that his girlfriend assaulted him. (Complaint at 3, 5).  The second count asserts that Defendants violated Gombert's right under the Fourth Amendment to be free from unlawful search and seizure when they took Gombert's property on March 1, 2000, without a warrant and without cause.  (Complaint at 4).  Gombert's second count also alleges that his Fourth Amendment rights were violated when Defendants searched through his belongings on or before May 8, 2000.  (*Id.*)  The third count is founded on Gombert's Fourteenth Amendment right to equal protection, which Gombert claims was violated because Defendants failed to protect the property Gombert had at his residence.  (Complaint at 4, 5).

Defendants answered the Complaint on June 30, 2004 (the "Answer").  The only material allegation that Defendants admit in their Answer is that they are New Milford police officers. Answer at ¶¶ 2, 3.  Defendants pled three affirmative defenses, including that Gombert failed to

state a claim upon which relief may be granted and two variations of the qualified immunity defense. *Id.* at 3. Defendants failed to plead any exceptions to the Fourth Amendment's warrant requirement as an affirmative or special defense.

In 2004, the parties cross-moved for summary judgment. Defendants moved for summary judgment as to all of Gombert's claims. Defendants' Motion for Summary Judgment dated 11/23/04 ("Defs. Mot. for Summ. Jud."). As Defendants admit, they did not seek summary judgment based on a "safekeeping" or "community caretaking" theory. (Defs. Mem. at 2-3). Instead, Defendants claim to have concentrated their argument on Gombert's equal protection claim and their qualified immunity defense. In support of the qualified immunity defense, Defendants argued that their conduct was reasonable because Gombert's property was in plain view. Gombert moved for summary judgment on each of his claims but only as to Defendants' liability.

In the Ruling, the Court denied Gombert's motion for summary judgment, without prejudice, because Gombert failed to file a Local Rule 56(a)(1) statement of facts. (Ruling at 7). The Court granted Defendants' motion for summary judgment on all of Gombert's claims except his § 1983 claim arising out of the March 1 search and seizure. (Ruling at 13). As to that claim, the Court found that the March 1 search warrant authorized Defendants to search only Gombert's house and thus Defendants' violated Gombert's Fourth Amendment rights by searching his car on March 1. (Ruling at 9). The Court also found that a genuine issue of material fact exists with respect to whether the car was open or closed when Defendants searched and seized Gombert's property from it. (*Id.* at 10).

Like Gombert, the Court believed that Defendants were arguing that their unlawful actions were excused under the well-known plain view exception to the Fourth Amendment's warrant requirement. The Court therefore held in the Ruling that the plain view theory failed as a matter of law because, even if the items taken from the Firebird were in plain view, "defendants did not suspect that any of the items seized from Gombert's car were connected to criminal activity." (*Id.* at 10-11). The Court did not address Defendants current safekeeping theory because Defendants failed to present it to the Court. Finally, the Court firmly rejected Defendants' qualified immunity defense because "[s]eizing property not covered by a warrant and not in plain view is a violation of Gombert's Fourth Amendment right that was clearly established at the time of the incident. . . . Thus, qualified immunity is not warranted on this claim." (Ruling at 13).

In October 2006, Gombert requested that the Court allow him to re-file his motion for summary judgment. Gombert discussed this request with opposing counsel before making the request to the Court and defense counsel stated that he would object to the request; defense counsel never suggested that Defendants should be permitted to file a second motion for summary judgment. Nevertheless, during a conference call with the Court on October 3, 2006, through counsel, Defendants stated that they would not object to Gombert filing a motion for summary judgment as long as they were permitted to cross-move for summary judgment. Gombert objected to Defendants' request because Defendants already had a full and fair opportunity to move for summary judgment whereas Gombert's prior motion had never been adjudicated and had been expressly denied without prejudice. Further, Gombert did not want to

be in a position of having to respond at length to Defendants' arguments that the Court already had decided. Nevertheless, the Court ordered that both parties file motions for summary judgment on or before October 24, 2006. The Court expressly noted, however, that if Defendants raised arguments in their cross-motion that the Court already had decided, Gombert should simply respond to those arguments by citing to the Ruling because those findings are law of the case.

Gombert filed his motion for summary judgment on October 24, 2006, arguing that Defendants were liable for violating his Fourth Amendment rights by conducting a warrantless search and seizure of items in the Firebird. (Gombert's Memorandum of Law in Support of His Motion for Partial Summary Judgment dated 10/24/06). As the Court held in the Ruling, Gombert believed that Defendants were asserting that their actions were justified under the plain view exception and thus Gombert argued that the plain view argument fails as a matter of law. Gombert also re-asserted the Court's finding, which is law of the case, that Defendants are not entitled to qualified immunity. (*See* Ruling at 13).

