**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| HOWARD JOHN GOMBERT : | |
|     Plaintiff, : | |
| : | Civil Action No. |
| v. : | 3:01 CV 1913 (DJS) |
| : | |
| LARRY LYNCH and WILLIAM KAMINSKI : | |
|     Defendants. : | January 19, 2007 |

**PLAINTIFF'S SUPPLEMENTAL LOCAL RULE 56(a)(1) STATEMENT OF FACTS**

Pursuant to Local Rule of Civil Procedure 56(a)(1), Plaintiff, Howard J. Gombert ("Gombert") submits this supplemental statement of undisputed facts and the Affidavit of Brian R. Hole dated January 19, 2007, with exhibits, in further support of his Motion For Partial Summary Judgment dated October 24, 2006. The Defendants asserted a new theory of their case for the first time when Defendants moved *again* for summary judgment on October 24, 2006. Neither this Court nor Gombert could have anticipated Defendants' belated "community caretaking" or "safekeeping" theory, especially in light of this Court's prior Ruling on summary judgment, which appeared to substantially narrow the issues for trial. Accordingly, in order to support his motion for partial summary judgment in response to Defendants' Renewed Motion, Gombert supplements his earlier Local Rule 56(a)(1) statement as follows:

1.      On the morning of February 29, 2000, Howard Gombert left his house for court, leaving his white Pontiac Firebird (the "Firebird") in its usual spot in the driveway. (Transcript of J's 12/13/06 Deposition ("J Dep.") Tr. at 44).[1]

2.      Shortly thereafter, J left to take their daughter to the doctor because she was sick. (*Id.* At 13, 44). When J left the Residence on February 29, the Firebird was parked at the Residence and it was entirely closed. (*Id.* at 44-45). J did not return to the Residence until after Defendants arrived there on March 1, 2000. (*Id.* at 45).

3.      On February 29, 2000, J made a complaint to the NMPD that Gombert had sexually assaulted her two days earlier, on February 27, 2000. (*Id.* at 12-13).

4.      When J arrived at the NMPD, Investigators Larry Lynch, William Kaminski, and a detective from the Carmel, New York police department were there. (J Dep. Tr. at 54-55, 68-69).

5.      Apparently, Investigator Mullin had been working with the Carmel police department to investigate Gombert in connection with the disappearance of a woman named Robin Murphy. Defendants were therefore able to quickly invite a Carmel officer to attend J's interview on February 29. (See J Dep. Tr. at 34).

---

[1] The various deposition transcripts and exhibits cited herein are attached as exhibits to the Affidavit of Brian R. Hole in Support of Plaintiffs' Opposition to Defendants' Renewed Motion for Summary Judgment filed contemporaneously herewith.

6. At that interview, J was informed that Gombert "was a very dangerous man and that what [J] was doing was correct because [Gombert] was wanted in connection with the case in Carmel, New York: that he's been suspected of other sexual assaults." (*Id.* at 54-55).

7. Carmel was particularly interested in a necklace that they believed was in Gombert's possession and could link Gombert to Ms. Murphy's disappearance. (J Dep. Tr. at 29; Transcript of James Mullin's 11/29/06 Deposition ("Mullin Dep.") Tr. at 115).

8. J remained at the NMPD through the evening of February 29, and was then transported by the police to a hotel. (J Dep. Tr. at 13-15).

9. At approximately 5:00 p.m. on February 29, 2000, Kaminski and several other officers converged on the Residence to arrest Gombert for sexual assault. (Kaminski Dep. Tr. at 87-88).

10. The officers parked on the street, spread out, and approached the Residence through the woods. (*Id.* at 90-91).

11. Kaminski never actually saw Gombert flee. (Kaminski Dep. Tr. at 92-93).

12. Gombert was charged with sexual assault and risk of injury to a minor and his bail was set at $500,000. (*Id.* at 112). Kaminski has never seen higher bail set in a sexual assault case in his 20 years with the NMPD. (*Id.*).

13. At approximately 9:00 p.m., Kaminski returned to the Residence while the NMPD's Investigative Services Division prepared an application for a warrant to search the Residence. (*Id.* at 113-114).

14. Despite not having a warrant, Kaminski did not hesitate to look into the Firebird on February 29 "to make sure there was nothing of evidentiary value inside". (*Id.* at 128-129).

