1  the items. You have a lawful relationship with the
2  property that's in question.
3    Q.   And inventory?
4    A.   An inventory is to itemize -- going to
5  something and itemize something specifically.
6    Q.   And I think you testified earlier that you
7  did not have a warrant to remove things from the
8  Firebird; is that correct?
9    A.   Right, not a warrant specifically.
10         MR. TALLBERG:  Off the record.
11         (Off the record discussion.)
12         MR. HOLE:  Can we go back?
13  BY MR. HOLE:
14    Q.   When you removed items from the Firebird,
15  was there a policy and procedure in place in 2000 that
16  authorized you to do that?
17         MR. TALLBERG:  Objection to form.
18         You could answer.
19    A.   To protect property, yes.
20  BY MR. HOLE:
21    Q.   To remove the property from the Firebird?
22    A.   To protect the property.
23    Q.   Was there a policy and procedure in place in
24  2000 that authorized you to remove the property from
25  the Firebird?

Page 187

1   A.   In order to protect property, it might be
2 necessary to remove it, to take it into a protective
3 environment.
4   Q.   So is your answer to my question yes?
5   A.   I would say yes.
6   Q.   In your 30-plus years as a New Milford
7 Police Department, have you ever requested or obtained
8 a warrant to search a vehicle?
9   A.   Yes.
10   Q.   In the ordinary course of your practice as a
11 New Milford police officer, would you obtain a warrant
12 to search vehicles?
13   A.   Yes.  That would be the preferred way to do
14 it.
15   Q.   Preferred by whom?
16   A.   The courts, the law.
17   Q.   Is there a reason why you did not obtain a
18 warrant to remove items from the Firebird on March 1
19 or 2?
20   A.   There wasn't a search conducted of it.
21   Q.   Was there a seizure on March 1 or 2 of items
22 from the Firebird?
23        MR. TALLBERG:  Objection to form.
24   A.   That's kind of a stronger word.  A seizure
25 is a little bit strong.

Page 207

1   Q.   There is a black and white bag and there is
2 a maroon bag; is that correct?
3   A.   It looks like that, yes.
4   Q.   And it appears that those bags are resting
5 on something; is that true?
6            MR. TALLBERG:  Objection to form.
7   A.   It appears.
8 BY MR. HOLE:
9   Q.   Do you know what they were resting on?
10  A.   It looks like on the back area of the car.
11  Q.   When you say "back area of the car," what do
12 you mean by that?
13  A.   The hatch area.
14  Q.   The hatch area, like a lid --
15           MR. TALLBERG:  Objection to form.
16 BY MR. HOLE:
17  Q.   -- to the hatch area; is that right?
18  A.   Well, lid is over top.
19  Q.   The actual hatch door is over top, but there
20 is some sort of floor or surface in the hatch on which
21 these bags are resting; is that right?
22           MR. TALLBERG:  Objection to form.
23  A.   It would appear.
24 BY MR. HOLE:
25  Q.   If you look at NMPD 00551, just a couple

1  before, do you see that picture?

2      A.    Yes.

3      Q.    Did you take that picture?

4      A.    I probably did.

5      Q.    Do you recognize it, the picture?

6      A.    Well, I see what it is.

7      Q.    What is it?

8      A.    It looks like a metal box there, at the rear
9  end of the car.

10     Q.    Of the Firebird?

11     A.    Of the Firebird.

12     Q.    And do you see on sort of the right third of
13 the picture, there appears to be what I characterize
14 as some sort of metal bracket area, and it looks like
15 it's attached to a hinge?

