©COPY                    Page 1

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT


------------------------------------)
HOWARD JOHN GOMBERT, JR.,            )
                                    )
     Plaintiff,                     ) Civil Action No.
                                    )
          vs.                       ) 3:01 CV 1913 (DJS)
                                    )
LARRY LYNCH AND WILLIAM KAMINSKI,   )
                                    )
     Defendants.                    )
------------------------------------)



       DEPOSITION OF:  WILLIAM J. KAMINSKI

        DATE:  NOVEMBER 30, 2006

              HELD AT:
         BINGHAM McCUTCHEN, LLP
           ONE STATE STREET
         HARTFORD, CONNECTICUT
               - - -








    Reporter:  Sandra V. Semevolos, RMR, CRR, LSR #74

        BRANDON SMITH REPORTING SERVICE
              (800) 852-4589

44 Capitol Avenue              Six Landmark Square
Hartford, Ct. 06106            Stamford, Ct. 06901
(860) 549-1850                 (203) 316-8591

Gombert v. Kaminski

11/30/2006                                    William Kaminski

Page 52

1      A.    As best I remember, it more or less

2  paralleled criminal law and cases that were decided.

3      Q.    Can you describe for me your understanding

4  of criminal law and cases that were decided with

5  respect to search and seizures in the year 2000?

6              MR. TALLBERG:  Object to the form.

7      A.    I can't recall anything specific, but I

8  understand that things change as different cases are

9  argued in the criminal courts.

10  BY MR. HOLE:

11      Q.    In the year 2000, did you understand what

12  you could and could not do based on the policies and

13  procedures when searching and seizing property?

14              MR. TALLBERG:  Object to the form.

15      A.    I believe I had a general understanding,

16  yes.

17  BY MR. HOLE:

18      Q.    What did you understand that you could do

19  when searching and seizing property in 2000?

20              MR. TALLBERG:  Object to the form.

21      A.    We could search a car incident to arrest.

22  We could search a car that has been abandoned.  We can

23  seize and keep things for safekeeping.  We could seize

24  items that became lost.  I'm sure more will come to me

25  as I think about it but --

Gombert v. Kaminski

11/30/2006                                                          William Kaminski

Page 55

1   BY MR. HOLE:

2       Q.   So --

3       A.   Or the vehicle was unsecured, and if there

4   was an item of value in there, I would take it and

5   hold on to it so I can give it back to the owner.

6       Q.   In your 20 plus years as a New Milford

7   police officer, have you ever conducted a safekeeping

8   search?

9            MR. TALLBERG:   Object to the form.

10      A.   Yes.

11  BY MR. HOLE:

12      Q.   Can you describe it for me?

13           MR. TALLBERG:   Object to the form.

14      A.   A specific incident?

15  BY MR. HOLE:

16      Q.   Yes.

17      A.   No.

18      Q.   How many incidents of safekeeping search

19  that you conducted are there?

20           MR. TALLBERG:   Object to the form.

21      A.   I would say numerous over my 17 years in

22  patrol.

23  BY MR. HOLE:

24      Q.   How many of those numerous, if you recall,

25  safekeeping searches were conducted and involved an

1    A.    Yes.

2    BY MR. HOLE:

3    Q.    And how long were you there by yourself?

4    A.    I believe I was there until approximately

5    2:30 a.m.

6    Q.    And what did you do during those five hours?

7    A.    Sat in my -- generally just sat in the car

8    and made sure no one entered the property.

9    Q.    Where was your car located?

10   A.    Adjacent -- facing toward the street,

11   adjacent to the cottage.

12   Q.    Was the Firebird still on the property?

13   A.    Yes.

14   Q.    Was the hood open?

15   A.    Yes.

16   Q.    And the hatch?

17   A.    Yes.

18   Q.    Was the driver's door still open?

19   A.    Yes.

20   Q.    Was the house open?

21        MR. TALLBERG:  Objection to form.

22   A.    I don't recall.

23   BY MR. HOLE:

24   Q.    Do you recall when you arrived at the

25   property or any time between 9:00 p.m. and 2:00 a.m.

