Page 133

1    Q.    Do you remember where in the Firebird they
2   were located?
3    A.    No.
4    Q.    But they were visible through the rear
5   hatch?
6    A.    The hatch was open.
7    Q.    Were the bags visible through the hatch?
8    A.    Yes.
9    Q.    All of them?
10   A.    I believe so, yes.
11   Q.    Do you remember roughly how many bags or
12  cases were removed from the Firebird?
13   A.    No.
14         MR. HOLE:  Want to mark this, please.
15         MR. TALLBERG:  I think we already have
16  this.
17         MR. HOLE:  Did you mark it?
18         MR. TALLBERG:  Let me just doublecheck
19  for you.
20         MR. HOLE:  From yesterday?
21         MR. TALLBERG:  Yes.  Yes, 19.
22         MR. HOLE:  Okay, then we will hold off
23  on marking it.  Thanks, Jim.
24  BY MR. HOLE:
25   Q.    I'm going to hand you what's been previously

```
 1   marked as Mullin Exhibit 19 and it's a document, at
 2   the bottom right corner it says "NMPD 00219," and at
 3   the top left-hand corner it says "Inventory of
 4   Property Seized Without a Search Warrant."
 5           Have you seen this document before?
 6   A.   I think I have in reviewing the case, yes.
 7   Q.   Was it your understanding on March 1st that
 8   the warrant that had issued with respect to the
 9   residence permitted the search of the Firebird?
10           MR. TALLBERG:  Objection to form.
11   A.   Can you rephrase that?
12   BY MR. HOLE:
13   Q.   Sure.  You said that you had been told that
14   there was a warrant for the search of the 322A
15   Aspetuck Ridge house on March 1; correct?
16   A.   Yes.
17   Q.   Were you told what that warrant permitted
18   you to search?
19   A.   I don't believe I was told specifically.
20   But my understanding was, it was for evidence of a
21   sexual assault.
22   Q.   But did it permit you to search just the
23   house?
24           MR. TALLBERG:  Objection to form.
25   A.   I don't recall what specifically it
```

1   permitted at the time.
2   BY MR. HOLE:
3       Q.   Did you believe that it permitted you to
4   search the car, the Firebird?
5            MR. TALLBERG:  Objection to form.
6       A.   It wasn't my understanding, no.
7   BY MR. HOLE:
8       Q.   You did not believe that?
9            MR. TALLBERG:  Objection to form.
10      A.   No.
11  BY MR. HOLE:
12      Q.   So you believed you were searching the car
13  without a warrant?
14           MR. TALLBERG:  Objection to form.  I
15  don't think there has been any testimony about search
16  of the car.
17      A.   We didn't search the car.
18  BY MR. HOLE:
19      Q.   You testified earlier that you removed bags
20  from the car; is that correct?
21      A.   Yes.
22      Q.   Did you believe that the warrant permitted
23  you to remove bags from the car?
24           MR. TALLBERG:  Objection to form.
25      A.   My understanding in this case was that there

Page 136

1  was no warrant required to remove the bags from the
2  car.
3  BY MR. HOLE:
4      Q.   What about this case permitted you to remove
5  bags from the car without a warrant?
6      A.   My understanding was that the bags were
7  removed for safekeeping. We were trying to protect
8  the bags.
9      Q.   And so back to my original question: Did
10 you understand that the warrant permitted you to
11 remove the bags from the Firebird?
12           MR. TALLBERG:  Objection to form.
13     A.   No.
14 BY MR. HOLE:
15     Q.   So your understanding then was that the bags
16 were being removed from the car without a warrant?
17     A.   Yes.
18     Q.   Okay. Back to Exhibit 19, you said that you
19 have seen this form at some point.
20     A.   Yes.
21     Q.   Do you know who filled this form out?
22     A.   No.
23     Q.   Do you see near the bottom a signature?
24     A.   Yes.
25     Q.   Do you recognize that signature?

```
1      A.    Yes.
2      Q.    Whose signature is it?
3      A.    Investigator Lynch.
4      Q.    And have you seen that signature often?
5      A.    Yes.
6      Q.    Often enough to recognize it?
7      A.    Yes.
8      Q.    Would you assume that Investigator Lynch
9  filled this form out because his signature is on it?
10     A.    Yes, I would.
11     Q.    Do you see that there are eight items listed
12 on this form?
13     A.    Yes.
14     Q.    Do you recognize the description of those
15 items?
16     A.    No.
17     Q.    Is it your understanding that the items
18 listed on this form were removed from the Firebird on
19 March 1?
20     A.    Yes.
21     Q.    But you don't recall what the items looked
22 like that were in the car on March 1?
23     A.    No.
24     Q.    You said, I believe, that you don't recall
25 who removed the items from the car on March 1; is that
```

