# EXHIBIT A

# (Part 2)

CTDOCS/1594690.1

LEXSEE 2006 U.S. DIST. LEXIS 68632


Analysis
As of: Feb 21, 2007

BIANCA FLEMING, Plaintiff, -against- VERIZON NEW YORK INC., Defendant.

03 Civ. 5639 (WHP)

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

*2006 U.S. Dist. LEXIS 68632; 99 Fair Empl. Prac. Cas. (BNA) 53; 18 Am. Disabilities Cas. (BNA) 1065*

September 22, 2006, Decided
September 25, 2006, Filed

**PRIOR HISTORY:** *Fleming v. Verizon N.Y., Inc., 419 F. Supp. 2d 455, 2005 U.S. Dist. LEXIS 28864 (S.D.N.Y., 2005)*

**COUNSEL:** [*1] Phyllis Gelman, Esq., Gelman & Feinberg, New York, NY, Attorneys for Plaintiff.

A. Jonathan Trafimow, Esq., Judith F. Stempler, Esq., Epstein, Becker & Green, P.C., New York, NY, Attorneys for Defendant.

**JUDGES:** WILLIAM H. PAULEY III, U.S.D.J.

**OPINION BY:** WILLIAM H. PAULEY III

**OPINION:**

MEMORANDUM AND ORDER

Bianca Fleming ("Plaintiff" or "Fleming") brings this employment discrimination action against her former employer, Verizon New York, Inc. ("Verizon") pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII"), *42 U.S.C. § 2000e et seq.*; the Americans with Disabilities Act of 1990 (the "ADA"), *42 U.S.C. § 12111-12117*; the New York State Human Rights Law (the "HRL"), *N.Y. Exec. Law § 290 et seq.*; and New York City Human Rights Law (the "NYCHRL"), *N.Y.C. Admin. Code § 8-101 et seq.* Verizon moves for summary judgment pursuant to *Fed. R. Civ. P. 56*. For the reasons set forth below, Verizon's motion is granted in part and denied in part.

BACKGROUND

I. Allegations of Race and Sex Discrimination

A. Plaintiff's Employment History and Responsibilities [*2]

Verizon hired Fleming as a temporary employee in June 1998. (Defendant's *Rule 56.1* Statement of Undisputed Material Facts ("Def.'s 56.1 Stmt.") P 1; Plaintiff's *Rule 56.1(b)* Statement of Material Contested Facts ("Pl.'s 56.1 Counterstmt.") P 1.) On February 1, 1999, while she was still a temporary employee, Verizon assigned Fleming to its Woodside Garage ("Woodside") in Queens, New York. (Def.'s 56.1 Stmt. P 2; Pl.'s 56.1 Counterstmt. P 2; Affidavit of A. Jonathan Trafimow ("Trafimow Aff."), Ex. D: Continued Deposition of Bianca Fleming ("Fleming Dep. II"), at 184.) From February 1 through December 4, 1999, Eugene Hinners ("Hinners") acted as Fleming's immediate supervisor at Woodside. (Def.'s 56.1 Stmt. P 4; Pl.'s 56.1 Counterstmt. P 4.) The parties dispute the precise date when Fleming became a permanent Verizon employee, but she appears to have been hired as a Field Technician on either March 26, 1999 or June 8, 1999. (Def.'s 56.1 Stmt. PP 5-6; Pl.'s 56.1 Counterstmt. PP 5-6.)

The precise duties of a Field Technician are disputed. Verizon contends that the duties include the installation and repair of equipment in various locations, which often requires employees to climb telephone [*3] poles, work below ground or drive Verizon vehicles. (Def.'s 56.1 Stmt. PP 7-9; Pl.'s 56.1 Counterstmt. PP 7-9.) Fleming admits that a Field Technician may have to engage in these physically demanding activities, but contends that some Field Technicians do not have to drive,

Case 3:01-cv-01913-DJS   Document 124-3   Filed 02/20/2007   Page 3 of 15

Page 2
2006 U.S. Dist. LEXIS 68632, *; 99 Fair Empl. Prac. Cas. (BNA) 53;
18 Am. Disabilities Cas. (BNA) 1065

climb telephone poles or work below ground. (Pl.'s 56.1 Counterstmt. PP 7-9.) However, it is undisputed that the vast majority of Field Technicians must drive to their work sites, though some in Manhattan travel on foot. (Def.'s 56.1 Stmt. P 13; Pl.'s 56.1 Counterstmt. PP 13-13A; Plaintiff's Declaration, dated Jan. 19, 2005 ("Fleming Decl.") P 11.)

At the beginning of her employment with Verizon, Fleming received training in pole climbing and driving. (Def.'s 56.1 Counterstmt. P 10; Pl.'s 56.1 Stmt. P 10.) Fleming climbed telephone poles in the course of her duties as a Field Technician until September 1, 2000. (Def.'s 56.1 Stmt. P 11; Pl.'s 56.1 Counterstmt. P 11.) She also drove Verizon vehicles as part of her job until March 2001. (Def.'s 56.1 Stmt. P 12; Pl.'s 56.1 Counterstmt. P 12.)

B. Posters and Calendars in Plaintiff's Work Environment

While working at Woodside, Fleming saw several posters and calendars [*4] in Verizon vehicles displaying pictures of women in bathing suits, in poses she describes as "sexually provocative." (Def.'s 56.1 Stmt. PP 14-15; Def.'s 56.1 Counterstmt. PP 14-15; Fleming Dep. II, at 256-57.) Fleming claims that the posters and calendars were placed in the vehicles by their male operators, though she could not recall any of their names. (Fleming Dep. II, at 257-58; Pl.'s 56.1 Counterstmt. P 16.)

Verizon has promulgated a Code of Business Conduct (the "Code") that sets forth the reporting alternatives for employees confronted by behavior that may constitute unlawful harassment. (Affidavit of Eugene Hinners in Support of Defendant's Motion for Summary Judgment ("Hinners Aff."), Ex. J: Code of Business Conduct.) These alternatives include a toll-free hotline and direct reporting to a manager, but Fleming never availed herself of any of them. (Hinners Aff., Ex. J; Def.'s 56.1 Stmt. PP 17, 19; Pl.'s 56.1 Counterstmt. P 17A.) According to Fleming, she did not complain of the alleged harassment because her supervisors were aware of and condoned the practice of hanging posters and calendars in company vehicles. (Pl.'s 56.1 Counterstmt. PP 17A-19; Fleming Decl. PP 6-7.) [*5]

C. Plaintiff's Refusal to Climb a Fence

In 1999, while Fleming was working at Woodside, she sought access to a "closed" worksite where she could only reach her target area by passing through a private residence or climbing a barbed wire fence. (Def.'s 56.1 Stmt. PP 21-22; Pl.'s 56.1 Counterstmt. PP 21-22; Fleming Decl. P 13.) After Fleming confirmed that no resident was at home to provide access, Hinners directed her to climb the fence to get to the worksite. When Fleming refused, Hinners reported her for insubordination. (Def.'s 56.1 Stmt. P 20; Pl.'s 56.1 Counterstmt. P 20.)

D. Plaintiff's Ravenswood Assignment

From February through December 1999, Fleming was given a field assignment at the Ravenswood Project ("Ravenswood"). (Def.'s 56.1 Stmt. P 26; Pl.'s 56.1 Counterstmt. P 26.) Field Technicians of various races were assigned to Ravenswood, but Fleming contends that a disproportionately high number of female and black Technicians were assigned to the site because it was a "dangerous, drug-ridden" place. (Def.'s 56.1 Stmt. PP 27-29; Pl.'s 56.1 Counterstmt. PP 26A-28.) Fleming also alleges that a colleague was told by a female drug dealer that the police used a Verizon [*6] vehicle in the course of a drug bust, which made Ravenswood's drug dealers hostile to the Field Technicians. (Def.'s 56.1 Stmt. PP 31-37; Pl.'s 56.1 Counterstmt. P 31-37; Fleming Dep. II, at 233, 235-36.) Hinners denies that he was aware of any illegal drug activity at Ravenswood, despite making over 50 visits to the site. (Def.'s 56.1 Stmt. P 36; Pl.'s 56.1 Counterstmt. P 36.)

Fleming later complained of an asbestos problem at Ravenswood. She was the first person to bring the asbestos problem to Verizon's attention, and thereafter was not required to return to the site. (Def.'s 56.1 Stmt. P 30; Pl.'s 56.1 Counterstmt. P 30.)