Defendants filed their Motion on October 24, 2006, asserting an entirely new theory of their case. Unlike their first motion for summary judgment, or any other pleading they had filed to date, Defendants' Motion is premised on the purported "safekeeping" or "continuing caretaking" doctrine. Defendants never clearly articulate exactly what that doctrine provides, offering only the conclusion that the doctrine is "analogous" to an inventory search of an automobile in police custody. (Defs. Mem. at 18). Despite that the Ruling held otherwise,

19

Defendants also contend that they are entitled to qualified immunity because they did not violate a clearly articulated right and their conduct was objectively reasonable.

Defendants' belated safekeeping theory is frivolous and their arguments with respect to qualified immunity have already been decided against them. The Motion should therefore be denied and Plaintiff's Motion for Partial Summary Judgment should be granted.

## BACKGROUND ON THE COMMUNITY CARETAKING DOCTRINE

### I.     The Community Caretaking Doctrine is a Rarely Used and Targeted Exception to the Fourth Amendment's Warrant Requirement.

Recognizing that police officers have duties that are distinct from their duties to detect and prevent crime, the United States Supreme Court coined the "Community Caretaking" label to cover the duties that police officers must discharge outside of their criminal law enforcement activities. *See Cady v. Dombrowski*, 413 U.S. 433, 441 (1973). The community caretaking doctrine historically has encompassed only three non-investigatory aspects of police work: (1) assisting people in distress, sometimes called the emergency aid doctrine, *see State v. Blades*, 626 A.2d 273 (Conn. 1993) (recognizing the emergency aide doctrine as part of police community caretaking function); (2) the public servant doctrine through which police assist citizens in non-emergent situations, *i.e.*, assisting stranded or lost motorists; and (3) the automobile impoundment and inventory doctrine, *see South Dakota v. Opperman*, 428 U.S. 364, 368-69 (1976) (automobiles may be impounded and inventoried as part of the community caretaking function).

Three distinct interests justify an inventory search of an automobile under this community caretaking doctrine: (1) to protect the owner's property while the car is in police custody; (2) to protect the police against baseless claims for lost or stolen property; and (3) to protect the police from potential danger. *Opperman*, 428 U.S. at 369 (citations omitted). Because these interests are generally codified in standardized police procedures, courts "accord deference to police caretaking procedures designed to secure and protect vehicles and their contents *within police custody*." *Colorado v. Bertine*, 479 U.S. 367, 371 (1987) (collecting cases); *see also United States v. Staller*, 616 F.2d 1284, 1289 (5th Cir. 1980) (stating that before police can justify a warrantless inventory search with the purported need to protect the *Opperman* interests, "the police must have the right to take custody of the vehicle"). Indeed, a search only is permissible under the community caretaking doctrine if conducted pursuant to standardized police procedures and it is not conducted for investigatory purposes. *Bertine*, 479 U.S. at 374, 376-77; *Cady*, 413 U.S. at 441 (holding that a community caretaking search or seizure must be "totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute").

Although a warrantless search of private property is presumptively unreasonable and a violation of the Fourth Amendment, *see Katz v. United States*, 389 U.S. 347, 357 (1967), courts have acknowledged that warrantless searches may be conducted under *c*ommunity caretaking doctrine under limited circumstances. *See*, *e.g.*, *Cady*, 413 U.S. at 441 (upholding warrantless search under community caretaking function where police acquired temporary custody of vehicle). Indeed, a community caretaking search of a car is only lawful if: (1) the automobile is

in police custody; (2) conducted to "secur[e] or protect[] the car and its contents," and not for investigatory purposes; and (3) conducted "pursuant to standard police procedures." *See Opperman*, 428 U.S. 372-73; *Cady*, 413 U.S. at 441. Only if all of these criteria are met can courts be certain that the community caretaking doctrine is not being misused as a pretext to insulate constitutional violations. *Bertine*, 479 U.S. at 371; *Opperman*, 428 U.S. at 370 n. 5.

Defendants search and seizure of items from the Firebird on March 1 and 2 does not meet any of the foregoing criteria and thus their motion should be denied.