15. Kaminski also collected data and transmitted it to Investigative Services so that they could include it in their warrant application. (Id. at 200-202). Included in the information Kaminski communicated was a detailed description of the Firebird and its contents. (*Id.* at 204-205).

16. Investigators Lynch and Mullin, the NMPD's only two juvenile Investigators, were responsible for making the warrant application on March 1, 2000. (Mullin Dep. Tr. at 88; Lynch Dep. Tr. at 146-147; Mullin Ex. 8).

17. Lynch had specific knowledge of the Firebird and its contents when making his search warrant affidavit. (Lynch Dep. Tr. at 219).

18. Lynch recalls having a conversation with State's Attorney Guy Wolf about the Firebird and the bags in it while Lynch was at headquarters preparing his search warrant affidavit. (*Id.* at 218-219). State's Attorney Wolf's advice regarding the bags was to "seize them, but don't look in them." (*Id.* at 217).

19. Neither the Firebird nor its contents are mentioned in the March 1 warrant application. (Lynch Dep. Tr. at 148; Mullin Ex. 8).

20. Investigators Lynch and Mullin obtained a warrant on March 1, 2000 (the "March 1 Warrant"). (Mullin Ex. 8; *Id.* at 161).

21. The March 1 Warrant permitted them to search only the Residence; it did not permit a search of the Firebird. (Mullin Dep. Tr. at 98-99; Lynch dep. Tr. at 148; Mullin Ex. 8).

22. The March 1 Warrant is specific and it permits a search of the Residence only for evidence related to the alleged sexual assault on J, including pillows, clothing, and other household items that may contain bodily fluids. (Lynch Dep. Tr. at 155).

23. Defendants also obtained a consent to search the Residence from J on March 1. (J Dep. Tr. at 20; Mullin Dep. Tr. at 94-95; Mullin Ex. 9).

24. The consent to search is much broader than the March 1 Warrant, and it allowed Defendants to seize items not listed in the March 1 Warrant, including pornography, children's clothing, VCR tapes, photographs and things generally having to do with sex crimes involving juveniles. (Lynch Dep. Tr. at 153-154; Mullin Ex. 9).

25.     Defendants asked J to sign the broad consent form because, as of March 1, they and other agencies that Defendants were cooperating with were investigating Gombert for a number of crimes other than the assault on J, including Robin Murphy's disappearance in Carmel and Maryanne Measles' murder in Connecticut.  (Mullin Dep. Tr. at 111-113; see also Lynch Dep. Tr. at 153).

26.     Defendants, Investigator Mullin, and Officer Earl Wheeler arrived at the Residence at approximately 8:00 p.m. on March 1, 2000 to conduct the search.  (Kaminski Dep. Tr. at 121).

27.     Lynch drove a crime scene van to the Residence on March 1, which the officers planned to use to transport any property seized during the search back to the NMPD.  (Lynch Dep. Tr. at 162).

28.     J was also present during the NMPD search of the Residence.  (J Dep. Tr. at 17).

29.     After completing their search, the officers believe that they locked the house in order to secure it.  (*Id.* at 174).

30.     Defendants next proceeded to search and seize items from the Firebird even though the March 1 Warrant did not authorize such a search and that Defendants could have obtained a warrant to search the Firebird if they had wanted to.  (Kaminski Dep. Tr. at 124; 130-131).

31.     Defendants wanted to search the Firebird because "it [was] a crime scene, so [they] wanted to examine [the Firebird] before [they] left" in order to determine whether there was "evidence of a crime" inside the car.  (Kaminski Dep. Tr. at 130-131).

32.     Defendants also were interested in the Firebird because J had "given information" about the Firebird presumably when she met with NMPD and Carmel officers on February 29, 2000.  (Lynch Dep. Tr. at 171).

33.     Defendants also were still looking for the pentagram necklace, which the Carmel police department thought would connect Gombert to Robin Murphy's disappearance.  (See Mullin Dep. Tr. at 119-120).

34.     At least some of the bags in the Firebird were not in plain view and could only be seen by removing other bags and then lifting a door to reveal the hatch's well compartment. (Lynch Dep. Tr. at 207-209).

35.     Defendants removed the items from the Firebird and then placed the property into the crime scene van.  (Lynch Dep. Tr. at 16, 171-172).

36.     Defendants did not look inside of the bags they removed from the Firebird even though the customary practice would have been to inspect any items taken into custody for safekeeping.  (Kaminski Dep. Tr. at 154-155).