16           Do you see that?

17                MR. TALLBERG:  Object to the form.

18     A.    I can see that.

19 BY MR. HOLE:

20     Q.    Do you think that's the lid on which the
21 bags we were discussing in NMPD 00527 were resting?

22                MR. TALLBERG:  Objection to form.

23     A.    I suppose you could presume that.

24 BY MR. HOLE:

25     Q.    So then on approaching the vehicle, the

Page 209

1 Firebird, on March 1 or 2, the bags and cases depicted
2 in NMPD 00551 were not visible; is that correct?
3          MR. TALLBERG: Objection to form.
4    A.   Clarify, please. Are you talking --
5 BY MR. HOLE:
6    Q.   Sure. The bags and cases in NMPD 00551,
7 which were at some point beneath the lid that we've
8 just been discussing and on which the bags in NMPD
9 00527 were resting, were not visible without removing
10 the bags in NMPD 00527 and raising the lid; is that
11 correct?
12          MR. TALLBERG: Objection to form.
13   A.   It appears that would be the case.
14 BY MR. HOLE:
15   Q.   NMPD 00525, do you see that picture?
16   A.   I see it, yeah.
17   Q.   What is that picture?
18   A.   That appears to be the passenger side, a
19 view into the passenger side of the car.
20   Q.   Of the Firebird?
21   A.   Of the Firebird.
22   Q.   Do you recall taking that picture?
23   A.   I probably did.
24   Q.   And if the driver's side door had been open,
25 would there be any reason to have taken a picture

Page 213

1 necklace looked like and the foregoing picture around
2 the mirror.
3 BY MR. HOLE:
4   Q.   Do you recall what happened to the necklace
5 photographed in NMPD 00536, what happened to that
6 necklace after you photographed it?
7        MR. TALLBERG:  Objection to form.
8   A.   It became into our custody.
9 BY MR. HOLE:
10  Q.   And then at some point later on, it was
11 turned over to the Carmel Police Department; correct?
12  A.   I would presume that, yes.
13  Q.   Why would you presume it?
14  A.   That's what we've been talking about all
15 afternoon.
16  Q.   You don't have any recollection of it being
17 given to the Carmel Police Department?
18       MR. TALLBERG:  Objection.  Asked and
19 answered.
20  A.   I don't have a recollection of it.
21 BY MR. HOLE:
22  Q.   Who were the main officers in charge of
23 investigating Howard Gombert --
24       MR. TALLBERG:  Objection to form.
25 BY MR. HOLE:

1 application.

2        MR. TALLBERG: There is no question

3 pending.

4 BY MR. HOLE:

5    Q.   And I think that you testified earlier that
6 at some point at headquarters on March 1, you were
7 advised by Guy Wolf to seize the bags in the Firebird,
8 but don't look at them; is that right?

9        MR. TALLBERG: Objection to form.

10   A.   I don't recall that.

11 BY MR. HOLE:

12   Q.   You don't recall what?

13   A.   Guy Wolf -- I don't recall having a
14 conversation with Guy Wolf about that.

15       MR. HOLE: Can we go back -- you know
16 what, it's okay.

17   Q.   So you don't recall having a conversation
18 with Guy Wolf about seizing the bags, but not looking
19 in them?

20       MR. TALLBERG: Objection to form.

21   A.   I just don't know.

22 BY MR. HOLE:

23   Q.   I hand you what was previously marked as
24 Mullin 17, if you can take a look at that for me,
25 please.

1        Do you see that?

2   A.   I see that.

3   Q.   Was that information transmitted to you
4 along with the description of the property that was on
5 the preceding page?

6             MR. TALLBERG: Objection to form.

7   A.   I don't remember it.

8 BY MR. HOLE:

9   Q.   Do you have any reason to doubt that it was
10 transmitted to you?

11            MR. TALLBERG: Objection to form.

12  A.   Yes.

13 BY MR. HOLE:

14  Q.   Officer Kaminski may have just chosen not to
15 relay that information to you?

16            MR. TALLBERG: Objection to form.

17  A.   It's possible.

18 BY MR. HOLE:

19  Q.   Again, on those notes, it says "Maroon
20 travel bag, marbled texture, back seat, dark brown
21 travel bag."

22            The items that were in that well area in the
23 hatch, that gold-colored case and the black bag, those
24 are not listed on this document, are they?