Gombert v. Kaminski

1   going to the house?

2               MR. TALLBERG:   Objection to form.

3       A.   No.

4   BY MR. HOLE:

5       Q.   You didn't go inside the house between --

6       A.   No.

7       Q.   Did you go into the car?

8       A.   No.

9       Q.   The Firebird, I mean.

10      A.   Understood.

11      Q.   Okay.  At the time you went back to the

12  house on the evening of February 29, were you aware

13  that the Carmel Police Department was investigating

14  Howard Gombert?

15      A.   No.

16      Q.   Were you aware of any other agency that was

17  investigating Howard Gombert?

18      A.   No.

19      Q.   And what happened at 2:30 -- did you say

20  2:00 or 2:30 on -- it would be March 1st now; correct?

21      A.   Correct.  It was about 2:30, according to

22  the records.  Officer Jerome Dombrowski took over

23  securing the scene.

24      Q.   And where did you go?

25      A.   Home.  I mean, I went back, brought the car

1   investigation going on of Howard Gombert?

2       A.   No.

3       Q.   At any point after the search, did you

4   become aware that there was another investigation

5   regarding Howard Gombert?

6               MR. TALLBERG:  Objection to form.

7       A.   Specific time period, I don't believe I knew

8   in those days following.  I'm not sure exactly at what

9   point I realized -- I came to know that.

10  BY MR. HOLE:

11      Q.   What investigation are you referring to that

12  you came to know?

13      A.   That he was a suspect or a person of

14  interest in a case from Carmel regarding the

15  disappearance of a girl.

16      Q.   Back to the search, you said you entered the

17  residence and Investigator Lynch and Investigator

18  Mullin were there?

19      A.   Yes.

20      Q.   And they entered the residence as well?

21      A.   Yes.

22      Q.   Did J enter the residence with you?

23      A.   I believe she was inside the residence, yes.

24      Q.   Was anyone else inside the residence?

25      A.   Not that I recall.

```
 1      A.    I guess it would be Investigator Lynch,

 2   Investigator Mullin, then myself.

 3      Q.    Is that based on in-service time?

 4      A.    Yes.

 5      Q.    How long were you searching the property --

 6   strike that.

 7            How long were you searching the house?

 8      A.    I don't recall specifically, but it was

 9   several hours.

10      Q.    Do you recall when you left the house or

11   completed the search of the house?

12      A.    Only by documents that I've seen.

13      Q.    What did you do after you completed the

14   search of the house?

15      A.    I returned to the police department.

16      Q.    You didn't search anything else other than

17   the house?

18      A.    Oh, I'm sorry.  I understood it to be --

19            MR. TALLBERG:  Yes, objection to form.

20   BY MR. HOLE:

21      Q.    Did you search anything other than the

22   house?

23            MR. TALLBERG:  Objection to form.

24      A.    No.

25   BY MR. HOLE:
```

Gombert v. Kaminski

1     Q.     You mentioned earlier that there was a

2  Firebird on the property.

3            Do you recall that?

4     A.     Yes.

5     Q.     Do you recall -- strike that.

6            At any point in time on March 1, 2000, did

7  you look inside the Firebird?

8     A.     I probably did, yes.

9     Q.     Do you recall when?

10    A.     No.

11    Q.     Do you recall where in the Firebird you

12  looked?

13    A.     No.  Probably into the trunk area and the

14  hatch compartment, and probably into the engine

15  compartment with the hood, you know, curiosity, to see

16  what was under the hood.

17    Q.     When was the first time you looked into the

18  Firebird?

19    A.     I don't recall.

20    Q.     Was it on March 1st?

21    A.     I don't recall specifically, but we probably

22  would have looked into it just after arresting Howard

23  on the 29th.

24    Q.     Why would you have looked at it on the 29th?

25    A.     Because everything was opened up.

Gombert v. Kaminski

11/30/2006                                                              William Kaminski

Page 129

1      Q.      So as a general matter, if there are cars or

2    property that's open on a piece of property where you

3    arrest someone, do you always look inside of it?