Page 138

1  right?
2     A.   Correct.
3     Q.   Do you recall whether anyone looked in the
4  glove box of the car, of the Firebird?
5     A.   No.
6     Q.   No, you don't recall?
7     A.   I don't recall.
8     Q.   Do you recall whether any of the items --
9  whether there were any items in the back seat of the
10 car?
11    A.   My recollection is yes, there were.
12    Q.   Do you recall how you came to see the items
13 in the back seat of the car?
14    A.   By looking in through the open door.
15    Q.   Which open door?
16    A.   The driver's door.
17    Q.   Do you recall who removed the items -- do
18 you recall whether the items in the back seat were
19 removed?
20    A.   I believe they were, yes.
21    Q.   Do you recall who removed them?
22    A.   No.
23    Q.   Do you recall that the Firebird has a hatch,
24 a rear hatch?
25    A.   Yes.

```
 1    Q.    I'm not sure how to describe it, but my
 2  understanding of hatches generally is that there is
 3  somewhat of a floor, and then when the hatch moves up,
 4  the floor sort of moves up, and there is an open well
 5  below, a sort of trunk area.
 6          Do you recall whether there was, for lack of
 7  a better term, a subfloor in the Firebird?
 8              MR. TALLBERG:  Objection to form.
 9    A.    My recollection is the well portion was
10  already visible.
11  BY MR. HOLE:
12    Q.    It was visible when you approached the
13  vehicle for the first time?
14    A.    Yes.
15    Q.    Do you recall how many bags were in the well
16  area?
17    A.    No.
18    Q.    But somehow the bags were removed from the
19  Firebird; is that right?
20    A.    Correct.
21    Q.    You don't remember who removed them?
22    A.    No.
23    Q.    Do you remember who took custody of the bags
24  after they had been removed from the Firebird?
25    A.    Specifically, no.
```

```
 1      Q.   Do you remember who took custody of the
 2  property that was seized from the house on March 1?
 3      A.   When you say "custody," ultimately it was
 4  Investigator Lynch.  It would have been turned over --
 5  it would have -- even though he was there, I would say
 6  it was in his custody.
 7      Q.   So ultimately, he was responsible for doing
 8  whatever he planned to do with it after it was seized
 9  from the house and property was taken from the
10  Firebird?
11      A.   That was my understanding, yes, that he
12  would follow through.
13      Q.   And do you recall whether the property that
14  was seized from the house and from the Firebird was
15  put into the crime scene van?
16      A.   Not specifically, but I'm sure it was.
17      Q.   That's the --
18      A.   That's the standard protocol.
19      Q.   Do you recall whether property was taken
20  from any other place on March 1 besides the residence
21  and the Firebird?
22      A.   No.
23      Q.   You don't recall?
24      A.   I don't recall.
25      Q.   I'm going to hand you what was previously
```

1    A.    Yes.

2    Q.    When property was removed from the Firebird
3    on March 1, was it your understanding that it was
4    being removed pursuant to the exigent circumstances
5    exception?

6    A.    No.

7    Q.    Just below that, letter D, it says seizure
8    of abandoned property.

9          Do you see that?

10   A.    Yes.

11   Q.    When property was removed from the Firebird
12   on March 1, was it your understanding that the
13   property was being removed pursuant to the seizure of
14   abandoned property exception?