E. Plaintiff's Assignments, Training and Equipment Under Hinners

Fleming contends that she was denied prime work assignments and superior equipment because she was a black woman. Fleming also claims that she received less on-the-job training because she was typically assigned to inexperienced work teams. (Def.'s 56.1 Stmt. PP 38, 40; Pl.'s 56.1 Counterstmt. PP 38-48.) Verizon disputes these contentions. (Def.'s 56.1 Stmt. PP 38-48)

F. Other Alleged Incidents of Discrimination

Fleming dated one of her co-workers, Greg Watts ("Watts"), for several months. [*7] (Reply Affidavit of A. Jonathan Trafimow ("Trafimow Supp. Aff.") Ex. L.) Notwithstanding this relationship, Fleming complains that Hinners regularly accused her of having an affair with Watts. (Fleming Decl. P 5.) Fleming avers that Hinners would "sneak up" on her, hoping to catch her "in an embrace" with Watts. (Fleming Decl. P 5.) She also claims Hinners "made frequent remarks, full of innuendo, about the affair to me." (Fleming Decl. P 5.) However, Fleming does not identify any specific time or place in which the alleged conduct occurred.

In addition, Fleming claims that Hinners invited the male Field Technicians under his supervision to weekly

Case 3:01-cv-01913-DJS   Document 124-3   Filed 02/20/2007   Page 4 of 15

Page 3

2006 U.S. Dist. LEXIS 68632, *; 99 Fair Empl. Prac. Cas. (BNA) 53;
18 Am. Disabilities Cas. (BNA) 1065

"part[ies]" at a bar in Queens while the female technicians were forced to work. (Fleming Decl. P 18.)

G. Plaintiff's Transfer to Lomax's Supervision

In December 2000, Fleming requested a transfer from Hinners to another supervisor, Walter Lomax ("Lomax"), which was arranged by the two supervisors and subsequently approved by George Van Houten ("Van Houten"), a more senior manager. (Def.'s 56.1 Stmt. P 49; Pl.'s 56.1 Counterstmt. P 49.) Fleming contends that after the transfer, she continued to suffer the same forms of discrimination [*8] she had suffered previously. In addition, Fleming claims that Van Houten ordered Lomax to visit her at home when she called in sick, to go to her work site to speak with her about her work, and to generally know "what [she] was doing." (Def.'s 56.1 Stmt. PP 51-52; Pl.'s 56.1 Counterstmt. PP 51-52.) Fleming also testified that any alleged discrimination after the transfer originated from Van Houten, not Lomax or Hinners. (Def.'s 56.1 Stmt. P 50; Fleming Dep. II, at 262-67.) Lomax was replaced by Supervisor LaTanya Buggs ("Buggs") in 2001, but Fleming claims that Lomax continued to have partial responsibility for supervising her even after Buggs' arrival. (Def.'s 56.1 Stmt. P 86; Pl.'s 56.1 Counterstmt. P 86.)

II. Allegations of Disability Discrimination

A. Plaintiff's Fainting Episode and its Aftermath

On September 1, 2000, Fleming fainted while at the top of a telephone pole. (Def.'s 56.1 Stmt. P 54; Pl.'s 56.1 Counterstmt. P 54.) Prior to that time, climbing had been a "normal and customary" part of her job. (Def.'s 56.1 Stmt. P 55; Pl.'s 56.1 Counterstmt. P 55.)

Fleming returned to light duties at Verizon's College Point Central Center ("CPCC") on October 16, 2000. (Def. [*9] 's 56.1 Stmt. P 54; Pl.'s 56.1 Counterstmt. P 54.) While at CPCC, Fleming was under the supervision of Lomax, Josephine Burnett ("Burnett"), and Van Houten. (Def.'s 56.1 Stmt. P 56; Pl.'s 56.1 Counterstmt. P 56; Fleming Dep. II, at 104.) Fleming claims that while she was at CPCC, she only suffered race and gender discrimination at the hands of Van Houten; she had no complaints about Lomax or Burnett. n1 (Fleming Dep. II, at 104, 107-108, 113.) Nor did Fleming ever complain to Verizon's Human Resources department, Van Houten, or any more senior manager about any discriminatory treatment. (Def.'s 56.1 Stmt. P 58; Pl.'s 56.1 Counterstmt. P 58.)

n1 Fleming also complains of disability discrimination at CPCC, as set forth below.

B. Plaintiff's Medical Condition

In October 2000, Fleming was diagnosed with vasovagal syncope, a medical condition that can result in sudden fainting. (Def.'s 56.1 Stmt. PP 59-60; Pl.'s 56.1 Counterstmt. PP 59-60.) As a consequence of this diagnosis, Fleming's physician advised her that [*10] although she could return to work with modified duties, she should avoid "working in manholes[] or climbing ladders" until at least December 31, 2000. (Def.'s 56.1 Stmt. P 64; Pl.'s 56.1 Counterstmt. PP 64-64b; Affidavit of Rukhsana Sadiqali in Support of the Company's Motion for Summary Judgment ("Sadiqali Aff."), Ex. A: Various Medical Reports.) This restriction has continued until the present day, and the parties agree that at all times since the fainting incident on September 1, 2000, Fleming has been medically advised not to climb ladders or poles over five feet in height. (Def.'s 56.1 Stmt. P 66; Pl.'s 56.1 Counterstmt. P 66.)

The scope of medical restrictions on Fleming's work activities is open to debate. On December 12, 2000, Fleming's physician advised Verizon that she should "[a]void prolong[ed] standing / avoid working on ladder or climbing pole[.]" (Sadiqali Aff., Ex. A.) On March 16, 2001, a different physician advised Verizon that Fleming "[wa]s advised to continue on restrictive duty (no climbing or outdoor work)" and stated that "[s]he [would] be re-evaluated [on] 4-15-2001." (Sadiqali Aff., Ex. A.) Verizon's Medical Director, Dr. Rukhshana Sadiqali, [*11] claims that she understood the recommendation against "outdoor work" to include driving. (Trafimow Aff., Ex. K: Deposition of Rukhsana Sadiqali, M.D. ("Sadiqali Dep."), at 126-128; but see Declaration of Michael Weinrauch, M.D. ("Weinrauch Decl.") P 25.) However, on April 4, 2001, Dr. Harry Weinrauch, a third physician, submitted a note stating that Fleming "may drive." (Sadiqali Aff., Ex. A.) Dr. Weinrauch's colleague, Dr. Michael Weinrauch, reiterated this point in another note dated September 12, 2001. On August 8, 2001 yet another physician stated that Fleming could "drive and operate machinery" but advised against allowing her to be suspended in a body belt or to work at heights or depths greater than five feet. (Sadiqali Aff., Ex. A.) On June 14, 2002 Dr. Michael Weinrauch reiterated that Fleming was "not fully disabled . . . [s]he is restricted only from duties that involve climbing to a height of greater than 5 feet. She may perform all other tasks." (Sadiqali Aff., Ex. A (emphasis in original).) Dr. Michael Weinrauch sent another note confirming the same diagnosis on March 29, 2004, expressly noting that "[t]he patient can operate a motorized vehicle and work in [*12] manholes," but reiterating that "[s]he may not climb telephone poles or [engage in] any activity that requires a body belt[.]" (Sadiqali Aff., Ex. A.)

Notwithstanding the medical advice suggesting Fleming could drive, Dr. Sadiqali barred Fleming from

Case 3:01-cv-01913-DJS    Document 124-3    Filed 02/20/2007    Page 5 of 15

Page 4
2006 U.S. Dist. LEXIS 68632, *; 99 Fair Empl. Prac. Cas. (BNA) 53;
18 Am. Disabilities Cas. (BNA) 1065

driving Verizon vehicles in March 2001. (Def.'s 56.1 Stmt. P 12; Pl.'s 56.1 Counterstmt. P 12.) Dr. Sadiqali claims she imposed the driving restriction because, based on the evidence before her, she believed that Fleming remained at risk for loss of consciousness. (Def.'s 56.1 Stmt. P 69; Pl.'s 56.1 Counterstmt. P 69.) Dr. Sadiqali further claims that she restricted Fleming's driving because (1) Department of Transportation regulations barred Verizon from allowing employees who had medical conditions that could cause loss of consciousness from driving vehicles weighing over 10,000 pounds; and (2) even in case of vehicles weighing less than 10,000 pounds, she sought to limit Verizon's exposure to tort liability. (Def.'s 56.1 Stmt. P 69; Pl.'s 56.1 Counterstmt. P 69.) Fleming claims that she was never advised that these were the reasons she was barred from driving Verizon vehicles. (Fleming Decl. P 54.)

C. Plaintiff's Enrollment [*13] in Verizon's HIP Program

Despite the conflicting medical evidence, on April 6, 2001, Verizon's Medical Director, Dr. Rukhsana Sadiqali, concluded that Fleming's work restrictions were indefinite or permanent. n2 (Def.'s 56.1 Stmt. P 70; Pl.'s 56.1 Counterstmt. P 70.) Accordingly, on May 17, 2001, Verizon placed Fleming in its Health Impairment Process ("HIP") program. (Def.'s 56.1 Stmt. P 70; Pl.'s 56.1 Counterstmt. P 70.)

> n2 Dr. Sadiqali testified at her deposition that she did not rely on any other physician's opinion in concluding that Fleming's work impairments were indefinite or permanent. (Sadiqali Dep., at 129-132.)