## ARGUMENT

As a matter of law, the Defendants' search and seizure of property from the Firebird does not fall within the community caretaking doctrine under the new theory articulated in the Defendants' motion. Incredulously, while the Defendants concede that the search and seizure of property from the Firebird was not conducted pursuant to any inventory search of that vehicle, (Defendants' Motion at 18 (stating that their search was "analogous to an inventory search in which the warrant requirement is not implicated")), they nonetheless ask this Court to make new law (on summary judgment) and uphold their actions under the community caretaking doctrine. This the Court should not do. The warrantless search and seizure of property from the Firebird was not conducted pursuant to the community caretaking doctrine or any recognized iteration of it. *See Opperman*, 428 U.S. at 372-73; *Cady*, 413 U.S. at 441. Defendants' motion should therefore be denied and Gombert's cross-motion for summary judgment should be granted.

**I.     The Firebird Was Not In Police Custody And Thus Defendants Search Of It Was Not Authorized Under The Community Caretaking Doctrine.**

The law is clear that a vehicle must be "*within police custody*" before it may be searched pursuant to the community caretaking doctrine. *Bertine*, 479 U.S. at 741.  Here, it is undisputed that the Defendants never took the Firebird into police custody and that they did not impound the Firebird either before or after searching it.  (Defs. Mem. at 18, 19 (the vehicle was not impounded); Lynch Depo. Tr. at 178-180; Mullin Depo. Tr. at 174-175).  Thus, Defendants' search and seizure of Gombert's property from the Firebird is not justified under this first requirement of the community caretaking doctrine.  *See*, *Bertine*, 479 U.S. at 741 (deference given to police caretaking procedures "designed to secure and protect vehicles and their contents *within police custody*") (emphasis added); *Cady*, 413 U.S. at 441 (warrantless search upheld when vehicle was in temporary police custody).

The requirement that a vehicle be in police custody before an inventory search of its contents is justified under the community caretaking doctrine is an important one, stemming from the interests being protected by the doctrine.  *See Opperman*, 428 U.S. at 369.  While courts acknowledge that protecting a vehicle and its contents from theft or vandalism may be sufficient to warrant protection under the community caretaking function, this is true *only* where the automobile is impounded or is otherwise lawfully in police custody.  *See United States v. Best*, 415 F. Supp. 2d 50 (D. Conn. 2006) (noting that vehicle was at risk of theft or vandalism and was *impounded* by the police for safekeeping before an inventory search was conducted pursuant to standard police procedures); *see also United States v. Johnson*, 734 F.2d 503, 505 (10th Cir.

1984) (reasonable for police to *tow and impound* vehicle because of concern for vandalism);

*Hallstrom v. Garden City*, 991 F.2d 1473, 1477 n.4 (9th Cir. 1993) (*impounding* vehicle to

protect it from vandalism or theft was reasonable under community caretaking function).

Where, as here, Defendants did not take custody of the Firebird, they had no right to search it or

seize its contents without a warrant and the community caretaking doctrine simply does not

apply.  *See Opperman*, 428 U.S. at 369; *Best*, 415 F. Supp. 2d 50.

II.    **The Community Caretaking Doctrine Does Not Apply Because The Defendants Were Not Acting Pursuant To Any Standardized Police Procedures When They <u>Conducted Their Warrantless Search and Seizure Of Property In the Firebird.</u>**

The community caretaking doctrine rests on the theory that police must act pursuant to

standard procedures when undertaking a community caretaking search.  *Opperman*, 428 U.S. at

372 ("the decisions of this Court point unmistakably to the conclusion…that inventories

*pursuant to standard police procedures* are reasonable" under the community caretaking

doctrine) (emphasis added).  Indeed, the Supreme Court's "decisions have always adhered to the

requirement that inventories be conducted according to standardized criteria."  *Bertine*, 479 U.S.

at 374 n. 6; *see State v. Billias*, 17 Conn. App. 635, 641-643 (1989) (where search of bag seized

from car was not pursuant to any police regulation or practice regarding inventory searches of

cars it does not fall within the community caretaking exception to the warrant requirement).

Thus, even if this Court were to make new law and hold that Defendants need not have taken the

Firebird into custody before searching it (which it should not do), the Defendants' actions still

cannot be upheld under any theory of the community caretaking doctrine because Defendants

were not acting pursuant to standard police procedures when they searched and seized property from the Firebird.

The NMPD does have standard search and seizure policies and procedures, including policies that authorize warrantless searches and seizures under limited circumstances. (*See, generally*, Mullin Ex. 4). These Policies demonstrate a strong preference that officers obtain a warrant before conducting a search and seizure whenever time permits. (Kaminski Depo. Tr. at 142-143). Defendants admitted that they could have obtained a warrant to search the Firebird but they chose not to. This decision itself violates NMPD Policies.