37.   Defendants did not impound the Firebird either before or after they searched it. (Lynch Dep. Tr. at 178-180; Mullin Dep. Tr. at 174-75).

38.   Defendants left the Firebird at the Residence.  (Lynch Dep. Tr. at 178-180).

39.   Defendants are not certain whether they secured the Firebird in any manner. (Lynch Dep. Tr. at 178-180; Mullin Dep. Tr. at 174-175).

40.   Defendants also conducted a warrantless search of a red Pontiac Fiero that was located at the Residence.  (Lynch Dep. Tr. at 85-86, 92-93).

41.   Defendants believed the Fiero might contain the necklace that the Carmel police were looking for.  (Lynch Dep. Tr. at 92-93; Mullin Dep. Tr. at 119-120).

42.   The necklace had nothing to do with the alleged assault on J because it was "a separate issue" stemming from Carmel's investigation.  (Lynch Dep. Tr. at 200-202).

43.   Lynch photographed a necklace hanging from the mirror of the Fiero before seizing it and then photographed it again on the floor of the crime scene van.  (Lynch Dep. Tr. at 210-211).

44.   Defendants placed the items removed from the Firebird into the crime scene van and, at some point, brought them back to the NMPD headquarters.  (Lynch Dep. Tr. at 17).

45. NMPD standard procedure requires officers to immediately log any seized property into the NMPD computer system and then to place those items into the evidence room. (Lynch Dep. Tr. at 19-20; Kaminski Dep. Tr. at 75-77).

46. When logging property into the NMPD's computer system, the officer was required to give the property a description and assign it a "type" or "status". (Kaminski Dep. Tr. at 59-60). The officer chose the "type" or "status" of the property from a drop-down menu, which included options such as "held for safekeeping," evidence, lost or found, and none. (*Id.* at 60). The officer entering the property into the system was responsible for choosing what "type" to assign the property being entered. (Kaminski Dep. Tr. at 60-61; Lynch dep. Tr. At 60).

47. Lynch was responsible for entering the property taken from the Firebird into the NMPD's computer system. (Lynch Dep. Tr. at 22, 60).

48. Lynch did not log the property seized from the Firebird into the NMPD's computer system until March 9, 2000, a week after it was seized. (*Id.* at 26-27, 36-38, 51-54; Kaminski Ex. 4).

49. Such a delay is unacceptable under the NMPD's policies and procedures. (Kaminski Dep. Tr. at 81-82).

50. Lynch did not know where the property was during that week, and he could not "specifically recall" whether it was in the evidence room although he knew that "it should have been." (Lynch Dep. Tr. at 33, 38).

51.     The necklace Defendants seized from the Fiero was never logged into the NMPD's computer system and it was instead turned over to the Carmel police department on March 3, 2000. (Lynch. Dep. Tr. at 92; Mullin Dep. Tr. at 124-125; Mullin Ex. 11).

52.     When Lynch finally entered the items taken from the Firebird into the computer, Lynch designated them as being "evidence," and not as being "held for safekeeping," despite that the latter was an option available to him. (Lynch Dep. Tr. at 53-55).

53.     According to Lynch, when property is listed as "evidence" that "means its evidence." (*Id.* at 46-47).

54.     There is no reason why the property should have been listed as evidence if it really was being held for safekeeping. (Kaminski Dep. Tr. at 63-64).

55.     Lynch also filled out a form entitled "Inventory of Property Seized Without A Search Warrant" on March 9, 2000, and he listed the bags and cases taken from the Firebird on that form. (Lynch Dep. Tr. at 33-38; Mullin Ex. 19).

56.     In filling out the form, Lynch checked a box for "investigation," which related to the reason why Defendants took the property. (Lynch Dep. Tr. at 35, Mullin Ex. 19). Lynch could have, but did not, choose to mark the property as having been lost or found. (*Id.* at 64).

57. Defendants later seized items from the Residence on April 17, but they never logged those items into the NMPD's computer system or created any documentation of the seizure. (Mullin Dep. Tr. at 130).

58. On May 9, 2000, Lynch searched the bags that had previously been seized from the Firebird and he created a document listing the property removed from the bags. (Lynch Dep. Tr. at 73-74; Lynch Ex. 5).

59. As required by NMPD policies, Lynch photographed all of the property removed from the bags while inventorying it on May 9. (Lynch Dep. Tr. at 75; Lynch Ex. 8).