25            MR. TALLBERG: Objection to form.

1   Q.   And what was the nature of your confusion?

2   A.   According to policy, Howard Gombert

3 abandoned that property around that car.

4   Q.   What did you understand Plaintiff's counsel

5 to have been asking you earlier when he asked you if

6 that portion of the policy was applicable to the

7 removal of property from the Firebird on March 1st or

8 2nd, 2000?

9   A.   I think I explained to counsel that, in

10 fact, I used the term "abandonment" to him, and he

11 kept reasking me the question, explain it, and so he

12 left the property unsecured.

13   Q.   What is your understanding with regard to

14 whether that section of Mullin Exhibit 4 entitled "D,

15 Seizure of Abandoned Property," what is your

16 understanding regarding whether that section of the

17 policy was applicable to the removal of property from

18 the Firebird on March 1 and March 2, 2000?

19          MR. HOLE:  Object to form.

20   A.   He was legally arrested.  He ran off,

21 abandoning his property.  How else can I put it?  Just

22 left it there.

23 BY MR. TALLBERG:

24   Q.   But not talking about Mr. Gombert's

25 behavior, what is your understanding with regards to

Page 239

1  whether you were acting within applicable New Milford

2  Police Department policies on that evening?

3          MR. HOLE:  Object to form.

4     A.   Because looking at the information in the

5  exhibit, it looks like I followed that particular

6  procedure.

7  BY MR. TALLBERG:

8     Q.   Which one are you referring to?

9     A.   I was referring to seizure of abandoned

10 property, titled "Seizure Of Abandoned Property."

11    Q.   Were you confused by Plaintiff's counsel's

12 question earlier about that policy and whether it was

13 applicable?

14    A.   Yes.

15    Q.   Okay.  Are you any less confused now?

16    A.   I'm less confused now.

17    Q.   Very well.

18          MR. TALLBERG:  I have no further

19 questions.  I do have one point for the record,

20 however.  Pursuant to Connecticut General Statutes,

21 1-217, a police officer's home address is not supposed

22 to be publicly discloseable, so we've discussed this

23 off the record, and we'd ask if the court reporter can

24 please strike the home address of Investigator Lynch

25 and just use his business address, which is 49 Poplar

Page 244

1                        C E R T I F I C A T E

2  STATE OF CONNECTICUT

3          I, SANDRA V. SEMEVOLOS, a Registered Merit
   Reporter/Notary Public within and for the State of
4  Connecticut, do hereby certify that I reported the
   deposition of LARRY E. LYNCH on DECEMBER 5, 2006, at
5  the offices of BINGHAM McCUTCHEN, LLP, ONE STATE
   STREET, HARTFORD, CONNECTICUT.
6
           I further certify that the above-named
7  deponent was by me first duly sworn to testify to the
   truth, the whole truth and nothing but the truth
8  concerning his/her knowledge in the matter of the case
   of HOWARD JOHN GOMBERT, JR., vs. LARRY LYNCH AND
9  WILLIAM KAMINSKI, now pending In The United States
   District Court, For The District of Connecticut.
10
           I further certify that the within testimony
11 was taken by me stenographically and reduced to
   typewritten form under my direction by means of
12 COMPUTER ASSISTED TRANSCRIPTION; and I further certify
   that said deposition is a true record of the testimony
13 given by said witness.

14         I further certify that I am neither counsel
   for, related to, nor employed by any of the parties to
15 the action in which this deposition was taken; and
   further, that I am not a relative or employee of any
16 attorney or counsel employed by the parties hereto,
   nor financially or otherwise interested in the outcome
17 of the action.

18         WITNESS my hand and seal this 19th day of
   December, 2006.
19

20         *Sandra Semevolos*

21         _____
           Sandra V. Semevolos, RMR/CRR
22         Notary Public

23 My Commission Expires:  September 30, 2010
   License Registration Number:  74
24

25