4                  MR. TALLBERG:  Objection to form.

5      A.      Yes.

6    BY MR. HOLE:

7      Q.      What is the purpose of looking inside of an

8    open vehicle?

9      A.      General curiosity, what's in there, and to

10   make sure that there is no contraband, maybe a weapon.

11   I mean, we were dealing with Howard Gombert, who was

12   accused of committing a sexual assault, so we wanted

13   to make sure there was nothing of evidentiary value

14   inside, just a cursory search, cursory examination of

15   the interior, just to see what was in there.

16     Q.      And so your review of the car on February 29

17   did not lead you to believe that you should take

18   anything out of it?

19                 MR. TALLBERG:  Objection to form.

20     A.      No.

21   BY MR. HOLE:

22     Q.      At what point in time on March 1st did you

23   return to the car, the Firebird?

24     A.      I probably looked at it while I was, you

25   know, waiting for Investigative Services to return,

Page 130

1    and, you know, to come with the search warrant at the

2    time I was sitting on the house, so to speak.  And

3    then I think we went to the car after the house was --

4    the search of the house was completed.

5        Q.    When you say you looked at it before

6    Investigative Services arrived, what do you mean?

7        A.    I probably just walked around trying to

8    stretch my legs or whatever, you know, I was just

9    sitting there waiting basically.

10       Q.    Did you open the passenger compartment?

11       A.    No.

12       Q.    So after the search of the residence, at

13   some point you went back to the Firebird; is that

14   right?

15       A.    I believe so, yes.

16       Q.    And on what basis did you go back to look in

17   the Firebird?

18            MR. TALLBERG:  Objection to form.

19       A.    I think that Investigator Lynch and

20   Investigator Mullin wanted to look at it before we

21   cleared the scene.

22   BY MR. HOLE:

23       Q.    Do you know why they wanted to look at it?

24       A.    Not specifically, no.  But I'm sure it had

25   something to do with just to make sure.  I mean, the

Gombert v. Kaminski

11/30/2006                                                    William Kaminski

Page 131

1    car was open and, you know, we should check it.  I

2    mean, it is a crime scene, so they wanted to examine

3    it before we left.

4        Q.    So when you looked at it, were you looking

5    at it for evidence of crime?

6                 MR. TALLBERG:  Objection to form.

7        A.    Yes.

8    BY MR. HOLE:

9        Q.    Do you remember if there were photographs

10   taken of the car, the Firebird?

11       A.    I have seen photographs, so, yes, I know

12   there were.

13       Q.    But you don't have a specific recollection

14   of photographs being taken?

15       A.    No.

16       Q.    Do you recall what the weather was on

17   March 1?

18       A.    No.

19       Q.    Do you recall who made the decision -- did

20   there come a time when a decision was made to remove

21   items from the Firebird?

22       A.    Yes.

23       Q.    Do you recall when that decision was made?

24       A.    Specifically, no.  I imagine it was done at

25   that time after the search of the house was completed

Gombert v. Kaminski

Page 132

1    and once they went over back to the Firebird.

2       Q.    Were you with Investigator Lynch and

3    Investigator Mullin when they went over to the

4    Firebird?

5       A.    Probably, yes.  I don't remember

6    specifically.

7       Q.    Do you remember who made the decision to

8    remove items from the Firebird?

9       A.    Not specifically, no.

10      Q.    Do you remember who reached into the

11   Firebird to remove items from it?

12      A.    No.

13      Q.    Do you recall whether you reached into the

14   Firebird to remove items from it?

15      A.    I don't recall.  No.

16      Q.    So you don't have any specific recollection

17   of picking something up out of the Firebird and

18   removing it?

19      A.    No.

20      Q.    But the items were removed from the

21   Firebird; is that right?

22      A.    Yes.

23      Q.    Do you remember what items were removed from

24   the Firebird?

25      A.    I know there were travel bags of some kind.