15         MR. TALLBERG: Objection to form.

16   A.    Yes. More or less.

17   BY MR. HOLE:

18   Q.    Okay. Then I'll read this one. It says "If
19   in the course of a lawful arrest or other lawful
20   action by an officer such as surveillance or
21   questioning of a person, a person discards personal
22   property at someplace outside his dwelling or its
23   curtilage, under circumstances demonstrating
24   abandonment, a officer may seize such property, even
25   though it is then beyond the person's physical

Page 160

1  locked when you left?
2      A.   Not specifically, no.
3      Q.   Would it be standard practice to lock the
4  residence?
5      A.   Absolutely.
6      Q.   But J**** was at the residence during the
7  search; is that right?
8      A.   Correct.
9      Q.   Do you recall whether J**** stayed at the
10 residence after you left?
11          MR. TALLBERG:  Objection as to form.
12 J.
13     A.   I don't remember specifically.
14 BY MR. HOLE:
15     Q.   Do you recall whether the car, the Firebird,
16 was open when you left?
17     A.   No.
18     Q.   You don't recall?
19     A.   I'm sure we closed it up.
20     Q.   Closed the hatch?
21     A.   Closed the hatch, the hood, the doors.
22     Q.   Were any of the windows open; do you recall?
23     A.   No.
24     Q.   Do you remember whether the keys were in the
25 ignition of the car?

Page 161

1     A.   No.
2     Q.   Do you remember whether the keys were taken?
3     A.   No.
4     Q.   Do you remember whether you locked the
5  Firebird?
6     A.   No.
7     Q.   Did you personally close any of the doors on
8  the Firebird?
9     A.   I don't recall.
10    Q.   I believe I asked you, but I don't recall
11 your answer.
12         After the search of the home and the
13 Firebird was complete, where did you go?
14    A.   After we left the scene?
15    Q.   Well, I'll ask you the question, did you
16 leave the scene immediately after completing the
17 search of the residence and the Firebird?
18    A.   I don't recall.
19    Q.   You returned to your vehicle after you
20 completed the search of the residence and the
21 Firebird?
22    A.   Yes.
23    Q.   And then at some point you left the scene?
24    A.   Yes.
25    Q.   Do you recall where you went?

```
 1    A.   No.
 2    Q.   I asked you, I think, when you went back to
 3  the New Milford Police Department, do you recall
 4  seeing Investigator Lynch?
 5    A.   No.
 6    Q.   When was the next time after the early
 7  morning hours of March 2 that you spoke with
 8  Investigator Lynch?
 9    A.   I don't recall.
10    Q.   Do you recall speaking to Investigator Lynch
11  at any point in time on, say, March 2nd through 10th
12  of 2000, regarding the search of 322A Aspetuck Ridge
13  and the Firebird?
14    A.   No.
15    Q.   After the search on March 2, did you have
16  any involvement in Howard Gombert's case?
17         MR. TALLBERG:  Objection to form.
18    A.   I don't believe so.
19  BY MR. HOLE:
20    Q.   Were you asked to be a witness?
21    A.   No.
22    Q.   Did you have any discussions with the
23  state's attorney?
24    A.   I don't believe so.
25    Q.   Did you have any discussions with the
```

# C E R T I F I C A T E

STATE OF CONNECTICUT

      I, SANDRA V. SEMEVOLOS, a Registered Merit Reporter/Notary Public within and for the State of Connecticut, do hereby certify that I reported the deposition of WILLIAM J. KAMINSKI on NOVEMBER 30, 2006, at the offices of BINGHAM McCUTCHEN, LLP, ONE STATE STREET, HARTFORD, CONNECTICUT.

      I further certify that the above-named deponent was by me first duly sworn to testify to the truth, the whole truth and nothing but the truth concerning his/her knowledge in the matter of the case of HOWARD JOHN GOMBERT, JR., vs. LARRY LYNCH AND WILLIAM KAMINSKI, now pending In The United States District Court, For The District of Connecticut.

      I further certify that the within testimony was taken by me stenographically and reduced to typewritten form under my direction by means of COMPUTER ASSISTED TRANSCRIPTION; and I further certify that said deposition is a true record of the testimony given by said witness.

      I further certify that I am neither counsel for, related to, nor employed by any of the parties to the action in which this deposition was taken; and further, that I am not a relative or employee of any attorney or counsel employed by the parties hereto, nor financially or otherwise interested in the outcome of the action.

      WITNESS my hand and seal this 13th day of December, 2006.

_Sandra Semevolos_
_____
Sandra V. Semevolos, RMR/CRR
Notary Public

My Commission Expires: September 30, 2010
License Registration Number: 74