The HIP program seeks to assist employees with indefinite or permanent health impairments that prevent them from doing their regular jobs (with or without a reasonable accommodation) by making other positions available to them. (Def.'s 56.1 Stmt. P 71; Pl.'s 56.1 Counterstmt. P 71.) Verizon's HIP program grants impaired employees a 90-day period to apply to other positions for which they [*14] are qualified that are lateral to, or a downgrade from, their previous positions. The applicants receive preference over most other employees in filling these new positions. n3 Employees are also free to seek upgraded positions, including those that would require a reasonable accommodation for them to perform adequately. (Def.'s 56.1 Stmt. P 72; Pl.'s 56.1 Counterstmt. P 72.)

> n3 Verizon asserts that "surplused" employees had a higher job-placement preference than HIP program participants. Fleming claims that she was unaware of her inferior preference at the time of her enrollment in the program. (Def.'s 56.1 Stmt. P 72; Pl.'s 56.1 Counterstmt. P 72.)

According to Verizon, the HIP program first attempts to find an employee a job within the department where she was previously employed. The next step involves a broader search process under which the employee is given preferential treatment for certain positions, which are determined by the collective bargaining agreement ("CBA") applicable to that employee. At the [*15] conclusion of the search process, an HIP committee meets to decide if and where an employee will be placed. (Def.'s 56.1 Stmt. P 75; Pl.'s 56.1 Counterstmt. P 75.) The parties dispute whether Fleming was made aware of the HIP program guidelines prior to the commencement of this litigation. (Def.'s 56.1 Stmt. P 74; Pl.'s 56.1 Counterstmt. PP 74A-74B.)

After placing Fleming in the HIP program, Van Houten and another manager, Director Stephen Broderick ("Broderick"), concluded that Fleming could not fill any position in her current department in light of her medical restrictions. (Def.'s 56.1 Stmt. P 76; Pl.'s 56.1 Counterstmt. P 76.) However, Fleming claims that Van Houten and Broderick did not make any effort to find work that she could perform, and that she "repeatedly asked Verizon to place her in a Field Technician position that did not require climbing, and specifically asked to be assigned to a position in Manhattan where such jobs were available." (Pl.'s 56.1 Counterstmt. PP 76-76A; Fleming Decl. P 62.) In addition, it is undisputed that Fleming never applied for any jobs through the HIP program's broader search process, although Fleming claims this was because Verizon instituted [*16] a hiring freeze within a week of her enrollment in the program. (Def.'s 56.1 Stmt. P 77; Pl.'s 56.1 Counterstmt. P 77; Fleming Decl. P 57.)

Fleming did not find a job using the HIP program. (Def.'s 56.1 Stmt. P 78; Pl.'s 56.1 Counterstmt. P 78.) Verizon put Fleming on short-term disability benefits on November 14, 2001. (Def.'s 56.1 Stmt. P 79; Fleming Dep. II, at 118-19.) Fleming claims that after she went on disability leave, Verizon replaced her with a white male, Brian Cunningham ("Cunningham"). (Fleming Decl. P61.)

D. Plaintiff's Job Search Through the SPV Process

In order to comply with its employees' CBA, Verizon developed Specific Published Vacancy ("SPV") procedures. The SPV process was intended to provide a "standardized and systematic selection process for filling non-management jobs." (Affidavit of Gregory Marshen ("Marshen Aff.") P 7, Ex. A.) The SPV process required

Case 3:01-cv-01913-DJS   Document 124-3   Filed 02/20/2007   Page 6 of 15

Page 5

2006 U.S. Dist. LEXIS 68632, *; 99 Fair Empl. Prac. Cas. (BNA) 53;
18 Am. Disabilities Cas. (BNA) 1065

Verizon to announce open SPVs by listing them in a weekly company publication. (Marshen Aff. P 8.)

When there was no work available for a particular job title within a given geographic area, certain employees in that area would be designated "surplus." (Marshen Aff. P 9.) Employees so designated were [*17] given the highest priority for placement into new positions of the same job title as soon as they became available. (Marshen Aff. P 9.) On November 19, 2001 Verizon issued a Surplus Declaration for Field Technicians in Fleming's geographic area.

The issuance of a Surplus Declaration should have given Fleming an advantage in the SPV process even greater than the one she enjoyed through the HIP program. However, Fleming contends that because the hiring freeze remained in effect on November 19, 2001, the SPV process did not help her. (Def.'s 56.1 Stmt. P 80; Pl.'s 56.1 Counterstmt. P 80; Marshen Aff. P 7.) In any event, Plaintiff did not apply for a job at Verizon through the SPV process until March 14, 2002. (Def.'s 56.1 Stmt. P 81; Pl.'s 56.1 Counterstmt. P 81.) After March 14, 2002 Plaintiff applied for 88 different jobs, but received an offer for only one -- a position as Special Assistant at Verizon's office at 375 Pearl Street. (Def.'s 56.1 Stmt. PP 82-83; Pl.'s 56.1 Counterstmt. PP 82-83.) Fleming accepted this job in or around August 2002 and has continued in the job since that time. (Def.'s 56.1 Stmt. P 83; Pl.'s 56.1 Counterstmt. P 83.)

Verizon contends that it impartially [*18] applied the terms of the applicable CBA to choose among job applicants participating in the SPV process. (Def.'s 56.1 Stmt. P 85; Marshen Aff. PP 6-93.) By contrast, Fleming asserts that Cunningham and numerous other employees were given special treatment and assigned jobs they would not have received if the CBA had been applied fairly. (See, e.g., Pl.'s 56.1 Counterstmt. PP85-85J.) Fleming does not maintain that she was denied any jobs through the SPV process because of her race or sex. (Fleming Dep. II, at 130.) However, Fleming claims that Van Houten and Buggs denied her application for a position as a Field Technician escort in May 2002 (after initially accepting it) because of her medical restrictions. (Def.'s 56.1 Stmt. PP 87-90; Pl.'s 56.1 Counterstmt. PP 87-90.)

E. Plaintiff's Complaints to the EEOC

On June 12, 2002, Fleming partially completed an Equal Employment Opportunity Commission ("EEOC") intake questionnaire in connection with a discrimination charge that she filed with the EEOC. Plaintiff did not indicate any disability on the questionnaire and stated at her deposition that she does not believe she is disabled. (Def.'s 56.1 Stmt. P 91; Pl.'s 56.1 Counterstmt. [*19] PP 91-91B; Fleming Dep. II, at 272-73.) In response to the question "Did [Verizon] regard you as having a substantially limiting physical or mental impairment, even though you do not," Fleming answered "yes." (Pl.'s 56.1 Counterstmt. P 91B; Trafimow Aff., Ex. C.) Fleming left blank the retaliation section of the intake questionnaire. When questioned about this omission later, Fleming stated that she had left the section blank because "I don't know if this is retaliation for something that has to do with ADA." (Fleming Dep. II, at 273; Def.'s 56.1 Stmt. P 92; Pl.'s 56.1 Counterstmt. P 92.) Fleming commenced this action on July 30, 2003.

DISCUSSION

On November 16, 2005, this Court dismissed (1) Plaintiff's Title VII claims for retaliation and a sexually hostile work environment; (2) Plaintiff's Title VII discrimination and gender- and race-based failure to accommodate claims to the extent they relied on discrete events that occurred prior to August 16, 2001; and (3) Plaintiff's HRL and NYCHRL claims to the extent they were premised on discrete events that occurred prior to July 30, 2000. *Fleming v. Verizon N.Y., Inc., 419 F. Supp. 2d 455, 2005 WL 3066040 (S.D.N.Y. 2005)* [*20] . Presently before the Court is Verizon's motion pursuant to *Fed. R. Civ. P. 56* for summary judgment on the remainder of Plaintiff's claims. In its reply papers, Verizon also moves to strike the declarations of Dawn Gibbs ("Gibbs"), Greg Watts ("Watts"), Yvette Betts ("Betts") and Rakelle Recard ("Recard") pursuant to *Fed. R. Civ. P. 37(c)(1)* on the ground that none of these witnesses were identified in Fleming's *Rule 26(a)* disclosures. Finally, Verizon asks the Court to strike portions of Fleming's declaration submitted in opposition to the motion for summary judgment on the grounds that they contradict her sworn deposition testimony or are conclusory in nature.

I. Motions to Strike

Before addressing the merits of Verizon's motion for summary judgment, this Court must consider to what extent it will admit evidence from the declarations of Fleming, Gibbs, Watts, Betts and Ricard.

A. The Fleming Declaration

Verizon contends that portions of the Fleming Declaration are conclusory and contradict Fleming's prior sworn deposition testimony. Verizon moves to strike those [*21] portions of the declaration.