Where, unlike here, time does not permit officers to obtain a warrant, the Policies set forth certain, well-defined circumstances in which NMPD officers may conduct a warrantless search or seizure: (a) when contraband is in "plain view;" (b) in a search incident to arrest; (c) in exigent circumstances; (d) when the property has been abandoned; (e) when inventorying items inside of a vehicle that lawfully is in police custody; and (f) when given consent. (*See* Mullin Ex. 4). Defendants could not uniformly point to any one of these policies as the one pursuant to which they acted when conducting the warrantless search and seizure of items from the Firebird.

Lynch admits that he was the officer in charge at the Residence on March 1 and 2, 2000, and that he made the decision that Defendants should search and remove items from the Firebird. (Lynch Affidavit dated 10/24/06 at ¶47; Kaminski Affidavit dated 10/24/06 at ¶22). Yet, Lynch stated that Defendants were not acting pursuant to any of the standard Policies in place in 2000 when they conducted the warrantless search and removal of Gombert's property from the

Firebird.  (Lynch Depo. Tr. at 193-98).[4]  Accordingly, the March 1 and 2 search of the Firebird is

not insulated from the Fourth Amendment's warrant requirement by the community caretaking

doctrine.  *Opperman*, 428 U.S. at 372 ("the decisions of this Court point unmistakably to the

conclusion…that inventories *pursuant to standard police procedures* are reasonable" under the

community caretaking doctrine) (emphasis added); *State v. Nelson*, 17 Conn. App. 566, 573-74

(1989) (recognizing that an inventory search under the community caretaking doctrine requires

the existence of standard police policies "to avoid arbitrary determinations by police with respect

to an inventory search").  Moreover, despite advancing the theory that their actions were akin to

an inventory search like those upheld in *Bertine*, *Opperman* and *Cady* -- *i.e.*, an inventory search

of a vehicle lawfully in police custody, (Defendants' Motion at 17-18) -- Defendants appear to

back away from that theory, presumably because it simply does not fit.  (Kaminski Depo. Tr. at

149) (rejecting idea that Gombert's property was taken from the Firebird pursuant to NMPD

"Search of a Motor Vehicle" policy).[5]

---

[4] Lynch initially testified that Defendants search and seizure of property from the Firebird did not fall within the "Abandoned Property" policy.  (Lynch Dep. Tr. at 196-197).  After counsel asked for "a moment to confer with [his] client" and the parties took a five minute break, Lynch and his counsel returned and stated that Lynch had been confused when testifying about the abandoned property policy.  (*Id.* at 198-99).  However, on re-direct examination, Lynch admitted that Gombert's counsel had asked him to interrupt the questioning if he ever became confused and Lynch never did so.  (*Id.* at 240-41).  It was only after a break with counsel that Lynch feigned confusion.

[5] The NMPD "Search of a Motor Vehicle" policy is analogous to the traditional community caretaking function recognized in *Bertine*, Cady, and *Opperman*, and allows the NMPD to inventory items in a vehicle that is lawfully in police custody.  (*See* Mullin Ex. 4, "Exceptions to the Requirement of a Search Warrant" at § (e)).

Kaminski's half-hearted attempt to fit the search of the Firebird into the NMPD's abandoned property policy fails on a number of grounds. (Kaminski Depo. Tr. at 146 (testifying that Gombert's property was taken from the Firebird "more or less" pursuant to the NMPD's policy for "Abandoned Property")). First, despite moving for summary judgment on entirely new grounds than ever previously asserted in this case, the Defendants have never formally articulated an "abandoned property" defense to Gombert's claims.

Second, the NMPD's "abandoned property" policy permits a warrantless search only

> If in the course of a lawful arrest (or other lawful action by a Officer [sic], such as a surveillance or questioning of a person), a person discards personal property at some place outside his dwelling or its curtilage, under circumstances demonstrating abandonment a Officer [sic] may seize such property (even though it is then beyond the person's physical control) on the grounds that it has been abandoned.

(Mullin Ex. 4, "Exceptions to the Requirement of a Search Warrant" at § (e)). Here, Kaminski conceded that (a) Gombert did not "discard" the items in the Firebird "in the course of a lawful arrest," (Kaminski Dep. Tr. at 148-150), and; (b) the Firebird, and the items in it were on Gombert's property and thus *inside* the "curtilage" of that property. (*Id.* at 147). Thus, the abandoned property policy is not remotely close to authorizing the March 1 and 2 search and seizure of property in the Firebird, even if it were more than an afterthought for Kaminski.