60. Lynch conducted the search in the NMPD's roll call room and spread Gombert's property out all over the room, which was open to anyone at the NMPD. (Mullin Dep. Tr. at 144-45).

61. Certain of the photographs of the property that were taken on May 9, bear the note "CSP has tape". (Lynch Dep. Tr. at 118-19).

62. This notation means that the Connecticut State Police had been given the item of property at some point before May 9, 2000. (*Id.* at 118).

63. After completing the search, Lynch filled out an inventory form listing the property taken from the bags and returned that form to Court as an attachment to the May 8 warrant. (Lynch Dep. Tr. at 111-12; Lynch Ex. 5). However, only a small number of the items taken from the bags were listed on the inventory returned to Court. (*Id*).

64. Gombert began requesting that Defendants return his property as early as April 2000. (April 12, 2000 Authorization from H. Gombert Giving Public Defender L. Panico permission to Retrieve Gombert's Property; Ex. N to Hole Aff.).

65. Over the course of 3 years, Gombert sent at least 6 letters requesting that Defendants return his property to him. (Correspondence from H. Gombert to Defendants on various dates; Ex. N to Hole Aff.).

66. Defendants received Gombert's demands but refused to return the property to him. (Lynch Dep. Tr. at 130-33; *see also* Kaminski Dep. Tr. at 34).

67. Defendants did not return Gombert's property to him until March 31, 2004. (Possessed Property Receipt, dated 3/31/04, signed by L. Panico and L. Lynch; Ex. O to Hole Aff.).

68.     Defendants showed and shared Gombert's property with at least other NMPD officers, the Connecticut State Police, the New York State Police, the Carmel Police Department, the Putnam County Sherriff's Office, the Danbury State's Attorney's Office, the Litchfield State's Attorney's and the Selinos, who were Gombert's landlords.  (Lynch Dep. Tr. at 81, 105, 106, 228; J Dep. Tr. at 60).

69.     Defendants released some of Gombert's property, including Gombert's personal film, to Detective Don Elmendorf of the Connecticut State Police and the Danbury and Litchfield State's Attorneys Office.  (Lynch Dep. Tr. at 81-83).

70.     Defendants released at least the necklace to the Carmel police department and permitted Carmel to view other of Gombert's property.  (Lynch Dep. Tr. at 85-87).

71.     The person responsible for monitoring the property, Lynch, does not know whether any of Gombert's property that he released to other agencies was ever returned.  (Lynch Dep. Tr. at 83).

72.     The NMPD provides all of its officers with a set of policies and procedures detailing how and when an officer may conduct a search and seizure of property.  The officers are expected to review the policies and act in accordance with them.  (Kaminski Dep. Tr. at 50).

73.     Mullin Exhibit 4 contains the policies and procedures governing searches and seizures conducted in March 2000 (the "Policies").  (*Id.* at 141-44; Lynch Dep. Tr. at 190; Mullin Ex. 4).

74. The Policies demonstrate that the NMPD strongly encourages its officers to obtain a warrant before conducting a search and seizure whenever time permits. (Kaminski Dep. Tr. at 142-43).

75. If time does not permit, however, the Policies set forth certain, well-defined circumstances in which NMPD officers may conduct a warrantless search or seizure: (a) when contraband is in "plain view;" (b) in a search incident to arrest; (c) in exigent circumstances; (d) when the property has been abandoned; and (e) when inventorying items inside of a vehicle that lawfully is in police custody; (f) when given consent. (Mullin Ex. 4).

THE PLAINTIFF,
HOWARD JOHN GOMBERT

By:_____/s/_____
Ben M. Krowicki [ct06153]
Sara R. Simeonidis [ct25566]
Brian R. Hole [ct26608]
BINGHAM McCUTCHEN LLP
One State Street
Hartford, CT 06103
Tel: (860) 240-2700
Fax: (860) 240-2818
His Attorneys

# CERTIFICATION

I hereby certify that a true and accurate copy of the foregoing was sent via the Court's electronic notification system or by first class U.S. mail, postage prepaid, on this 19th day of January, 2007, to the following counsel of record:

James N. Tallberg, Esq.
Karsten, Dorman & Tallberg, LLC
8 Lowell Road
West Hartford, CT 06119


\_\_/s/_____
Brian R. Hole