"To allow a party to defeat a motion for summary judgment by offering purely conclusory allegations of discrimination, absent any concrete particulars, would necessitate a trial in all Title VII cases." *Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir. 1985)*; see also *Bickerstaff v. Vassar Coll., 196 F.3d 435, 454-55 (2d Cir. 1999)* ("It is

Case 3:01-cv-01913-DJS   Document 124-3   Filed 02/20/2007   Page 7 of 15

Page 6
2006 U.S. Dist. LEXIS 68632, *; 99 Fair Empl. Prac. Cas. (BNA) 53;
18 Am. Disabilities Cas. (BNA) 1065

beyond cavil that a 'party may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that . . . contradicts the affiant's previous deposition testimony.'") (quoting *Hayes v. New York City Dep't of Corrections, 84 F.3d 614, 619 (2d Cir. 1996)).* Accordingly, Verizon's motion to strike those portions of the Fleming Declaration that are conclusory in nature is granted.

### B. Other Witness Declarations

Verizon also moves to strike the declarations of Gibbs, Watts, Betts and Recard on the grounds that none of these witnesses were listed in Plaintiff's initial disclosures pursuant to *Fed. R. Civ. P. 26(a)*. *Fed. R. Civ. P. 26(a)(1)(A)* requires a party to disclose [*22] the names of "each individual likely to have discoverable information that the disclosing party may use to support its claims or defenses . . . ." (Emphasis added.) *Fed. R. Civ. P. 37(c)(1)* provides, in relevant part: "A party that without substantial justification fails to disclose information required by *Rule 26(a)* . . . is not, unless such failure is harmless, permitted to use as evidence at a trial, at a hearing, or on a motion any witness or information not so disclosed." This preclusionary rule applies on motions for summary judgment. See, e.g., *Ebewo v. Martinez, 309 F. Supp. 2d 600, 607 n.2 (S.D.N.Y. 2004)*. Its purpose is to prevent the practice of "sandbagging" an opposing party with new evidence. *Ventra v. United States, 121 F. Supp. 2d 326, 332 (S.D.N.Y. 2000)*. Courts in this Circuit recognize that preclusion of evidence pursuant to *Rule 37(c)(1)* is a drastic remedy and should be exercised with caution. *Ventra, 121 F. Supp. 2d at 332*.

Some district courts in this Circuit have read a bad faith requirement into *Rule 37(c)(1)*, stating that preclusion of testimony is not appropriate [*23] unless "the party's conduct represents flagrant bad faith and callous disregard of the federal rules." *McNerney v. Archer Daniels Midland Co., 164 F.R.D. 584, 587 (W.D.N.Y. 1995)*; see also *Ward v. Nat'l Geographic Soc'y, 2002 U.S. Dist. LEXIS 310, No. 99 Civ. 12385 (LAK), 2002 WL 27777, at *2 (S.D.N.Y. Jan. 11, 2002)*; *Grdinich v. Bradlees, 187 F.R.D. 77, 79 (S.D.N.Y.1999)*. However, the Second Circuit has not yet addressed the issue, and it is an open question whether bad faith or willfulness is required before testimony may be excluded under *Rule 37(c)(1)*. See *Wantanabe Realty Corp. v. City of New York, 2004 U.S. Dist. LEXIS 954, No. 01 Civ. 10137 (LAK), 2004 WL 169751, at *2 n.2 (S.D.N.Y. Jan. 28, 2004)*; *Ebewo, 309 F. Supp. 2d at 607 n.2*. In any case, as discussed below, Fleming's failure to disclose the names of four witnesses -- the only non-party witnesses on whom she relies to support her claims of race and gender discrimination -- represents a complete disregard for the rules.

It is undisputed that Fleming did not include the names of Gibbs, Watts, Betts or Recard in her *Rule 26(a)* disclosures or in her subsequent answers to interrogatories.

Notwithstanding [*24] Fleming's duty to do so, it is also undisputed that she never supplemented her *Rule 26(a)* disclosures to include the names of those witnesses. See *Fed. R. Civ. P. 26(e)*. However, Fleming's counsel stated at oral argument that she had "pursued these people diligently" but that they had previously been unwilling to become involved in the litigation. (Transcript of Mar. 1, 2006 Hearing ("Mar. 1 Tr."), at 18.) Fleming argues that the witnesses' prior reluctance to testify constitutes "substantial justification" for the non-disclosure of their names and permits the admission of their declarations under *Rule 37(c)(1)*. Further, Fleming argues that she mentioned the names of two of the declarants -- Gibbs and Watts -- at her deposition on January 3, 2005, and that Verizon therefore had adequate notice of their potential involvement in this action. (Mar. 1 Tr., at 18.) Fleming's arguments are unavailing.

As an initial matter, Verizon would be prejudiced by the admission of the declarations, because it made its motion for summary judgment based on what it thought to be all of the evidence accumulated in discovery. Fleming has submitted no evidence [*25] to this Court regarding the four witnesses' motives for declining to testify until the close of discovery. More importantly, *Rule 26(a)(1)(A)* requires parties to disclose the names of any individuals who "may" have relevant information, and *Rule 26(e)* requires parties to supplement their disclosures when they become aware of additional witnesses. In light of the facial stringency of these requirements, Fleming's excuse that the witnesses' participation in the litigation was uncertain does not rise to the level of a "substantial justification" for her failure to list them in her *Rule 26(a)* disclosures.

Similarly, this Court finds unpersuasive Fleming's argument that, because the declarants were all Verizon employees and she mentioned two of their names at her deposition, Defendant could have deposed them at any time. Verizon is a large corporation with thousands of employees, and Fleming admits that several of the declarants did not even work directly with her. (Mar. 1 Tr., at 6.) Absent the disclosure of the declarants' identities under *Rule 26(a)*, it would be unreasonable to expect Verizon to depose them.

For these reasons, Fleming's contentions do not constitute the "substantial [*26] justification" that would be required for her to rely on the Gibbs, Watts, Betts and Recard declarations. See *Ebewo, 309 F. Supp. 2d at 607* (declining to consider affidavit submitted in opposition to summary judgment because the affiant was not listed

Case 3:01-cv-01913-DJS    Document 124-3    Filed 02/20/2007    Page 8 of 15

Page 7

2006 U.S. Dist. LEXIS 68632, *; 99 Fair Empl. Prac. Cas. (BNA) 53;
18 Am. Disabilities Cas. (BNA) 1065

in plaintiff's *Rule 26(a)* disclosures); *L-3 Communs. Corp. v. OSI Sys.*, 2005 U.S. Dist. LEXIS 4935, No. 02 Civ. 9144 (DC), 2005 WL 712232, at *2 (S.D.N.Y. Mar. 28, 2005) (striking declaration under *Rule 37* for failure to identify the witness in *Rule 26(a)* disclosure); *Every v. Makita U.S.A., Inc.*, 2005 U.S. Dist. LEXIS 24881, No. 02 Civ. 8545 (GEL), 2005 WL 2757952, at *5-7 (S.D.N.Y. Oct. 24, 2005) (striking expert affidavit under *Rule 37* for failure to identify the expert in *Rule 26(a)* disclosure). Verizon's motion to strike the Gibbs, Watts, Betts and Recard declarations is granted. n4

> n4 Since Verizon has now received notice that Gibbs, Watts, Betts and Recard are relevant witnesses, this Court will permit them to testify at trial on those claims that survive this motion. However, their testimony will be limited to subjects relevant to the surviving claims. Moreover, Verizon will be given an opportunity to take additional discovery of these witnesses in advance of trial.

[*27]

II. Standard on Summary Judgment

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Fed. R. Civ. P. 56(c)*; see also *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). The burden of demonstrating the absence of any genuine dispute as to a material fact rests with the moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S. Ct. 1598, 26 L. Ed. 2d 142 (1970); *Grady v. Affiliated Cent., Inc.*, 130 F.3d 553, 559 (2d Cir. 1997). In determining whether there is a genuine issue as to any material fact, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [its] favor." *Liberty Lobby*, 477 U.S. at 255.

"A trial court must be cautious about granting summary judgment to an employer [in a discrimination case] when . . . its intent is at issue. [*28] " *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994). Nonetheless, "a plaintiff must provide more than conclusory allegations of discrimination to defeat a motion for summary judgment." *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997). "[M]ere speculation or conjecture" are also insufficient. *W. World Ins. Co. v. Stack Oil, Inc.*, 922 F.2d 118, 121 (2d Cir. 1990). Rather, a plaintiff "must come forward with evidence that would be sufficient to support a jury verdict in [his] favor." *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995).

III. Race and Sex Discrimination Claims

A. Title VII Claims

Title VII provides, in pertinent part: "It shall be unlawful for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of the individual's race, color, religion, sex, or national origin." *42 U.S.C. § 2000e-2(a)(1)*. In *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973), the Supreme Court set forth the framework [*29] for analyzing Title VII discrimination claims. See *Grady v. Affiliated Cent., Inc.*, 130 F.3d 553, 559 (2d Cir. 1997). A plaintiff bears the initial burden of proving a prima facie case of discrimination, which requires her to demonstrate that: (1) she is a member of a protected class; (2) she was qualified for the position or satisfactorily performed the duties of her position; (3) she was subjected to an adverse employment action; and (4) the adverse action occurred in circumstances giving rise to an inference of discrimination. *McDonnell Douglas*, 411 U.S. at 802. "The burden that an employment discrimination plaintiff must meet in order to defeat summary judgment at the prima facie stage is de minimis." *McLee v. Chrysler Corp.*, 109 F.3d 130, 134 (2d Cir. 1997); accord *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981); *Scaria v. Rubin*, 117 F.3d 652, 653 (2d Cir. 1997).