Defendants were not acting according to any articulated NMPD policy when they conducted the warrantless search and seizure of items from the Firebird. Thus, as a matter of law, their actions are inexcusable under the community caretaking doctrine. *See Bertine*, 479 U.S. at 374 n. 6 (requiring standardized criteria for community caretaking searches); *Florida v.*

*Wells*, 495 U.S. 1 (1990) (where suitcase was opened during "inventory search," holding that Fourth Amendment was not satisfied and inventory search was invalid absent policy with respect to opening of closed containers); *Billias*, 17 Conn. App. 635 (inventory search does not fall within community caretaking exception when not conducted pursuant to any police regulation or policy).

**III.    Defendants Resort To The Community Caretaking Doctrine Only As A Pretext To Hide Their Investigatory Purpose When Entering And Removing Property From The Firebird.**

The touchstone of the community caretaking doctrine is that the police function is "totally divorced from the detection, investigation, or acquisition of evidence" of a crime.  *Cady*, 413 U.S. at 441.  *See also Bertine*, 479 U.S. at 375-76 (the hallmark of an inventory search that follows an impoundment under the community caretaking doctrine is that it is not a pretext for initiating a search for evidence of criminal activity.  Indeed, in *Florida v. Wells*, the United States Supreme Court stated that "an investigatory search must not be a ruse for a general rummaging in order to discover incriminating evidence." 495 U.S. 1, 4 (1990).  Each time the Supreme Court has upheld an inventory search under the community caretaking doctrine, crucial to the Court's determination was its finding that there was no showing that the "police acted in bad faith or for the sole purpose of investigation."  *See*, *e.g.*, *Bertine*, 479 U.S. at 372; *see also New York v. Burger*, 482 U.S. 691, 716-717 n. 27 (1987) (noting in context of administrative inspection that the search did not appear to be a "pretext for obtaining evidence of …violation of…penal laws").  In fact, the Supreme Court expressly recognizes that an officer's ulterior

motives will in fact invalidate a community caretaking search.  *See Whren v. United States*, 517 U.S. 806, 811-812 (1996).

Here, the Defendants admit their investigatory motives when searching and seizing items from the Firebird.  (Kaminski Dep. Tr. at 128-129, 130-131; Lynch Dep. Tr. at 171).  Before even going to the Residence, the Defendants knew that the Firebird contained property they were interested in, (Kaminski Dep. Tr. at 128-129; Lynch Dep. Tr. at 219), and they sought advice from Assistant State's Attorney Guy Wolf on how to obtain custody of the property in the Firebird.  (Lynch Dep. Tr. at 217-219).  Yet despite having substantial time to obtain a search warrant - indeed more than twenty four hours - the Defendants failed to even apply for such warrant and contented themselves to the unwarranted search. (Lynch Dep. Tr. at 148, 192-193; Mullins Dep. Tr. At 98-99; Mullin Ex. 8).

Defendants' claimed search and seizure of property from the Firebird for "safe-keeping" is a mere pretext to mask their true investigatory interest in the property.  Indeed, the Defendants wanted to search the Firebird because "it [was] a crime scene, so [they] wanted to examine [the Firebird] before [they] left" to determine if the Firebird contained any "evidence of a crime." (Kaminski Dep. Tr. at 128-129).  Defendants were not just looking for evidence related to the sexual assault on J; as of February 29, they also were also cooperating with other agencies investigating Gombert for a number of crimes, including the disappearance of Robin Murphy in Carmel.  (Mullin Dep. Tr. at 111-113; *see also* Lynch Dep. Tr. at 153).[6]  Indeed, Defendants

---

[6] Illustrative of the Defendants' investigatory interest in the Firebird and its contents is the New Milford Police Department's collaboration with the Carmel, New York Police Department prior to and

stated that they had no interest in the Necklace purportedly hanging from the Fiero for purposes

of the assault on J, thus, they must have been aware of Carmel's investigation during the March

1 and March 2 search and seizure; otherwise, Lynch would never have photographed it.

The manner in which Defendants accounted for and handled Gombert's property after

searching and seizing it from the Firebird further evidences their investigatory purpose:

- Despite claiming an interest in safeguarding Gombert's "valuable property," the
  Defendants failed to impound the Gombert's most valuable property -- the Firebird --
  and they do not even know what, if anything, they did to secure it before leaving.
  (Lynch Dep. Tr. 178-180; Kaminski Dep. Tr. at 174-175).

- Although Defendants logged the items seized from the Residence into the computer
  system on March 2, the property removed from the Firebird was not processed for a
  week, an unreasonable delay under the NMPD policies. (Lynch Dep. Tr. at 26-27,
  36-38, 51-54; Kaminski Dep. Tr. at 81-82; Kaminski Ex. 4). Indeed, Defendants are
  not even certain where the items taken from the Firebird were for that week. (Lynch
  Dep. Tr. at 33, 38). This is hardly safekeeping.