Title VII extends to complaints of a hostile work environment. *Harris v. Forklift Sys. Inc.*, 510 U.S. 17, 21, 114 S. Ct. 367, 126 L. Ed. 2d 295 (1993). In order to prevail under a hostile work environment claim, a plaintiff [*30] must establish that "[t]he workplace is permeated with 'discriminatory intimidation, ridicule, and insult,' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Harris*, 510 U.S. at 21 (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65, 106 S. Ct. 2399, 91 L. Ed. 2d 49 (1986)); see also *Quinn v. Green Tree Credit Corp.*, 159 F.3d 759 (2d Cir. 1998). The court must consider the totality of the circumstances in assessing whether the plaintiff has a viable hostile work environment claim. See *Distasio v. Perkin Elmer Corp.*, 157 F.3d 55, 62 (2d Cir. 1998). "Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment -- an environment that a reasonable person would find hostile or abusive -- is beyond Title VII's purview." *Harris*, 510 U.S. at 20.

Case 3:01-cv-01913-DJS   Document 124-3   Filed 02/20/2007   Page 9 of 15

Page 8
2006 U.S. Dist. LEXIS 68632, *; 99 Fair Empl. Prac. Cas. (BNA) 53;
18 Am. Disabilities Cas. (BNA) 1065

1. Discrimination and Hostile Work Environment

This Court has already dismissed the bulk of Fleming's Title VII claims on statute of limitations grounds. See *Fleming, 419 F. Supp. 2d 455, 2005 WL 3066040 at *8*. The exception was Fleming's claim that she [*31] suffered from unlawful discrimination and a hostile work environment from February 1999 until mid-November 2001 as a result of race-based severe scrutiny. In declining to dismiss that claim, the Court relied on Fleming's allegation that she was subject to discriminatory scrutiny both at Woodside and at CPCC, which had been directed by Van Houten during the entire time and thus constituted a single, continuing violation of Title VII for statute of limitations purposes. See *Fleming, 419 F. Supp. 2d 455, 2005 WL 3066040 at *8*. Specifically, Fleming claims that she was subjected to race-based severe scrutiny because Van Houten ordered Lomax to (1) visit her at home when she called in sick; (2) visit her in the field to "interrogate" her about her work; and (3) generally know "what [she] was doing." (Def.'s 56.1 Stmt. PP 51-52; Pl.'s 56.1 Counterstmt. PP 51-52; Fleming Decl. PP 35-37.) Fleming also avers that she had a "confrontation" with Van Houten on an unspecified date in which she "told him that he was rude because he habitually did not respond to my friendly greetings." (Fleming Decl. P 37.) Fleming asserts that this treatment cumulatively caused her "chronic anxiety and anger" and [*32] that it constituted adverse employment action as well as a hostile work environment. (Fleming Decl. P 35.)

Fleming's allegations against Van Houten are supported in significant part by hearsay -- namely, what Fleming claims to have been told by Lomax and others -- and vague, conclusory statements in her declaration. Nonetheless, even accepting Plaintiff's version of events as true, the conduct she alleges does not rise to the level of an adverse employment action, much less a hostile work environment. See *Bennett v. Watson Wyatt & Co., 136 F. Supp. 2d 236, 248 (S.D.N.Y. 2001)* ("Courts in this district have found that reprimands, threats of disciplinary action and excessive scrutiny do not constitute adverse employment actions."); *Castro v. New York City Bd. of Educ. Personnel Dir., 1998 U.S. Dist. LEXIS 2863, No. 96 Civ. 6314 (MBM), 1998 WL 108004, at *7 (S.D.N.Y. Mar. 12, 1998)* ("[A]lthough reprimands and close monitoring may cause an employee embarrassment or anxiety, such intangible consequences are not materially adverse alterations of employment conditions."); *Nicastro v. Runyon, 60 F. Supp. 2d 181, 186 (S.D.N.Y. 1999)* (excessive scrutiny from supervisors and [*33] requiring documentation for sick leave could not support a Title VII retaliation claim); *Henriquez v. Times Herald Record, 1997 U.S. Dist. LEXIS 18760, No. 96 Civ. 6176 (SHS), 1997 WL 732444, at *6 (S.D.N.Y. Nov. 25, 1997)* (unfair criticism of plaintiff's performance not the type of employment action that courts find to be materially adverse).

Finally, it is undisputed that Fleming never attempted to report any of the circumstances that created the supposedly hostile work environment through Verizon's anonymous hotline procedure. This failure to report gives rise to an affirmative defense to Fleming's claims. See *Faragher v. City of Boca Raton, 524 U.S. 775, 807, 118 S. Ct. 2275, 141 L. Ed. 2d 662 (1998)* ("If the plaintiff unreasonably failed to avail herself of the employer's preventive or remedial apparatus, she should not recover damages that could have been avoided if she had done so."); *Leopold v. Baccarat, Inc., 239 F.3d 243, 245 (2d Cir. 2001)* (recognizing an affirmative defense for employers in Title VII actions where "the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and . . . the plaintiff employee unreasonably failed to take advantage [*34] of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.").

For these reasons, Plaintiff has failed to demonstrate the existence of a genuine issue of material fact on her Title VII claims for discrimination or a hostile work environment, and summary judgment on these claims is appropriate.

2. Gender-Based Failure to Accommodate

Fleming claims that she was subjected to a failure to accommodate motivated by gender bias on three different occasions: (1) when she was placed on involuntary disability leave on November 14, 2001; (2) when she was denied numerous positions through the HIP and SPV programs; and (3) when Van Houten denied her a position as a Field Technician escort on May 2, 2002. Fleming argues that these are discrete events occurring after August 16, 2001 and therefore are not time-barred. See *Fleming, 419 F. Supp. 2d 455, 2005 WL 3066040 at *8*.

As this Court has previously noted, Fleming's gender-based failure to accommodate claims are time-barred for discrete events that occurred prior to August 16, 2001, but timely for discrete events that occurred after that date, as well as continuing violations that persisted after that [*35] date. *Fleming, 419 F. Supp. 2d 455, 2005 WL 3066040 at *8*. Fleming's alleged "failure to accommodate springs from Plaintiff's October 16, 2000 assignment to light duty. That assignment constitutes one discrete act, even though Plaintiff claims to have sustained the effects over a longer period." *Fleming, 419 F. Supp. 2d 455, 2005 WL 3066040 at *8*; see also *Elmenayer v. ABF Freight Sys., Inc., 318 F.3d 130, 134 (2d Cir. 2003)* ("[A]n employer's rejection of an employee's proposed accommodation . . . does not give rise to a continuing violation. . . . Although the effect of the employer's rejection continues to be felt by the employee for

Case 3:01-cv-01913-DJS    Document 124-3    Filed 02/20/2007    Page 10 of 15

Page 9

2006 U.S. Dist. LEXIS 68632, *; 99 Fair Empl. Prac. Cas. (BNA) 53;
18 Am. Disabilities Cas. (BNA) 1065

as long as he remains employed, that continued effect is similar to the continued effect of being denied a promotion or denied a transfer." (emphasis in original)). Accordingly, Fleming's Title VII claims arising out of her assignment to light duty and her involvement in the HIP program are time-barred.

As for Fleming's claim that Van Houten denied her an escort position on May 2, 2002, Fleming concedes that she was not denied any of the jobs she applied for through the SPV process because of her race or sex, contending only that she [*36] may have been denied some of them on the basis of her perceived disability. (Fleming Dep. II, at 130.) It is also undisputed that the escort position in question was given to a black woman. (Affidavit of Walter Lomax, dated Nov. 18, 2005, P 5.) The only direct evidence of a gender-based failure to accommodate (other than some inconsistencies in the testimony of Van Houten and Buggs) comes in the form of conclusory allegations in Fleming's latest declaration, which contradict her prior deposition testimony. (See, e.g., Fleming Decl. PP 56-57; Fleming Dep. II, at 130.) Accordingly, summary judgment is appropriate on Fleming's Title VII claims for failure to accommodate arising out of her involvement in the SPV program.

However, the situation is different with respect to Fleming's placement on involuntary disability leave on November 14, 2001. In particular, there are specific factual disputes regarding white male employees who were allegedly similarly situated but who were not placed on involuntary leave, and Fleming was replaced by Cunningham, a white male. Thus, there is sufficient record evidence to warrant a trial on this issue.