- When they finally logged the items taken from the Firebird into the NMPD's
  computer system, Defendants chose to label those items as "Evidence," despite that
  they could have labeled the items as being "Held for Safekeeping." (Lynch Dep. Tr.
  at 53-55; Kaminski Ex. 4). According to the NMPD policies, there is absolutely no
  reason why Gombert's property would be listed as "Evidence" if it really was being
  held for safekeeping. (Kaminski Dep. Tr. at 63-64). Indeed, as Lynch admits,
  "'evidence' means its evidence." (Lynch Dep. Tr. at 46-47).

---

contemporaneously with Mr. Gombert's arrest. On February 29, the date J made her complaint against
Mr. Gombert, the New Milford Police Department immediately called in a detective from Carmel. (J
Depo. Tr. at 54-55, 68-69 (the officer from Carmel informed J that Gombert "was a very dangerous man
and that what [J] was doing was correct because [Gombert] was wanted in connection with the case in
Carmel, New York: that he's been suspected of other sexual assaults")). Carmel was particularly
interested in a necklace that they believed to be in Mr. Gombert's possession and which they believed
could link Mr. Gombert to a missing person. (J Depo. Tr. at 29; Mullin Depo. Tr. at 119-120). The
Defendants' sole purpose in searching the Fiero was to determine whether the necklace they believed
Carmel wanted for its own investigation could be found there. (Lynch Dep. Tr. at 85-86, 92-93; Mullin
Dep. Tr. at 119-120).

- Defendants refused to return the property taken from the Firebird to Gombert, which they allegedly were holding for safekeeping, despite Gombert's almost immediate (and repeated) demands for its return.  (Ex. N to Hole Affidavit).

- Instead, Defendants began releasing Gombert's property to other law enforcement agencies, including the Connecticut State Police, the Litchfield State's Attorney's Office, the Danbury State's Attorney's Office, and the Carmel Police Department, which was "not a common occurrence" if property really was being held for safekeeping.  (Lynch Dep. Tr. at 81-83 (release of Gombert's property), 133-134 (Lynch had never refused before to return property being held for safekeeping)).

- Defendants willingly allowed at least disinterested NMPD officers, the Connecticut State Police, the Litchfield State's Attorney's Office, the Danbury State's Attorney's Office, the Carmel Police Department, and the Selinos (Gombert's landlords) to view Gombert's property during the four years it was in their custody.  (Lynch Dep. Tr. at 81, 105-106, 228).

- Defendants failed to return Gombert's property even after the Connecticut Superior Court issued its first order, in January 2002, claiming falsely that the property first had to be inventoried before it could be properly returned, despite having already obtained the May 8 Warrant and thereafter searching and inventorying all of the contents of the bags taken from the Firebird on May 9, 2000.  Defendants did not return the property in their possession, which does not include the property destroyed or sent to other agencies, until March 2004.

The Defendants' conduct both before and after the search and seizure of property from the Firebird clearly establishes their investigatory motives for searching and removing Gombert's property from the Firebird.  Rather than impound the Firebird in the interest of protecting all of Gombert's property against theft and vandalism, the Defendants took only the property that had potential evidentiary value to them and other law enforcement agencies. Thereafter, the Defendants shared Gombert's property with other agencies with impunity, despite their claimed "caretaking" role.  Indeed, while claiming to never have opened Gombert's bags prior to the May 8 Warrant, photographs taken during the May 8 search evidences that the NMPD had already given several items of Gombert's property to the Connecticut State Police.

(Lynch Dep. Tr. at 118-119; Lynch Ex. 8).  The Defendants' refusal to return to Gombert the very property they claimed to hold for his protection makes clear that the Defendants took the property from the Firebird for purposes of their multiple investigations.  *Cf. United States v. Banks*, 150 F. Supp. 2d 548 (S.D.N.Y. 2001) (noting validity of search for inventory purposes and not investigatory purposes was bolstered by police preparing inventory list and almost immediately turning over personal items to plaintiff's brother).  Because of their ulterior motive and investigatory purpose, the Defendants did not act under the community caretaking doctrine and their motion should be denied.  *See Wren*, 517 U.S. at 811-812 (officer's ulterior motive invalidates community caretaking search).

IV.    **The Court Already Has Decided That Defendants Are Not Entitled To Qualified Immunity And In All Events Defendants' Actions Were Unreasonable.**

Defendants contend that they are entitled to summary judgment on their qualified immunity defense even if they violated Gombert's constitutional rights because (1) their conduct did not violate a clearly established right and (2) their conduct was objectively reasonable. (Defs. Mem. at 24).  These arguments are meritless.