B. HRL and NYCHRL Claims

This Court's consideration [*37] of claims brought under the HRL and NYCHRL parallels the analysis used in Title VII claims. See *Cruz v. Coach Stores, Inc., 202 F.3d 560, 565 n.1 (2d Cir. 2000); Leopold v. Baccarat, Inc., 174 F.3d 261, 264 n.1 (2d Cir. 1999); Landwehr v. Grey Adver. Inc., 211 A.D.2d 583, 622 N.Y.S.2d 17 (1st Dep't 1995)*. However, because the applicable statutes of limitation for HRL and NYCHRL claims are different from those that govern Title VII claims, this Court has previously dismissed Fleming's HRL and NYCHRL claims only to the extent they were premised on discrete events that occurred prior to July 30, 2000. n5 *Fleming, 419 F. Supp. 2d 455, 2005 WL 3066040 at \*9-10*. Fleming therefore has surviving claims that (1) she suffered a continuing violation when she "was afforded inferior equipment, less training and worse assignments than white males and worked in trucks containing pictures of women in bathing suits" at Woodside, see *Fleming, 419 F. Supp. 2d 455, 2005 WL 3066040 at \*10*; (2) she suffered a continuing violation when she was subjected to severe scrutiny at both Woodside and CPCC; and (3) she suffered discrete events of gender- and race-based [*38] discrimination after July 30, 2000. The Court considers each of these claims seriatim.

> n5 At oral argument, this Court granted Fleming's counsel permission to file a short letter memorandum on a "recent Kings County [S]upreme [C]ourt case" addressing the statute of limitations for HRL and NYCHRL claims. (Mar. 1 Tr., at 26.) Counsel submitted a three-page letter that amounts to a motion for reconsideration of this Court's prior statute of limitations rulings. *Fleming, 419 F. Supp. 2d 455, 2005 WL 3066040 at \*10*; March 9, 2006 Letter from Lindsay Nicely Feinberg to the Court, dated March 9, 2006. Under *Local Civil Rule 6.3*, motions for reconsideration must be submitted "within ten (10) days after the entry of the court's determination of the original motion . . . ." Failure to submit a timely motion for reconsideration may result in denial of the motion. *Petit v. Bender, 2003 U.S. Dist. LEXIS 20925, No. 99 Civ. 0969 (SHS), 2003 WL 22743485, at \*3 (S.D.N.Y. Nov. 19, 2003)*. Moreover, a motion for reconsideration should be granted only when the moving party demonstrates that the Court has overlooked factual matters or controlling decisions that were presented to it on the underlying motion. See *Local Rule 6.3; Shrader v. CSX Transp., Inc., 70 F.3d 255, 257 (2d Cir. 1995)*. Here, Plaintiff submitted its motion for reconsideration five months late, after the close of discovery. Plaintiff's counsel also admitted at oral argument that the authorities cited in the March 9 letter were not presented to the Court on the underlying motion. (Mar. 1 Tr., at 25-26.) Accordingly, Plaintiff's motion for reconsideration is denied.

[*39]

1. Continuing Violation -- Training, Equipment and Work Assignments

Fleming claims that while she was at Woodside (i.e., until September 1, 2000) she was placed in a segregated work gang, not assigned experienced partners who could provide her with the kind of "on the job" training that similarly situated white male employees received, denied overtime opportunities as a result of her lack of high-tech training, forced to use inferior equipment and less comfortable (i.e., non-air conditioned) trucks, and forced to work at Ravenswood and other dangerous locales.

Where employee training may result in increased job security or more overtime hours, "'the denial of such

Case 3:01-cv-01913-DJS    Document 124-3    Filed 02/20/2007    Page 11 of 15

Page 10
2006 U.S. Dist. LEXIS 68632, *; 99 Fair Empl. Prac. Cas. (BNA) 53;
18 Am. Disabilities Cas. (BNA) 1065

Case 3:01-cv-01913-DJS    Document 124-3    Filed 02/20/2007    Page 11 of 15

Page 10
2006 U.S. Dist. LEXIS 68632, *; 99 Fair Empl. Prac. Cas. (BNA) 53;
18 Am. Disabilities Cas. (BNA) 1065

training may constitute an adverse employment action.'" *Little v. Nat'l Broad. Co.*, 210 F. Supp. 2d 330, 381 (S.D.N.Y. 2002) (quoting *Ewing v. Coca Cola Bottling Co. of N.Y., Inc.*, 2001 U.S. Dist. LEXIS 8849, No. 00 Civ. 7020 (CM), 2001 WL 767070, at *5 (S.D.N.Y. June 25, 2001)). Defendant contends that there were no segregated work gangs, that Fleming received more formal training than all but a few other Field Technicians, and that to the extent Fleming was given inferior equipment it was because she was not [*40] qualified to perform more specialized tasks. Fleming's testimony regarding her training contradicts that of Hinners, Lomax, and Van Houten. Accordingly, there are disputed issues of material fact on this issue requiring a trial.

In contrast, the bulk of Fleming's allegations regarding allegedly discriminatory work assignments are conclusory -- although she avers differential treatment, she does not describe any of the details necessary to substantiate her claims. (See, e.g., Fleming Decl. PP 18-20.) Indeed, with respect to Ravenswood, Fleming admits that white and Asian employees were sent there alongside African Americans, and she concedes that Hinners decided who to assign to Ravenswood "[b]ased on [the employee's] experience." (Fleming Dep. II, at 231.) Unsupported, conclusory allegations of discrimination cannot survive a motion for summary judgment. See, e.g., *Sklar v. N.Y. Life Ins. Co.*, 2001 U.S. Dist. LEXIS 12890, No. 00 Civ. 2254 (WHP), 2001 WL 984724, at *6 (S.D.N.Y. Aug. 27, 2001) (finding unsubstantiated allegations insufficient to sustain a claim of age discrimination on summary judgment). Accordingly, there is no genuine issue of material fact in respect of Plaintiff's [*41] Ravenswood discrimination claim, or her claims regarding discriminatory work assignments more generally, and summary judgment on these issues is appropriate.

2. Continuing Violation -- Discrimination and Hostile Work Environment

For the reasons discussed above, the workplace conditions alleged by Fleming do not rise to the level of adverse employment action or a hostile work environment under Title VII as a matter of law. Accordingly, dismissal of Fleming's parallel claims under the HRL and NYCHRL is also appropriate. See *Cruz*, 202 F.3d at 565 n.1 (consideration of claims under HRL and NYCHRL parallels Title VII analysis); *Leopold*, 174 F.3d at 264 n.1 (same).

Fleming seeks to distinguish her HRL and NYCHRL claims from her Title VII claims by reference to the different statute of limitations. Specifically, Fleming argues that she has a surviving claim of a gender-based hostile work environment under the HRL and NYCHRL because she was forced to work in trucks containing posters and calendars depicting women in bathing suits while employed at Woodside between July 30, 2000 and September 1, 2000 (a period that falls outside the statute of limitations [*42] for Title VII claims, but not for HRL and NYCHRL claims). However, this allegation is insufficient to establish a hostile work environment as a matter of law. See, e.g., *Brennan v. Metro. Opera Ass'n, Inc.*, 192 F.3d 310, 319 (2d Cir. 1999) (holding that prolonged display of photos of nude and partially clothed men in a shared office did not constitute a hostile work environment); *Petrosky v. N.Y. State Dep't of Motor Vehicles*, 72 F. Supp. 2d 39, 58 (N.D.N.Y. 1999) (same).

3. Discrete Events After July 30, 2000

Fleming also brings claims for a gender-based failure to accommodate under the HRL and NYCHRL. Specifically, Fleming parallels her Title VII allegations that she was subjected to a failure to accommodate motivated by gender bias when she was denied jobs through the HIP and SPV programs, placed on involuntary disability leave on November 14, 2001, and denied a position as a Field Technician escort by Van Houten on May 2, 2002. As noted, these acts "spring[] from Plaintiff's October 16, 2000 assignment to light duty," *Fleming*, 419 F. Supp. 2d 455, 2005 WL 3066040 at *8, which renders them timely under both the HRL and the NYCHRL.

Citing [*43] *Henderson v. Bolanda*, 253 F.3d 928 (7th Cir. 2001), Verizon argues that these claims must now be considered time barred because, in light of this Court's grant of summary judgment with respect to Fleming's severe scrutiny claims, Plaintiff's pro se Complaint did not state any valid Title VII claim and the Amended Complaint accordingly cannot relate back to it for statute of limitations purposes. See *Fleming*, 419 F. Supp. 2d 455, 2005 WL 3066040 at *9. This argument is without merit, as it conflates summary judgment with failure to state a claim. Compare *Fed. R. Civ. P. 12(b)(6)* with *Fed. R. Civ. P. 56*. This Court is granting summary judgment on Fleming's remaining Title VII claim, not reversing its prior holding that Fleming successfully stated a claim under Title VII in her original pro se Complaint. See *Fleming*, 419 F. Supp. 2d 455, 2005 WL 3066040 at *8. Moreover, Verizon's argument ignores this Court's other stated reasons for holding that the Amended Complaint relates back, such as that Fleming's original form complaint did not list an option for state or local claims, and [*44] that Fleming attached her EEOC charge (which asserted claims under "state and local statutes") to her original Complaint.