As to the first point, the Court already has determined that Gombert's right to be free from warrantless searches and seizures of his property is well-defined under the Fourth Amendment to the United States Constitution.  (Ruling at 13).  This finding is law of the case and, as the Court stated in the October 3, 2006 teleconference, Gombert is entitled to rely on it.

In any event, Defendants' contention that they did not violate a clearly established right is meritless.  It is indisputable that the Fourth Amendment right to be free from warrantless

searches and seizures is clearly established. (Ruling at 13). It also is clear that warrantless searches are presumed to violate that right unless some exception applies. *Kerman v. New York*, 261 F.3d 229, 235 (2d Cir. 2001) ("Warrantless searches are presumptively unreasonable"). Defendants ignore this premise and seek qualified immunity because they allegedly were confused as to whether their search and seizure of items from the Firebird was justified under the purported safekeeping doctrine. (Defs. Mem. at 26). However, Defendants have not cited a single safekeeping case where, as here, officers seized items from a vehicle that was lawfully parked on private property and was not impounded. Indeed, there is absolutely no law supporting Defendants' decision to seize items from the Firebird under these circumstances and, thus, it cannot be said that a reasonable officer would have taken the unprecedented actions that Defendants took here. By not acting in accordance with a well-established exception or pursuant to the Fourth Amendment, Defendants are presumed to have violated Gombert's well-established right to be free from warrantless searches and seizures.

Defendants' citation to *Kerman* illustrates this point. In that case, defendants acted pursuant to clear, pre-existing law authorizing police officers to conduct a warrantless search and seizure based on an anonymous tip and the presence of exigent circumstances. *See Kerman*, 261 F.3d at 237. The Second Circuit therefore held that the officers were entitled to qualified immunity under the circumstances. *Id.* By contrast, no court had ever held that officers may search and seize items for safekeeping from an automobile that is parked on private property and not impounded, which is precisely what Defendants did here. Since no court has ever authorized such a search, it is presumptively unreasonable and in violation of Gombert's clearly established

constitutional right.  *Kerman*, 261 F.3d at 235 ("Warrantless searches are presumptively unreasonable").[7]

Defendants also claim that their actions were reasonable because "[t]here is no suggestion that Investigator Lynch seized this property for his own personal use, for investigatory purposes, or for any other improper purpose."  Aside from admitting that their actions were improper if made for an investigatory purpose, this statement simply is not true.  Defendants first looked into the Firebird on February 29 "to make sure there was nothing of evidentiary value inside." (Kaminski Dep. Tr. at 128-129).  Moreover, they went to the Firebird on March 1 because "it [was] a crime scene, so [they] wanted to examine [the Firebird] before [they] left" in order to determine whether there was "evidence of a crime" inside the car.  (Kaminski Depo. Tr. at 130-131).  Further, it is abundantly clear that Defendants were assisting at least one other agency in their investigation of Gombert when they searched the Firebird.  (*See* Mullin Dep. Tr. at 114-115).  Indeed, Defendants stated in the form in which they listed the items removed from the Firebird that they took that property for purposes of "Investigation."  (Lynch Dep. Tr. at 35; Mullin Ex. 19).  That is precisely why Defendants logged the property removed from the Firebird into the NMPD's computer system as "evidence" instead of as being "held for

---

[7]  Defendants' remaining cases are simply irrelevant.  In *Moore v. Vega*, 371 F.3d 110, 114 (2d Cir. 2004), the issue was whether a parolee's Fourth Amendment rights were clearly established given that "a state's operation of a probation program 'presents special needs beyond normal law enforcement that may justify departures from the usual warrant and probable-cause requirements.'"  *Id.* at 115 (citing and quoting *Griffin v. Wisconsin*, 483 U.S. 868, 873-74 (1987)).  No parolees are involved here.  In *Hart v. Myers*, 183 F. Supp. 2d 512, 525 (D. Conn. 2002), the issue was whether defendants were unlawfully inside the curtilage of plaintiff's property when they seized his guns. Here, Defendants have admitted that the Firebird was lawfully parked on Gombert's property when they searched it and thus *Hart* is simply inapposite.

safekeeping." (Lynch Depo. Tr. at 53-55). The evidence is thus conclusive that Defendants in

fact searched and removed property from the Firebird for an investigatory purpose and their

belated resort to the safekeeping or community caretaking doctrine is nothing more than a

pretext. If not conclusive, these facts at least create a genuine issue of material fact as to

Defendants' purpose in searching the Firebird and thus Defendants are not entitled to summary

judgment on their qualified immunity defense.