As discussed above, Fleming does not cite sufficient evidence for a reasonable jury to conclude that the denial of the Field Technician escort position on May 2, 2002 was based on race or gender animus. Fleming also fails to adduce any competent evidence from which an infer-

Case 3:01-cv-01913-DJS   Document 124-3   Filed 02/20/2007   Page 12 of 15

Page 11
2006 U.S. Dist. LEXIS 68632, *; 99 Fair Empl. Prac. Cas. (BNA) 53;
18 Am. Disabilities Cas. (BNA) 1065

ence of discrimination can be drawn regarding her involvement in the HIP and SPV programs more generally. (See, e.g., Fleming Decl. PP 56-60, 63 (conclusory allegations and speculation regarding Fleming's involvement in the HIP and SPV programs).) However, the situation is different with respect to Fleming's placement on involuntary disability leave on November 14, 2001, and there is sufficient evidence to warrant a trial on that issue.

Verizon's motion for summary judgment on Plaintiff's HRL and NYCHRL claims is granted to the extent those claims are based on the denial of the escort position on May 2, 2002 or on Fleming's participation in the HIP or SPV programs more generally. Verizon's motion is denied to the extent Fleming's failure to accommodate claim is based on her involuntary placement [*45] on disability leave on November 14, 2001.

IV. Disability Claims

A. ADA Claims

To establish a prima facie case under the ADA, Fleming must show that: (1) Verizon is subject to the ADA; (2) she has a disability within the meaning of the ADA; (3) she was otherwise qualified to perform the essential functions of her job with or without reasonable accommodation; and (4) she suffered adverse employment action as a result of her disability. *Shannon v. New York City Transit Auth.*, 332 F.3d 95, 99 (2d Cir. 2003); *Reeves v. Johnson Controls World Servs., Inc.*, 140 F.3d 144, 149-50 (2d Cir. 1998). If the plaintiff makes out a prima facie case, this creates a presumption of discrimination. The burden of production then shifts to the defendant, who must proffer a nondiscriminatory reason for its action. *James v. New York Racing Ass'n*, 233 F.3d 149, 153-54 (2d Cir. 2000). If the defendant carries its burden, the presumption of discrimination disappears and the plaintiff must offer evidence reasonably supporting a finding of unlawful discrimination. *James*, 233 F.3d at 154.

Verizon concedes that it is subject [*46] to the ADA, but claims that Fleming cannot demonstrate a genuine issue of material fact on any of the other elements.

1. Disability

42 U.S.C. § 12102(2) defines a "disability" as "(A) a physical or mental impairment that substantially limits one or more of the major life activities of [an] individual . . . or (C) being regarded as having such an impairment."

The EEOC, the agency with principal responsibility for the enforcement of the ADA and to whose interpretation of the statute this Court is required to accord great deference, see *Muller v. Costello*, 187 F.3d 298, 312 (2d Cir. 1999), has interpreted "major life activity" to refer to "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, or working." *29 C.F.R. § 1630.2(i)*. "[T]his list of major life activities is meant to be illustrative and not exclusive" and allows courts to determine on a "case-by-case basis" whether a non-enumerated "major life activity" is implicated. *Reeves*, 140 F.3d at 150-51; see also *Bragdon v. Abbott*, 524 U.S. 624, 118 S. Ct. 2196, 141 L. Ed. 2d 540 (1998). "[S]itting, [*47] standing, lifting, or reaching" are other major life activities recognized in this Circuit. *Ryan v. Grae & Rybicki*, 135 F.3d 867, 870 (2d Cir. 1998). The Court must "ask whether th[e] activity is a significant one within the contemplation of the ADA, rather than whether th[e] activity is important to a particular plaintiff." *Colwell v. Suffolk County Police Dep't*, 158 F.3d 635, 642 (2d Cir. 1998). The Second Circuit has cautioned that a major life activity should be defined broadly. *Reeves*, 140 F.3d at 152.

The term "substantially limits" means "[s]ignficantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity." *29 C.F.R. § 1630.2(j)(1)(ii)*. Read in conjunction with the requirement that the impairment affect a "major life activity," the "substantially limits" requirement "underscores that the impairment must be significant, and not merely trivial." *Reeves*, 140 F.3d at 151 [*48] (internal quotation omitted). The Court should consider "(i) the nature and severity of the impairment; (ii) the duration or expected duration of the impairment; and (iii) the permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment." *29 C.F.R. § 1630.2(j)(2)*; accord *Colwell*, 158 F.3d at 643.

Verizon attempts to tailor the extent of Fleming's disability by arguing that her vasovagal syncope limited only her ability to climb poles and drive, both of which are non-major life activities. See, e.g., *Colwell*, 158 F.3d at 643 (holding that driving is not a major life activity). Fleming takes a more expansive view in opposing summary judgment, arguing that she is unable to maintain consciousness, which is a major life activity. The breadth with which major life activities are defined lends Fleming's argument a superficial appeal; however, it founders on the averments in her Amended Complaint. There, Fleming pleaded only that she suffered from a perceived disability -- not an actual one. (See, e.g., Amended Complaint, PP 1, 40, 45.) Nowhere did Plaintiff plead that she was in danger of losing consciousness [*49] except under "unusual conditions." (Amended Complaint, P 24.) Indeed, Fleming conceded that she has suffered only a

Case 3:01-cv-01913-DJS    Document 124-3    Filed 02/20/2007    Page 13 of 15

Page 12

2006 U.S. Dist. LEXIS 68632, *; 99 Fair Empl. Prac. Cas. (BNA) 53;
18 Am. Disabilities Cas. (BNA) 1065

single fainting incident as a result of her vasovagal syncope. (Amended Complaint, P 24.) This hardly rises to the level of an "impairment that substantially limits . . . [a] major life activit[y]." *42 U.S.C. § 12102(2).*

Nonetheless, material disputed issues of fact exist to justify a trial on the question of whether Verizon regarded Fleming as disabled. Specifically, the record evidence in this action shows that after Fleming's fainting episode on September 1, 2000, Verizon placed her on indoor light duty, barred her from driving, restricted her from performing any field work and relegated her solely to the performance of clerical and administrative tasks. Verizon argues that these limitations were imposed in response to notes from Fleming's physicians, and that she is accordingly barred from complaining that Verizon regarded her as disabled. *See Crispi v. Green Bus Line, Inc.*, No. 00 Civ. 7159 (NG), 2003 WL 1903264, at *5 (E.D.N.Y. Jan. 7, 2003) (noting that a plaintiff "cannot rely on doctor's reports that [she herself] [*50] proffered . . . to establish that [her] employer impermissibly characterized [her] as disabled."). However, Verizon ignores the evidence that it did not relax its restrictions on Fleming even after April 2001, when her physicians began to abandon some of the limitations they had previously imposed on her work activities, such as driving. Likewise, Verizon's argument that "[a]ssignment to light duty status . . . does not support the inference that the [employer] viewed [the plaintiff] as disabled," *Colwell, 158 F.3d at 647*, is without merit. Unlike Colwell, in which the plaintiff was placed on light duty but kept in a fundamentally similar position, Fleming was barred from field work altogether and was forced to perform strictly administrative and clerical duties. That these forced limitations persisted -- and that Verizon employees, including Van Houten, intended them to be permanent -- establishes that there is a triable issue of fact on whether Verizon perceived Fleming as disabled.

2. Ability to Perform Essential Functions

"Essential functions" are "the fundamental duties to be performed in the position in question, but not the functions that [*51] are merely marginal." *29 C.F.R. § 1630.2(n)(1).* A reasonable accommodation under the ADA can never involve eliminating an essential function from a particular position. *Shannon, 332 F.3d at 100.* Generally, an employer is entitled to deference in defining the essential functions of a position. *D'Amico v. City of New York, 132 F.3d 145, 151 (2d Cir. 1998).* The employer's written job description, especially, is given substantial weight. *42 U.S.C. § 12111(8); 29 C.F.R. § 1630.2(n)(3)(ii).*

The parties dispute the essential functions of a Field Technician, particularly whether they encompass climbing poles, working below ground and driving. Relying on its written job description, Verizon contends that climbing poles is an essential function of Fleming's Field Technician position, and the Field Technician position more generally. Verizon also claims the same about driving. For her part, Fleming contends that other Field Technicians (such as Cunningham and various Field Technicians in Manhattan) did not climb poles. Fleming also contends that (1) it was safe for her to drive; and [*52] (2) in any event, because Field Technicians were deployed in groups, only one member of the group needed be able to drive. Finally, the parties have similar disputes with respect to the essential functions of the Field Technician escort position and other positions for which Fleming applied at Verizon. Accordingly, summary judgment on this issue is not appropriate.