**V.     Defendants' Warrantless Search and Seizure of Gombert's Property Unquestionably Rises To The Level of A Constitutional Violation.**

Defendants final argument is also a new one. It essentially contains three points: (1) that

Gombert's Fourth Amendment search and seizure claim does not rise to the level of a

constitutional violation because he could have sued Defendants in tort; (2) that Defendants'

failure to provide Gombert with a receipt for the property they took does not rise to the level of a

constitutional violation, and (3) that Gombert's property has been returned to him. None of these

arguments have merit.

Defendants' first argument ignores the reams of cases holding that a warrantless seizure

of property may give rise to an actionable claim under § 1983 as a violation of the Fourth

Amendment to the Constitution. If Defendants' argument were correct, all of these cases are

wrongly decided because the plaintiffs in those cases should have been required to sue the

defendants in tort instead of under § 1983. Obviously, this is not, and cannot be, the rule.

The two cases Defendants cite in support of their argument are not even remotely

relevant to this case. Both cases involve a prisoner's claim that the prison system had deprived

him of his property in violation of the Fourteenth Amendment's Due Process Clause. *Hudson v. Palmer*, 468 U.S. 517, 530-31 (1984) (prisoner alleged that the state had deprived him of due process by destroying his property in a shakedown); *Parratt v. Taylor*, 451 U.S. 527, 529 (1981) (prisoner alleged that the state had deprived him of due process by losing an item sent to him in the mail). Moreover, the holding in both cases was that "an unauthorized [] deprivation of property by a state employee does not constitute a violation of *the procedural requirements* of the Due Process Clause". *Hudson*, 468 U.S. at 533 (emphasis added); *Parratt*, 451 U.S. at 537 ("[w]e must decide whether the tort remedies which the State of Nebraska provides as a means of redress for property deprivations satisfy *the requirements of procedural due process*."). The procedural requirements of the Due Process Clause are immaterial here, where Gombert's surviving claim is that Defendants violated the Fourth Amendment's prohibition on warrantless searches and seizures. Thus, *Parratt* and *Hudson* have no bearing on this case.

Gombert has never argued that Defendants violated his constitutional rights by failing to give him a receipt for the property they took from the Firebird. As Defendants recognize, Gombert has instead argued that Defendants failure to give him a receipt violates Connecticut General Statutes § 54-36f. (Defs. Mem. at 30). Thus, Gombert is doing precisely what Defendants argue he should be doing -- seeking an appropriate remedy under state law, in conjunction with his available remedies under federal law. Moreover, Defendants have essentially conceded that they violated § 54-36f by acknowledging that this statute required them to give Gombert a receipt and that they failed to provide such a receipt. Although Defendants

rifle off a number of excuses as to why the did not give Gombert a receipt for his property, the cite absolutely no authority demonstrating that their reasons are valid.

Defendants also contend that they are entitled to summary judgment because "essentially all" of Gombert's property has been returned to him. (Defs. Mem. at 31). Defendants blissful ignorance is unsupportable. Had they not taken his property from the Firebird in the first place, Gombert's property would never have been destroyed as much of it was. (*See* Defs. Mem. at 31 (acknowledging that some of Gombert's property was destroyed)). That some of the property was destroyed is not the equivalent of returning it to Gombert. Further, Defendants released quite a substantial amount of Gombert's property, including his personal film, to other agencies and they cannot demonstrate that the property was ever returned to them or to Gombert. (Lynch Dep. Tr. at 83, 97-98; Lynch Ex. 6 (if property had been returned, it would be noted on inventory tracking reports)). Thus, Defendants' claim that all of Gombert's property has been returned to him misses the point and is factually untrue. Accordingly, Defendants are not entitled to summary judgment on this issue.

## CONCLUSION

For all of the foregoing reasons, and those stated in Gombert's Motion, Defendants'

Renewed Motion should be denied and, consequently, Gombert's Motion should be granted.


THE PLAINTIFF,
HOWARD JOHN GOMBERT


By:____/s/_____
    Ben M. Krowicki [ct06153]
    Sara R. Simeonidis [ct25566]
    Brian R. Hole [ct26608]
    BINGHAM McCUTCHEN LLP
    One State Street
    Hartford, CT 06103
    Tel:  (860) 240-2700
    Fax:  (860) 240-2818
    His Attorneys

## **CERTIFICATION**

I hereby certify that a true and accurate copy of the foregoing was sent via the Court's electronic notification system or by first class U.S. mail, postage prepaid, on this 19th day of January, 2007, to the following counsel of record:

James N. Tallberg, Esq.
Karsten, Dorman & Tallberg, LLC
8 Lowell Road
West Hartford, CT 06119


_____/s/_____
Brian R. Hole