3. Adverse Employment Action

Fleming contends that she suffered adverse employment action when Verizon denied her requests for lateral transfers, forced her to go on involuntary disability leave and eventually gave her a lesser position as special assistant when equal positions were available. Verizon contends that Fleming suffered no adverse employment action and that it reasonably accommodated her, first by placing her on light duty at CPCC and then by giving her a job as a special assistant in Manhattan. Verizon points out that an employee is not entitled to a positional upgrade as a reasonable accommodation. *29 C.F.R. § 1630.* However, there remain disputes of fact regarding, inter alia, what positions were available at various times, the qualifications required for those positions, and the way in which the [*53] positions were eventually assigned. Accordingly, this Court finds that summary judgment on the issue of adverse employment action is inappropriate.

Verizon also argues that Fleming's claims are defeated by the CBA. n6 Specifically, Verizon claims that it was obligated to follow the CBA through its implementing SPV process and that it is not unlawful discrimination for an employer to follow the seniority preferences dictated by an applicable CBA absent "special circumstances." *U.S. Airways, Inc. v. Barnett, 535 U.S. 391, 402-06, 122 S. Ct. 1516, 152 L. Ed. 2d 589 (2002).* Fleming contends she can show that this asserted non-discriminatory reason is pretextual by showing that (1) Verizon deviated from the strictures of the SPV system for other employees; and (2) Verizon accommodated her disability outside of the SPV process as soon as she filed her EEOC charge. Fleming's arguments raise a genuine issue of material fact requiring a trial and summary judgment on this issue is not appropriate.

n6 Verizon argues that the Labor Management Relations Act preempts this Court from in-

Case 3:01-cv-01913-DJS   Document 124-3   Filed 02/20/2007   Page 14 of 15

Page 13
2006 U.S. Dist. LEXIS 68632, *; 99 Fair Empl. Prac. Cas. (BNA) 53;
18 Am. Disabilities Cas. (BNA) 1065

terpreting the CBA. See, e.g., *Lingle v. Norge Div. of Magic Chef, Inc.,* 486 U.S. 399, 405-06, 108 S. Ct. 1877, 100 L. Ed. 2d 410 (1988). However, this argument is a non sequitor. Fleming contends that Verizon did not adhere to its own interpretation of the CBA in her case, and the issue for this Court is whether the alleged deviation was a result of unlawful discrimination. There is no need for this Court to offer an independent interpretation of the CBA.

[*54]

4. Statute of Limitations

Fleming's ADA claims are time barred in the same manner and to the same extent as her Title VII claims. See *42 U.S.C. § 2000e-5(e)(1); 42 U.S.C. § 12117(a).* Thus, Fleming's ADA claims for discrete acts are barred to the extent they occurred prior to August 16, 2001. See *Fleming,* 419 F. Supp. 2d 455, 2005 WL 3066040 at *8. Such claims include those arising out of Fleming's allegations regarding (1) her placement on light duty and her assignment to various indoor and clerical jobs; and (2) her participation in the HIP program. See *Fleming,* 419 F. Supp. 2d 455, 2005 WL 3066040 at *7 ("A discrete act occurs at one particular time -- for example, a retaliatory or discriminatory termination, failure to promote, denial of transfer or refusal to hire."); see also *AMTRAK v. Morgan,* 536 U.S. 101, 114-16, 122 S. Ct. 2061, 153 L. Ed. 2d 106 (2002).

B. HRL and NYCHRL Claims

1. HRL and NYCHRL Disability Claims Parallel the ADA Analysis

In general, disability claims under the HRL and NYCHRL are subject to the same analytical framework as claims under the ADA. *Parker v. Columbia Pictures Indus.,* 204 F.3d 326, 332 n.1 (2d Cir. 2000) [*55] (HRL); *Mohamed v. Marriott Int'l Inc.,* 905 F. Supp. 141, 156-57 (S.D.N.Y. 1995) (NYCHRL). The sole exception appears to be the more expansive definition of "disability" in the HRL and NYCHRL. See, e.g., *Giordano v. City of New York,* 274 F.3d 740, 754 (2d Cir. 2001) (noting the discrete, and more expansive, definitions of "disability" under the HRL and NYCHRL). Accordingly, for the same reasons discussed in the context of the merits of Fleming's ADA claims, summary judgment on her HRL and NYCHRL disability claims is not appropriate.

2. Statute of Limitations

As discussed above, the statutes of limitations under the HRL and NYCHRL are more relaxed than those governing Title VII and the ADA. Accordingly, all of Fleming's disability-related claims are timely under the HRL and NYCHRL. These include Fleming's claims that (1) the 90-day window she was given for the HIP process was unreasonable given the then-prevailing hiring freeze; and (2) she was denied an "interactive process" with Verizon to find a reasonable accommodation for her disability, both of which are time barred under the ADA.

V. Retaliation Claims

Fleming brings claims for [*56] retaliation under the ADA, HRL and NYCHRL. The ADA makes it unlawful for an employer to "discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter." *42 U.S.C. § 12203(a).* See also *Treglia v. Town of Manlius,* 313 F.3d 713, 719 (2d Cir. 2002). The HRL and NYCHRL contain similar provisions against retaliation and are governed in this respect by the same standards as the ADA. See *N.Y. Exec. Law. § 296(7); Weissman v. Dawn Joy Fashions, Inc.,* 214 F.3d 224, 234 (2d Cir. 2000). In order to establish a prima facie case of retaliation, a plaintiff must show that: (1) she engaged in an activity protected by the ADA; (2) the employer was aware of this activity; (3) the employer took adverse employment action against the plaintiff; and (4) a causal connection exists between the alleged adverse action and the protected activity. *Treglia,* 313 F.3d at 719.

In order to state a retaliation claim, Fleming [*57] would have to allege either that (1) she complained to her supervisors or their superiors at Verizon about unlawfully discriminatory practices; or (2) filed an EEOC charge against Verizon. See *42 U.S.C. § 12203(a); Treglia,* 313 F.3d at 719. However, there is no record evidence that Fleming complained of discrimination to anyone at Verizon, whether in-person or via the company's toll-free hotline. Moreover, as this Court has already noted, "Plaintiff does not allege that Verizon retaliated against her for filing the EEOC [c]harge. Quite the contrary, Plaintiff alleges that Verizon rehired her after she filed the charge." *Fleming,* 419 F. Supp. 2d 455, 2005 WL 3066040 at *5. Indeed, the EEOC charge itself -- filed on June 12, 2002 -- did not contain any allegations of retaliation. *Fleming,* 419 F. Supp. 2d 455, 2005 WL 3066040 at *5. Accordingly, Fleming has failed to establish a genuine issue of material fact in respect of her retaliation claims, and summary judgment on those claims is appropriate.

CONCLUSION

For the foregoing reasons, Verizon's motion for summary judgment is granted in part and denied in part. Specifically, Verizon's motion [*58] is granted with respect to all of Fleming's Title VII claims except her

Case 3:01-cv-01913-DJS   Document 124-3   Filed 02/20/2007   Page 15 of 15

Page 14

2006 U.S. Dist. LEXIS 68632, *; 99 Fair Empl. Prac. Cas. (BNA) 53;
18 Am. Disabilities Cas. (BNA) 1065

claim of a gender-based failure to accommodate arising out of her placement on involuntary disability leave on November 14, 2001. Verizon's motion is also granted with respect to Fleming's HRL and NYCHRL claims alleging (1) discriminatory work assignments; (2) severe scrutiny and a hostile work environment; and (3) race- and gender-based discrimination and failure to accommodate based on the denial of Fleming's escort position on May 2, 2002 and Fleming's participation in the HIP or SPV programs more generally. Verizon's motion is also granted with respect to Fleming's ADA claims to the extent based on discrete acts that occurred prior to August 16, 2001, including (1) Fleming's placement on light duty on October 16, 2000 and her assignment to various indoor and clerical jobs; and (2) her participation in the HIP program. Finally, Verizon's motion is granted with respect to Fleming's retaliation claims under the ADA, HRL and NYCHRL.

Verizon's motion for summary judgment is denied with respect to Fleming's Title VII claim for a gender-based failure to accommodate arising out of her placement on involuntary disability [*59] leave on November 14, 2001. Verizon's motion is also denied with respect to Fleming's HRL and NYCHRL claims for (1) race- and gender-based discrimination based on Verizon's allegedly discriminatory training practices; (2) gender-based discrimination and failure to accommodate based on Fleming's involuntary placement on disability leave on November 14, 2001; and (3) Fleming's disability-based claims. Finally, Verizon's motion is denied with respect to Fleming's ADA claims to the extent they are based on Fleming's involuntary placement on disability leave on November 14, 2001 and her involvement in the SPV process.

Dated: September 22, 2006

   New York, New York

   SO ORDERED:

   WILLIAM H. PAULEY III

   U.S.D.J.